DAVID M. POITRAS P.C. (State Bar No. 141309)
DAN P. SEDOR (State Bar No. 139091)
THOMAS M. GEHER (State Bar No. 130588)
JEFFER, MANGELS, BUTLER & MARMARO LLP
1900 Avenue of the Stars, Seventh Floor
Los Angeles, California  90067-4308
Telephone:      (310) 203-8080
Facsimile:      (310) 203-0567
Email:          dpoitras@jmbm.com

Counsel for Bradley D. Sharp, Chapter 11 Trustee
for Namco Capital Group, Inc.

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA
LOS ANGELES DIVISION

| | |
|---|---|
| In re<br><br>NAMCO CAPITAL GROUP, INC.,<br>a California corporation,<br><br>          Debtor. | Case No.:  2:08-BK-32333-BR<br><br>Chapter 11<br><br><br>Adversary No.:  2:10-AP-01244-BR |
| KAMRAN PASADENA GROUP, INC., a California corporation and KAMRAN GROUP, LLC, a California limited liability company,<br><br>          Plaintiffs,<br><br>vs.<br><br>BRADLEY D. SHARP, CHAPTER 11 TRUSTEE OF NAMCO CAPITAL GROUP INC., a California corporation; WOODMAN PARTNERS, LLC, a California limited liability company; FIDELITY NATIONAL TITLE COMPANY, a California corporation; DANIEL JACOB ISSAC, an individual; FAY FRANAK SARAFIAN, an individual; DARIOUSH SOLEIMANI, an individual; MORTEZA HOMAYOUNJAM, an individual; MEHRNAZ HEKMATRAVAN, an individual; JAMSHID BAHARVAR, an individual; ASHLAND PROPERTIES, LLC, a California limited liability company; FARMCO TRUST, SAWTELLE PROPERTIES, LLC, a California limited liability company; MAHMOUD FATORECHI AND SOUSSAN HASHEMI AS TRUSTEE FOR THE FATORECHI-HASHEMI TRUST; and DOES 1 THROUGH 100,<br><br>          Defendant(s). | **EVIDENTIARY OBJECTIONS OF DEFENDANT BRADLEY D. SHARP, CHAPTER 11 TRUSTEE OF NAMCO CAPITAL GROUP, INC., TO DECLARATIONS OF ALI AKBAR HELMI AND DAVID GOLKAR**<br><br>Trial Date:  April 27, 2011<br>Time:  10:00 a.m.<br>Place:  Courtroom 1668<br>255 E. Temple Street<br>Los Angeles, CA 90012 |

PRINTED ON

RECYCLED PAPER

7642291v1

EVIDENTIARY OBJECTIONS

Bradley D. Sharp, the duly appointed, qualified and acting chapter 11 trustee (the "Trustee" and "Defendant") of Namco Capital Group, Inc. ("Namco") hereby submits the following Evidentiary Objections to the Declarations of Ali Akbar Helmi (the "Helmi Declaration") and David Golkar (the "Golkar Declaration"). Copies of the Helmi and Golkar Declarations are attached hereto as Exhibits 1 and 2, respectively.

## I.   INTRODUCTION AND SUMMARY OF OBJECTIONS

The Helmi and Golkar Declarations are fraught with unreliable, misleading, and unsupported statements, and with legal opinions and conclusions that constitute improper argument instead of the proper presentation of admissible evidence. Helmi claims to know the terms and performance of an alleged agreement between Golkar and Ezri Namvar ("Namvar"), but fails specifically to explain how he knows them or how he came to acquire his purported knowledge about them, their businesses, their business dealings with each other. Much of Golkar's Declaration likewise lacks proper foundation, and is irrelevant, speculative and conclusory argument characterizing the purported legal nature of the parties' relationship.

The Trustee has articulated his specific objections to the Helmi and Golkar Declarations in Part II below, and requests that the Court sustain those specific objections and strike the purported evidence to which they refer.

## II.   SPECIFIC EVIDENTIARY OBJECTIONS TO THE HELMI DECLARATION

1.      Page 2, Paragraph 1: "I have personal knowledge of both David Golkar and Ezir [sic] Namvar."

OBJECTION: **Lack of foundation (FRE 602).**

2.      Page 2, Paragraph 2: "Mr. Golkar is an individual with expertise in the area of real estate development. Mr. Golkar owned and operated Kamran Group, LIC and Kamran Pasadena Group, Inc. (collectively, the 'Kamran Entities'). Mr. Namvar's expertise was in finance. Mr. Namvar owned and operated Namco Capital Group, Inc. as well as other entities."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602).**

3.      Page 2, Paragraph 3: "I introduced David Golkar to Ezri Namvar."

OBJECTION: **Irrelevant (FRE 401, 402) ; lack of foundation (FRE 602).**

PRINTED ON
RECYCLED PAPER

4.     Page 2, Paragraph 4: "Having introduced the two, I was aware of the fact that their intention was to enter into a joint venture relationship, that they in fact entered into a joint venture relationship, and that pursuant thereto Mr. Golkar and Mr. Namvar, through their respective entities, were going to develop a mixed-use commercial/residential property with hotel, residential, and retail space (hereinafter referred to as the 'Project')."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

5.     "I was also aware of the fact that advances of funds by Namco Capital Group, Inc. ('Namco') to either of the Kamran Entities, directly, to owners of the real property comprising the Project, or to third parties providing services for the development of the Project, were for the acquisition of the real property comprising the Project and the development thereof in furtherance of Mr. Namvar's capital contribution obligations to the joint venture and not pursuant to any purported loans from Name to the Kamran Entities, respectively."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

III.   **SPECIFIC EVIDENTIARY OBJECTIONS TO THE GOLKAR DECLARATION.**

1.     Page 2, Paragraph 2: "The Trustee is making several assumptions which are inaccurate, including:

- That Namco loaned Kamran monies as set forth in certain promissory notes;
- That any monies tendered by Namco to Kamran were categorized as debt versus equity or these monies were advanced to further the joint venture relationship between Namco and Kamran;
- That Kamran was obligated to tender interest and principal payments pursuant to promissory notes;
- That Kamran failed to tender interest and/or principal payments for promissory notes; and
- As a result, Namco has the right to foreclose on the real property which secures the promissory notes.

PRINTED ON
RECYCLED PAPER

7642291v1

- 2 -     EVIDENTIARY OBJECTIONS

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

2.    Page 2, heading line 25: **"No Consideration Was Given by Namco/Namvar for Promissory Notes:"**

OBJECTION: **Lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

3.    Pages 2-3, Paragraph 3: "These assumptions are false. As set forth below, Kamran had an ongoing joint venture relationship for the creation of the Pasadena project. Namco never provided any monies pursuant to the terms of the promissory notes. The monies the Trustee argues constitute "consideration" were paid by Namco for the acquisition of the real properties, not for consideration for promissory notes."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

4.    Page 3, Paragraph 4: "I also understand that the Trustee contends that the relationship between Namco and the Kamran Entities, respectively, was that of lender-debtor (as a bank to a borrower). **That, too, is false.** Ezri Namvar and his Namco entity were a joint venture partner with me in the Pasadena project. As more particularly detailed below, monies advanced by Namco to the Kamran Entities was in furtherance of Ezri Namvar's ('Namvar') obligation, as a joint venture partner with me. The advances were made as equity in the joint venture and for the acquisition and development of certain real property comprising the Project. The funds tendered by Namco were contributions of equity to the joint venture on behalf of Namvar, not loan proceeds paid to the Kamran Entities pursuant to promissory notes. It is important how the Court categorizes any monies transferred through any Kamran entity is important (i.e. debt vs. equity). The Trustee is arguing that Namco was a lender, not my partner. This is not correct."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

5.    Page 3, Paragraph 5: "Though the scope of the facts set forth below goes a little bit beyond the specific issue of consideration, these facts are necessary to show the Court for what

purpose, and on what basis, monies were tendered by Namco. The bottom line is that all monies advanced by Namvar, including all funds from Namco, were advanced in furtherance of Namvar's obligation to contribute capital to fund the operations of the joint venture relationship, and not as consideration for any promissory notes. The conduct of the parties as articulated herein will make it clear that all financial activity on the part of Namco was in furtherance of Namvar's obligation to commit capital contributions to the joint venture with me."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

6.    Pages 3-4, Paragraph 6: "I was introduced to Namvar by Ali Akbar 'Alex' Helmi, a mutual friend of Namvar and mine. Mr. Namvar was introduced as a potential source of short-term financing for the development of a large tract of land (approximately 1,600 acres into several thousand residential lots) in Beaumont, California. Namvar was impressed with my development expertise and urged me to consider forming a joint venture relationship with him to develop other properties. Namvar and I solidified our intention to develop other properties and we created joint venture relationships for that purpose. At all times mentioned herein I operated through the Kamran Entities and Namvar operated through Namco and related entities."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704); inadmissible hearsay (FRE 801).**

7.    Page 4, Paragraph 7: "Namvar and I agreed that the joint venture for the Pasadena Project would be owned 50%-50%. I would contribute my development, engineering, and architectural expertise and 10% of the capital and Namvar would contribute his finance expertise and 90% of the capital. Our contributions were characterized as equity and credited toward our respective capital accounts. The value of my contribution of development, engineering, and architectural expertise was also credited to me as capital. The profits would be split 50-50 after Namvar and I were reimbursed for our respective financial contributions to the joint venture. At all times during the course of our relationship, the advances from Namco were treated as contributions of equity to the joint venture relationship on behalf of Namvar."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704); inadmissible hearsay (FRE 801).**

8.   Page 4, heading line 14: **"Decision to Enter Into Joint Venture on the Pasadena Project:"**

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

9.   Page 4, Paragraph 8: "Thus, Namvar and I, by and through our respective entities, agreed to pursue the purchase of 233 N. Fair Oaks and the PAC Parcel."

OBJECTION: **Lack of foundation (FRE 602).**

10.   Pages 4-5, Paragraph 9: "Our intentions with respect to the joint venture relationship were memorialized in a Memorandum of Understanding. I prepared the Memorandum of Understanding. The Memorandum of Understanding is identified on Plaintiffs' Exhibit List attached to and made part of the Joint Pretrial Order as Exhibit 1. A true and correct copy of the Memorandum of Understanding is attached hereto and is incorporated herein by reference. The Memorandum of Understanding memorialized key terms of the joint venture agreement between Namvar and I, including, but not limited to: (1) that our joint venture would be owned 50%-50%, with me contributing my development, engineering, and architectural expertise and 10% of the capital, and Namvar contributing his finance expertise and 90% of the capital; and (2) that profits were to be split pursuant to the parties' 50-50 percentage ownership interest after a return of the parties' invested capital. (See the Memorandum of Understanding.) It was my role to manage the Project and to assemble the real property that was to comprise the Project, which included 233 N. Fair Oaks, the PAC Parcel, and any other property deemed necessary to complete the development of the Project. (See the Memorandum of Understanding.)."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704); inadmissible hearsay (FRE 801); best evidence rule (FRE 1004).**

PRINTED ON
RECYCLED PAPER

7642291v1

11.   Page 5, heading lines 12-13: **"Joint Venture Entity 'Walnut Holding, LLC' Was Never Finalized/Formed Because of Namvar/Namco's Legal Problems and Complexity of Joint Venture:"**

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

12.   Pages 5-6, Paragraph 10: "Namvar (through Namco) and I agreed to form a new entity, Walnut Land Holding, LLC, that would ultimately hold title to 233 N. Fair Oaks and 25 West Walnut (which included the PAC Parcel and additional residential condominiums located at 25 West Walnut Ave.). Since the entity was not formed at the time the 233 N. Fair Oaks sale closed, Namvar requested that I use the entity, Tranmar Properties, LLC, whose managing member was Namvar, to take title thereto. I understand that Namvar has stated that he needed to use Tranmar Properties, LLC for 1031 exchange purposes. Our joint venture was very complex to own, develop, and operate. The value of the Project was two hundred million dollars ($200,000,000.00). We had attorneys forming and ironing out the details for our new joint venture entity, including complex tax, ownership, and operating issues related to the following facets of the Pasadena Project:

- Starwood's hotel 'W' (which we had a signed LOI for this project);
- A spa on the project;
- Retail stores;
- Nightclub;
- A Spago Restaurant; and
- Residential Condominiums."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

13.   Page 6, Paragraph 11: "The project was a huge undertaking that could not be slapped together. As a result, we could not complete the creation of the joint venture entity Walnut Land Holding, LLC prior to Namvar/Namco's legal problems (including this Chapter 11 proceeding). Regardless of the fact that Walnut Land Holding, LLC was not finalized or formed in

time to be utilized by the parties in the joint venture, Namvar and I continued to operate with our joint venture for the Pasadena project, including the acquisition, entitlements, and developing of this Pasadena project."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

14.    Page 6, heading line 8:  " **Acquisition of Real Properties for Joint Venture:"**

OBJECTION: **Improper opinion/legal conclusion (FRE 701, 702, 704).**

15.    In furtherance of the Project, Namvar, through his entity Tranmar Properties, LLC, acquired the 233 N. Fair Oaks site and I, through Kamran Group, LLC, acquired the PAC Parcel, condominiums also located on the 25 West Walnut property, and an affordable housing site.  The N. 233 Fair Oaks property was purchased on or about August 12, 2005, for $4,300,000.00.  Kamran Group, LLC tendered $1,250,000 and Namco tendered $3,050,000 for the purchase of 233 N. Fair Oaks.  The 233 N. Fair Oaks transaction closed on December 12, 2005.

OBJECTION: **Irrelevant (FRE 401, 402).**

16.    Page 6, Paragraph 13 (in part):  "The Pasadena Athletic Club was a three story athletic club with four condominiums on the fourth floor.  John Richards, the owner and president of Pasadena Athletic Club offered me the opportunity to purchase his parcel and include it with the Project.  Richards informed me that the Pasadena Athletic Club had over 3,500 members and he wanted to close the property transaction after approximately one year to enable him to give notification to the Club's members and ease the transition.  Namvar and I agreed to this extended escrow period.  Kamran Group, LLC deposited $500,000 in February 2006 and released another $500,000 for the purchase in June 2006."

OBJECTION: **Irrelevant (FRE 401, 402).**

17.    Pages 6-7, Paragraph 14 (in part):  "In addition to the PAC Parcel, there were four residential units owned by other individuals at 25 West Walnut, namely Units #402, #405, #501, and #504.  The purchase prices for these individual units was as follows:

[¶]

c.    ... At closing, Kamran Group, LLC deposited an additional $630,000 to escrow.

d.    Condominium unit No. 402 at 25 West Walnut, Pasadena was purchased for approximately $648,600.  Escrow opened on October 19, 2006 and Namco deposited $125,000 in escrow.  The parties agreed that this unit would be exchanged and replaced with a new unit after the completion of the Project.  Chris Holden, the person from whom Unit No. 402 was purchased, was carrying a mortgage of about $127,000 at that time and Kamran Group, LLC paid the mortgage thereafter.  Later, on November 21, 2008, Kamran Group, LLC paid an additional $57,194 to Chris Holden for an extension of escrow.  Upon information and belief, Chris Holden currently owns about 2% of this property."

OBJECTION: **Irrelevant (FRE 401, 402).**

18.    Pages 7-8, Paragraph 16 (in part): "In furtherance of Namvar's obligations to the joint venture, Namvar through Namco, made payment of the following approximate amounts in furtherance of Namvar's joint venture with me for the development of the Project on the following dates:"

OBJECTION: **Improper opinion/legal conclusion (FRE 701, 702, 704).**

19.    Page 8, Paragraph 17: "All of the foregoing purchase and development activities were performed outside the context of any Promissory Notes.  Rather, all funds expended by Namco were in furtherance of Namvar's obligation to the joint venture to contribute 90% of the capital necessary, as equity therein, to fund the development of the Project."

OBJECTION: **Lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

20.    Page 8, Paragraph 18: "After I complied with the joint venture terms, conditions, and obligations, the Kamran Entities needed cash to continue to develop the Project as well as other projects.  The total acquisition price for the real properties included in the Project was $19,226,215 with $648,000 not yet closed for one outstanding condominium (Unit #402).  I, through the Kamran Entities, had already contributed over $8,300,000 rather than the $1,922,621.50 I was obligated to

provide (as 10% of the capital needed to fund the Project) under the terms of the joint venture agreement."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

21.   Pages 8, Paragraph 19 (in part): "Rather than obtain financing from other investors or financial institutions secured by the Kamran Entities' ownership interests in the 25 West Walnut and Marengo properties,"

OBJECTION: **Irrelevant (FRE 401, 402).**

22.   Page 9, Paragraph 20: "However, despite executing such Promissory Notes and Deeds of Trust, the Kamran Entities did not receive any of the funds required of Namco to be provided pursuant to and under the Promissory Notes. Moreover, Namco recognized and stated to me, as agent for the Kamran Entities, that no payments and/or interest would be due until the funds contemplated by the Promissory Notes were tendered to the Kamran Entities, respectively. Such tender of monies pursuant to the Promissory Notes never took place. A quick review of the operative dates when Namco purchased the properties and paid third parties for services rendered in the development of the Project as compared to the dates of the Promissory Notes shows that such funds could not have been pursuant to the Promissory Notes."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704); inadmissible hearsay (FRE 801).**

23.   Pages 9-10, Paragraph 21: "Although the Kamran Entities executed Promissory Notes in favor of Namco, Plaintiffs never received the consideration contemplated for such Promissory Notes, i.e., the money called for under the Promissory Notes to be tendered to the Kamran Entities. Because the Kamran Entities never received the money promised under the Promissory Notes, the Kamran Entities, respectively, never made any interest or principal payments on any of the Promissory Notes. Since no monies were tendered to the Kamran Entities under the Promissory Notes, Namco never sent demands for principal or interest payments or a notice of default. Notices of Default were issued only after the Trustee was appointed and made a wrongful assumption that the consideration contemplated by the Notes, i.e., the funds to be tendered pursuant

PRINTED ON
RECYCLED PAPER

7642291v1

- 9 -   EVIDENTIARY OBJECTIONS

thereto, had been tendered."

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation and lack of personal knowledge (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

24. Page 10, heading line 2: " **Failure to Give Consideration Resulted in Kamran Getting Sued:"**

OBJECTION: **Irrelevant (FRE 401, 402); lack of foundation (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704).**

25. Pages 10-11, Paragraph 22: "Kamran Group, LLC was sued in multiple lawsuits by contractors and vendors. The Complaints filed in certain lawsuits are identified as Plaintiffs' Exhibits 14, 15, 16 and 17 in the Joint Pretrial Order on file with the Court, and they are attached hereto and incorporated herein by reference. These suits were directly related to Namvar/Namco's inability to tender consideration for the promissory notes and fund the Pasadena project. If the Kamran Entities had received the money the Trustee is claiming it received from the promissory notes, these suits would not have occurred. Unfortunately, Namvar/Namco did not tender consideration for the promissory notes and ultimately did not fund the Pasadena project. As a result, the Kamran Entities directly paid millions of dollars to vendors and contractors in furtherance of the development of the Project, as well as defending the above referenced lawsuits. The Court can see that Namco/Namvar was directly in touch with these vendors and/or with me in connection with the entitlement and contract work on the Pasadena project. If Namco was simply a lender, why would they be involved with third parties or entitlement providers? The answer is simple. They would not. If the Kamran Entities had actually received millions in exchange for promissory notes (as argued by the Trustee), the Kamran Entities would have paid the entitlement professionals and continued to develop the project and avoided these lawsuits that were created by the failure of Namvar/Namco to tender consideration for promissory notes."

OBJECTION:  **Irrelevant (FRE 401, 402); lack of foundation and lack of personal knowledge (FRE 602); improper opinion/legal conclusion (FRE 701, 702, 704); best evidence rule (FRE 1004).**

Respectfully submitted,

Dated: March 9, 2011          JEFFER MANGELS BUTLER & MITCHELL LLP


By: */s/ David M. Poitras*
_____
DAVID M. POITRAS P.C.
Attorneys for Defendant, Bradley D. Sharp, Chapter 11
Trustee for Namco Capital Group Inc.

7642291v1

- 11 -    EVIDENTIARY OBJECTIONS

PRINTED ON
RECYCLED PAPER

# EXHIBIT 1

Matthew Clarke (SBN 184959)
Matt@christmankelley.com
Dugan P. Kelley (SBN 207347)
Dugan@christmankelley.com
CHRISTMAN, KELLEY & CLARKE
831 State Street
Santa Barbara, California 93101
Telephone:     (805) 884-9922
Facsimile:     (866) 611-9852

Attorneys for Plaintiffs
Kamran Pasadena Group, Inc. and Kamran Group, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| In Re: NAMCO CAPITAL GROUP INC, a California corporation<br><br>Debtor. | Case No.: 2:08-bk-32333-BR<br>Chapter 11<br>Adv. No.: 2:10-ap-01244-BR<br><br>**DECLARATION OF ALI AKBAR HELMI** |
| KAMRAN PASADENA GROUP, INC., a California corporation; and KAMRAN GROUP, LLC, a California limited liability company<br><br>Plaintiffs,<br><br>v.<br><br>BRADLEY D. SHARP, CHAPTER 11 TRUSTEE OF NAMCO CAPITAL GROUP INC, a California corporation; WOODMAN PARTNERS, LLC, a California limited liability company; FIDELITY NATIONAL TITLE COMPANY, a California corporation DANIEL JACOB ISSAC, an individual; FAY FRANAK SARAFIAN, an individual; DARIOUSH SOLEIMANI, an individual; MORTEZA HOMAYOUNJAM, an individual; MEHRNAZ HEKMATRAVAN, an individual; JAMSHID BAHARVAR; an individual; ASHLAND PROPERTIES, LLC, A California limited liability company; FARMCO TRUST, SAWTELLE PROPERTIES, LLC; a California limited liability company; MAHMOUD FATORECHI AND SOUSSAN HASHEMI AS TRUSTEES FOR THE FATORECHI-HASHEMI TRUST; and DOES 1 THROUGH 100<br><br>Defendants. | |

1

DECLARATION OF ALI AKBAR HELMI

EXHIBIT "1"-12

## DECLARATION OF ALI AKBAR HELMI

I, Ali Akbar "Alex" Helmi, do declare and say:

1.    I have personal knowledge of both David Golkar and Ezir Namvar. I make this declaration based upon my own personal knowledge. I could and would competently testify to these facts in a court of law.

2.    Mr. Golkar is an individual with expertise in the area of real estate development. Mr. Golkar owned and operated Kamran Group, LLC and Kamran Pasadena Group, Inc. (collectively, the "Kamran Entities"). Mr. Namvar's expertise was in finance. Mr. Namvar owned and operated Namco Capital Group, Inc. as well as other entities.

3.    I introduced David Golkar to Ezri Namvar.

4.    Having introduced the two, I was aware of the fact that their intention was to enter into a joint venture relationship, that they in fact entered into a joint venture relationship, and that pursuant thereto Mr. Golkar and Mr. Namvar, through their respective entities, were going to develop a mixed-use commercial/residential property with hotel, residential, and retail space (hereinafter referred to as the "Project")

5.    I was also aware of the fact that advances of funds by Namco Capital Group, Inc. ("Namco") to either of the Kamran Entities, directly, to owners of the real property comprising the Project, or to third parties providing services for the development of the Project, were for the acquisition of the real property comprising the Project and the development thereof in furtherance of Mr. Namvar's capital contribution obligations to the joint venture and not pursuant to any purported loans from Namco to the Kamran Entities, respectively.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _____ day of February, 2011 at Los Angeles, California.

_____
Ali Akbar Helmi

2
DECLARATION OF ALI AKBAR HELMI

EXHIBIT "1"-13

| In re: NAMCO CAPITAL GROUP, INC.<br><br>Debtor(s). | CHAPTER 11<br>CASE NUMBER: 2:08-bk-32333-BR<br>ADVERSARY PROC. NO.: 2:10-ap-01244-BR |
| --- | --- |

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

## PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 831 State Street, Santa Barbara, California 93101. A true and correct copy of the foregoing document described **DECLARATION OF ALI AKBAR HELMI** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I. TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐ Service information continued on attached page

**II. SERVED BY U.S. MAIL OR OVERNIGHT MAIL** (indicate method for each person or entity served):

On **February 23, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

**III. SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL.** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 23, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 2/23/11 | Kathy Koester | _Kathy Koester_ |
| --- | --- | --- |
| Date | Type Name | Signature |

## II.    SERVED BY U.S. MAIL OR OVERNIGHT MAIL

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009
09019.003 - 163624.1

**F 9013-3.1**

EXHIBIT "1"-14

| In re: NAMCO CAPITAL GROUP, INC. | CHAPTER 11 |
|---|---|
| Debtor(s). | CASE NUMBER: 2:08-bk-32333-BR<br>ADVERSARY PROC. NO.: 2:10-ap-01244-BR |

United States Trustee (LA)
725 S Figueroa St # 2600
Los Angeles, CA 90017-5413

Sawtelle Properties LLC
Weissmann Wolff, et al
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

Soussan Hashemi
Weissmann Wolff, et al
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

John M. Rygh
915 Wilshire Blvd, Suite 2100
Los Angeles, CA 90017

Ashland Properties, LLC
Weissmann Wolff, et al
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

Mahmoud Fatorechi
Weissmann Wolff, et al
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

Morteza Homayounjam
Weissmann Wolff, et al
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

Saul Reiss
Law Offices of Saul Reiss, P.C.
2800 28th St Ste 328
Santa Monica, CA 90405

III.    SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL:

SERVED BY E-MAIL:

- David M. Poitras        dpoitras@jmbm.com
- Robyn B. Sokol         rsokol@ebg-law.com; ecf@ebg-law.com
- Joseph A. Eisenberg    jeisenberg@jmbm.com
- Gregory M. Salvato     gsalvato@salvatolawoffices.com; gsalvato@pmcos.com
- Saul Reiss             saulreiss@verizon.net

SERVED BY PERSONAL DELIVERY:

Honorable Barry Russell
United States Bankruptcy Court – Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009                                                                F 9013-3.1
09019.003 - 163624.1                                          EXHIBIT "1" -15

# EXHIBIT 2

Matthew Clarke (SBN 184959)
Matt@christmankelley.com
Dugan P. Kelley (SBN 207347)
Dugan@christmankelley.com
CHRISTMAN, KELLEY & CLARKE
831 State Street
Santa Barbara, California 93101
Telephone:    (805) 884-9922
Facsimile:    (866) 611-9852

Attorneys for Plaintiffs
Kamran Pasadena Group, Inc. and Kamran Group, LLC

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

| | |
|---|---|
| In Re:  NAMCO CAPITAL GROUP INC, a California corporation<br><br>Debtor. | Case No.: 2:08-bk-32333-BR<br>Chapter 11<br>Adv. No.: 2:10-ap-01244-BR<br><br>**DECLARATION OF DAVID GOLKAR** |
| KAMRAN PASADENA GROUP, INC., a California corporation; and KAMRAN GROUP, LLC, a California limited liability company<br><br>Plaintiffs,<br><br>v.<br><br>BRADLEY D. SHARP, CHAPTER 11 TRUSTEE OF NAMCO CAPITAL GROUP INC, a California corporation; WOODMAN PARTNERS, LLC, a California limited liability company; FIDELITY NATIONAL TITLE COMPANY, a California corporation DANIEL JACOB ISSAC, an individual; FAY FRANAK SARAFIAN, an individual; DARIOUSH SOLEIMANI, an individual; MORTEZA HOMAYOUNJAM, an individual; MEHRNAZ HEKMATRAVAN, an individual; JAMSHID BAHARVAR; an individual; ASHLAND PROPERTIES, LLC, A California limited liability company; FARMCO TRUST, SAWTELLE PROPERTIES, LLC; a California limited liability company; MAHMOUD FATORECHI AND SOUSSAN HASHEMI AS TRUSTEES FOR THE FATORECHI-HASHEMI TRUST; and DOES 1 THROUGH 100<br><br>Defendants. | |

EXHIBIT " 2" –16

1
DECLARATION OF DAVID GOLKAR

# DECLARATION OF DAVID GOLKAR

I, David Golkar, do declare and say:

1.      I am the sole member of Plaintiff, Kamran Group, LLC, a member-managed limited liability company, and the sole shareholder of Plaintiff, Kamran Pasadena Group, Inc. I make this declaration based upon my own personal knowledge. I could and would competently testify to these facts in a court of law.

**Limited Issue(s) of Lack of Consideration for Promissory Notes:**

2.      I understand that the Court has limited testimony at this phase of trial to the sole issue of whether consideration was provided for certain promissory notes executed by Kamran Group, LLC and/or Kamran Pasadena Group, Inc. (collectively, the "Kamran Entities" or "Kamran"), respectively, in favor of Namco Capital Group, Inc. ("Namco"). I understand the Chapter 11 Trustee for Namco, Bradley D. Sharp (the "Trustee"), has essentially stepped into the shoes of Namco and alleges that the Kamran Entities received consideration for certain promissory notes in favor of Namco. The Trustee is making several assumptions which are inaccurate, including:

- That Namco loaned Kamran monies as set forth in certain promissory notes;
- That any monies tendered by Namco to Kamran were categorized as debt versus equity or these monies were advanced to further the joint venture relationship between Namco and Kamran;
- That Kamran was obligated to tender interest and principal payments pursuant to promissory notes;
- That Kamran failed to tender interest and/or principal payments for promissory notes; and
- As a result, Namco has the right to foreclose on the real property which secures the promissory notes.

**No Consideration Was Given by Namco/Namvar for Promissory Notes:**

3.      These assumptions are false. As set forth below, Kamran had an ongoing joint venture relationship for the creation of the Pasadena project. Namco never provided any monies pursuant to the terms of the promissory notes. The monies the Trustee argues constitute

EXHIBIT  " 2" -17

2
DECLARATION OF DAVID GOLKAR

"consideration" were paid by Namco for the acquisition of the real properties, not for consideration for promissory notes.

4.      I also understand that the Trustee contends that the relationship between Namco and the Kamran Entities, respectively, was that of lender-debtor (as a bank to a borrower). **That, too, is false.** Ezri Namvar and his Namco entity were a joint venture partner with me in the Pasadena project. As more particularly detailed below, monies advanced by Namco to the Kamran Entities was in furtherance of Ezri Namvar's ("Namvar") obligation, as a joint venture partner with me., The advances were made as equity in the joint venture and for the acquisition and development of certain real property comprising the Project. The funds tendered by Namco were contributions of equity to the joint venture on behalf of Namvar, not loan proceeds paid to the Kamran Entities pursuant to promissory notes. It is important how the Court categorizes any monies transferred through any Kamran entity is important (i.e. debt vs. equity). The Trustee is arguing that Namco was a lender, not my partner. This is not correct.

5.      Though the scope of the facts set forth below goes a little bit beyond the specific issue of consideration, these facts are necessary to show the Court for what purpose, and on what basis, monies were tendered by Namco. The bottom line is that all monies advanced by Namvar, including all funds from Namco, were advanced in furtherance of Namvar's obligation to contribute capital to fund the operations of the joint venture relationship, and not as consideration for any promissory notes. The conduct of the parties as articulated herein will make it clear that all financial activity on the part of Namco was in furtherance of Namvar's obligation to commit capital contributions to the joint venture with me.

**My Introduction to Joint Venture Partner Ezri Namvar/Namco:**

6.      In or about late 2004, I met Mr. Ezri Namvar ("Namvar"), then president and, to the best of my knowledge, owner of Namco Capital Group, Inc. ("Namco"). I was introduced to Namvar by Ali Akbar "Alex" Helmi, a mutual friend of Namvar and mine. Mr. Namvar was introduced as a potential source of short-term financing for the development of a large tract of land (approximately 1,600 acres into several thousand residential lots) in Beaumont, California. Namvar was impressed with my development expertise and urged me to consider forming a joint venture

EXHIBIT " 2" -18

3

DECLARATION OF DAVID GOLKAR

relationship with him to develop other properties. Namvar and I solidified our intention to develop other properties and we created joint venture relationships for that purpose. At all times mentioned herein I operated through the Kamran Entities and Namvar operated through Namco and related entities.

7. Namvar and I agreed that the joint venture for the Pasadena Project would be owned 50%-50%. I would contribute my development, engineering, and architectural expertise and 10% of the capital and Namvar would contribute his finance expertise and 90% of the capital.. Our contributions were characterized as equity and credited toward our respective capital accounts. The value of my contribution of development, engineering, and architectural expertise was also credited to me as capital. The profits would be split 50-50 after Namvar and I were reimbursed for our respective financial contributions to the joint venture. At all times during the course of our relationship, the advances from Namco were treated as contributions of equity to the joint venture relationship on behalf of Namvar.

**Decision to Enter Into Joint Venture on the Pasadena Project:**

8. Throughout the remainder of 2004 and into 2005, Namvar and I (through our respective entities) looked for development ideas. In early August 2005, a real estate broker approached me with the opportunity to purchase 233 North Fair Oaks Avenue in Pasadena, California ("233 N. Fair Oaks"). This parcel was formerly used as a bank and abutted the Pasadena Athletic Club parcel located at 25 West Walnut Avenue, Unit # 503, Pasadena, California (the "PAC Parcel"). While I performed due diligence on 233 N. Fair Oaks, I was approached by the owner of the Pasadena Athletic Club, John Richards. Mr. Richards was interested in selling the PAC Parcel, the property upon which the Pasadena Athletic Club was located. Thus, Namvar and I, by and through our respective entities, agreed to pursue the purchase of 233 N. Fair Oaks and the PAC Parcel. We wanted to develop these properties into a mixed use commercial/residential property with a hotel, residential, and retail space (hereinafter referred to as the "Project").

9. Our intentions with respect to the joint venture relationship were memorialized in a Memorandum of Understanding. I prepared the Memorandum of Understanding. The Memorandum of Understanding is identified on Plaintiffs' Exhibit List attached to and made part of

EXHIBIT " 2 " -19

4

DECLARATION OF DAVID GOLKAR

the Joint Pretrial Order as Exhibit 1. A true and correct copy of the Memorandum of Understanding is attached hereto and is incorporated herein by reference. The Memorandum of Understanding memorialized key terms of the joint venture agreement between Namvar and I, including, but not limited to: (1) that our joint venture would be owned 50%-50%, with me contributing my development, engineering, and architectural expertise and 10% of the capital, and Namvar contributing his finance expertise and 90% of the capital; and (2) that profits were to be split pursuant to the parties' 50-50 percentage ownership interest after a return of the parties' invested capital. (*See* the Memorandum of Understanding.) It was my role to manage the Project and to assemble the real property that was to comprise the Project, which included 233 N. Fair Oaks, the PAC Parcel, and any other property deemed necessary to complete the development of the Project. (*See* the Memorandum of Understanding.)

**Joint Venture Entity "Walnut Holding, LLC" Was Never Finalized/Formed Because of Namvar/Namco's Legal Problems and Complexity of Joint Venture:**

10.    Namvar (through Namco) and I agreed to form a new entity, Walnut Land Holding, LLC, that would ultimately hold title to 233 N. Fair Oaks and 25 West Walnut (which included the PAC Parcel and additional residential condominiums located at 25 West Walnut Ave.). Since the entity was not formed at the time the 233 N. Fair Oaks sale closed, Namvar requested that I use the entity, Tranmar Properties, LLC, whose managing member was Namvar, to take title thereto. I understand that Namvar has stated that he needed to use Tranmar Properties, LLC for 1031 exchange purposes. Our joint venture was very complex to own, develop, and operate. The value of the Project was two hundred million dollars ($200,000,000.00). We had attorneys forming and ironing out the details for our new joint venture entity, including complex tax, ownership, and operating issues related to the following facets of the Pasadena Project:

- Starwood's hotel "W" (which we had a signed LOI for this project);
- A spa on the project;
- Retail stores;
- Nightclub;
- A Spago Restaurant; and

EXHIBIT " 2 " -20

5

DECLARATION OF DAVID GOLKAR

- Residential Condominiums.

11. The project was a huge undertaking that could not be slapped together. As a result, we could not complete the creation of the joint venture entity Walnut Land Holding, LLC prior to Namvar/Namco's legal problems (including this Chapter 11 proceeding). Regardless of the fact that Walnut Land Holding, LLC was not finalized or formed in time to be utilized by the parties in the joint vennture, Namvar and I continued to operate with our joint venture for the Pasadena project, including the acquisition, entitlements, and developing of this Pasadena project.

**Acquisition of Real Properties for Joint Venture:**

12. In furtherance of the Project, Namvar, through his entity Tranmar Properties, LLC, acquired the 233 N. Fair Oaks site and I, through Kamran Group, LLC, acquired the PAC Parcel, condominiums also located on the 25 West Walnut property, and an affordable housing site. The N. 233 Fair Oaks property was purchased on or about August 12, 2005, for $4,300,000.00. Kamran Group, LLC tendered $1,250,000 and Namco tendered $3,050,000 for the purchase of 233 N. Fair Oaks. The 233 N. Fair Oaks transaction closed on December 12, 2005.

13. The PAC Parcel was purchased for $7,650,000. The Pasadena Athletic Club was a three story athletic club with four condominiums on the fourth floor. John Richards, the owner and president of Pasadena Athletic Club offered me the opportunity to purchase his parcel and include it with the Project. Richards informed me that the Pasadena Athletic Club had over 3,500 members and he wanted to close the property transaction after approximately one year to enable him to give notification to the Club's members and ease the transition. Namvar and I agreed to this extended escrow period. Kamran Group, LLC deposited $250,000 in February 2006 and released another $500,000 for the purchase in June 2006. Namco paid $6,9000,000 towards the total purchase price. The transaction closed on June 23, 2007.

14. In addition to the PAC Parcel, there were four residential units owned by other individuals at 25 West Walnut, namely Units #402, #405, #501, and #504. The purchase prices for these individual units was as follows:

a. Condominium unit No. 405 at 25 West Walnut, Pasadena was purchased for approximately **$530,000**. Escrow opened on March 29, 2007 and Namco deposited $30,000

EXHIBIT " 2 " - 21

6

DECLARATION OF DAVID GOLKAR

to escrow. Escrow closed on April 30, 2007. At the closing, Namco deposited an additional $503,154 including closing cost.

b.      Condominium unit No. 504 at 25 West Walnut, Pasadena was purchased for approximately **$1,657,847**. Escrow opened on May 10, 2007 and Namco put a $300,000 deposit in escrow. Escrow closed on July 6, 2007. At closing, Namco deposited an additional $1,357,847 to escrow including the closing cost.

c.      Condominium unit No. 501 at 25 West Walnut, Pasadena was purchased for approximately **$780,000**. Escrow opened on February 27, 2007 and Namco deposited $150,000 in escrow. Escrow closed on July 3, 2007. At closing, Kamran Group, LLC deposited an additional $630,000 to escrow.

d.      Condominium unit No. 402 at 25 West Walnut, Pasadena was purchased for approximately **$648,600**. Escrow opened on October 19, 2006 and Namco deposited $125,000 in escrow. The parties agreed that this unit would be exchanged and replaced with a new unit after the completion of the Project. Chris Holden, the person from whom Unit No. 402 was purchased, was carrying a mortgage of about $127,000 at that time and Kamran Group, LLC paid the mortgage thereafter. Later, on November 21, 2008, Kamran Group, LLC paid an additional $57,194 to Chris Holden for an extension of escrow. Upon information and belief, Chris Holden currently owns about 2% of this property.

15.     During the course of procuring entitlements and negotiating with vendors for the new Project, Namvar and I looked into purchasing another parcel that would comply with the City's requirement that a part of the development include low income housing. In order to receive approval for the Project, 15% of the residential housing component needed to be allocated for low income housing. Such a property was found at 810-820 Marengo Avenue ("Marengo"), Pasadena, California for $3,600,000. Marengo had 18 units that satisfied the low income housing requirement and was located within one mile of 25 West Walnut. , Namco tendered payment of all funds for the purchase of the Marengo property, and the transaction closed on June 27, 2007.

16.     In furtherance of Namvar's obligations to the joint venture, Namvar through Namco, made payment of the following approximate amounts in furtherance of Namvar's joint venture with

EXHIBIT " 2" –22

7

DECLARATION OF DAVID GOLKAR

me for the development of the Project on the following dates:

    a.    $150,000 on March 5, 2007;

    b.    $30,000 on March 30, 2007;

    c.    $200,000 on April 25, 2007;

    d.    $503,154.60 on April 27, 2007;

    e.    $200,000 on May 16, 2007;

    f.    $3,205,000 on June 27, 2007;

    g.    $300,000 on June 19, 2007;

    h.    $1,350,000 on June 29, 2007; and

    i.    $6,900,000 on June 20, 2007.

17. All of the foregoing purchase and development activities were performed outside the context of any Promissory Notes. Rather, all funds expended by Namco were in furtherance of Namvar's obligation to the joint venture to contribute 90% of the capital necessary, as equity therein, to fund the development of the Project.

18. After I complied with the joint venture terms, conditions, and obligations, the Kamran Entities needed cash to continue to develop the Project as well as other projects. The total acquisition price for the real properties included in the Project was $19,226,215 with $648,000 not yet closed for one outstanding condominium (Unit #402). I, through the Kamran Entities, had already contributed over $8,300,000 rather than the $1,922,621.50 I was obligated to provide (as 10% of the capital needed to fund the Project) under the terms of the joint venture agreement.

19. Rather than obtain financing from other investors or financial institutions secured by the Kamran Entities' ownership interests in the 25 West Walnut and Marengo properties, the Kamran Entities agreed to allow Namco to provide them with $12,650,000 in exchange for Promissory Notes secured by these three pieces of real property as follows:

    a.    Kamran Pasadena Group, Inc. executed a promissory note in favor of Namco in the amount of $5,000,000 dated **June 29, 2007**, and $1,700,000 dated **September 11, 2008**, with an associated deed of trust related to 25 West Walnut, Unit #503 (Pasadena Athletic Club portion);

b.      Kamran Group, LLC executed a promissory note in the amount of $3,600,000 dated **June 29, 2007**, with an associated deed of trust related to the Marengo property.

c.      Kamran Group, LLC executed a promissory note in favor of Namco in the amount of $600,000 dated **September 10, 2007**, with an associated deed of trust related to 25 West Walnut, Unit #501 (Condo unit);

d.      Kamran Group, LLC executed a promissory note in favor of Namco in the amount of $1,300,000 dated **September 10, 2007**, with an associated deed of trust related to 25 West Walnut, Unit #504;

e.      Kamran Group, LLC executed a promissory note in favor of Namco in the amount of $450,000 dated **September 10, 2007**, with an associated deed of trust related to 25 West Walnut, Unit #405 (Condo unit); and

20.      However, despite executing such Promissory Notes and Deeds of Trust, the Kamran Entities did not receive any of the funds required of Namco to be provided pursuant to and under the Promissory Notes. Moreover, Namco recognized and stated to me, as agent for the Kamran Entities, that no payments and/or interest would be due until the funds contemplated by the Promissory Notes were tendered to the Kamran Entities, respectively. Such tender of monies pursuant to the Promissory Notes never took place. A quick review of the operative dates when Namco purchased the properties and paid third parties for services rendered in the development of the Project as compared to the dates of the Promissory Notes shows that such funds could not have been pursuant to the Promissory Notes.

21.      Although the Kamran Entities executed Promissory Notes in favor of Namco, Plaintiffs never received the consideration contemplated for such Promissory Notes, i.e., the money called for under the Promissory Notes to be tendered to the Kamran Entities. Because the Kamran Entities never received the money promised under the Promissory Notes, the Kamran Entities, respectively, never made any interest or principal payments on any of the Promissory Notes. Since no monies were tendered to the Kamran Entities under the Promissory Notes, Namco never sent demands for principal or interest payments or a notice of default. Notices of Default were issued only after the Trustee was appointed and made a wrongful assumption that the consideration

EXHIBIT " 2" - 24

9

DECLARATION OF DAVID GOLKAR

contemplated by the Notes, i.e., the funds to be tendered pursuant thereto, had been tendered.

**Failure to Give Consideration Resulted in Kamran Getting Sued:**

22.    Kamran Group, LLC was sued in multiple lawsuits by contractors and vendors. The Complaints filed in certain lawsuits are identified as Plaintiffs' Exhibits 14, 15, 16 and 17 in the Joint Pretrial Order on file with the Court, and they are attached hereto and incorporated herein by reference. These suits were directly related to Namvar/Namco's inability to tender consideration for the promissory notes and fund the Pasadena project. If the Kamran Entities had received the money the Trustee is claiming it received from the promissory notes, these suits would not have occurred. Unfortunately, Namvar/Namco did not tender consideration for the promissory notes and ultimately did not fund the Pasadena project. As a result, the Kamran Entities directly paid millions of dollars to vendors and contractors in furtherance of the development of the Project, as well as defending the above referenced lawsuits. The Court can see that Namco/Namvar was directly in touch with these vendors and/or with me in connection with the entitlement and contract work on the Pasadena project. If Namco was simply a lender, why would they be involved with third parties or

///

///

///

///

///

///

///

///

///

///

///

///

///

///

EXHIBIT " 2 " -25

10

DECLARATION OF DAVID GOLKAR

entitlement providers? The answer is simple. They would not. If the Kamran Entities had actually received millions in exchange for promissory notes (as argued by the Trustee), the Kamran Entities would have paid the entitlement professionals and continued to develop the project and avoided these lawsuits that were created by the failure of Namvar/Namco to tender consideration for promissory notes.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 23rd day of February, 2011 at Tehran/Iran.

David Golkar

11
DECLARATION OF DAVID GOLKAR                    EXHIBIT "2" - 26

# Exhibit 1

(Plaintiffs' Exhibit 1 in Joint Pretrial Order)

## MEMORANDUM OF UNDERSTANDING

This Memorandum of Understanding ("Memorandum"), is intended as an outline of the general terms which the undersigned find acceptable with respect to the development of a development project located in the City of Pasadena which we commonly refer to as the Pasadena Athletic Club Project ("Project"). We have agreed to develop the Project jointly through our respective resources and expertise. David Golkar ("Golkar") will contribute his development, engineering and architectural expertise (the value of which shall be attributed to capital) in developing the Project. Likewise, he will be the point person and manager for completing the assemblage of the real property consisting of the property commonly referred to as 233 N. Fair Oaks Blvd., 25 W. Walnut Street and other necessary property/companies to complete the development of a planned mixed use commercial land residential property. The parties agree that Ezri Namvar, through his affiliate companies, will be responsible for 90% of the capital necessary for the acquisition and development of the Project and Golkar shall be responsible for 10% of the capital. After a return of the parties' capital, the parties shall divide profits as they are commonly understood, equally (50-50).

The parties understand and agree that the Project will entail the acquisition of a number of parcels and/or holding companies and that the parties will at a subsequent date, form one or more legal entities to implement the Project to the advantage of the partners.


_____
David Golkar


_____
Ezri Namvar


EXHIBIT "2"-28

# Exhibit 2

(Plaintiffs' Exhibit 14 in Joint Pretrial Order)

CHRISTOPHER GONZALEZ, STATE BAR NO. 174455
PEREZ GONZALEZ, A PROFESSIONAL LAW CORP.
111 EAST BROADWAY, SUITE 210
GLENDALE, CALIFORNIA 91205
TELEPHONE NO. (818) 550-8300
FACSIMILE NO. (818) 956-1984

ATTORNEY FOR PLAINTIFF
THE TEECOR GROUP, INC.
      D/B/A KEY ENVIRONMENTAL SERVICES

**ORIGINAL FILED**

SEP 17 2008

LOS ANGELES
SUPERIOR COURT
NORTHEAST DISTRICT

LOS ANGELES SUPERIOR COURT

LOS ANGELES COUNTY, STANLEY MOSK (CENTRAL DISTRICT)

| | |
|---|---|
| THE TEECOR GROUP, INC., A CALIFORNIA CORPORATION D/B/A KEY ENVIRONMENTAL SERVICES, <br><br> PLAINTIFF, <br><br> VS. <br><br> KAMRAN PASADENA, INC., A CALIFORNIA CORPORATION, GREGORY McNICOL, AN INDIVIDUAL D/B/A FULLSCOPE, KAMRAN GROUP, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY AND DOES 1 TO 100, INCLUSIVE, <br><br> DEFENDANTS. | CASE NO. G c c 41526 <br><br> COMPLAINT FOR DAMAGES. <br><br> 1. BREACH OF WRITTEN CONTRACT <br> 2. BREACH OF ORAL CONTRACT <br> 3. QUANTUM MERUIT <br> 4. DECLARATORY RELIEF <br> 5. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING <br><br> [UNLIMITED CIVIL CASE; OVER $25,000] |

Plaintiff alleges:

1. Plaintiff, THE TEECOR GROUP, INC., A CALIFORNIA CORPORATION D/B/A KEY ENVIRONMENTAL SERVICES ("KEY") is, and at all times herein mentioned was, a general contractor duly licensed by the State of California, License No. 783159, authorized to do business in the state of California.

- 1 -
COMPLAINT FOR DAMAGES

PEREZ GONZALEZ

EXHIBIT "2"-30

2. At all times herein mentioned KEY was, a corporation organized and existing under the laws of California with its principal place of business in this state in Los Angeles County, California.

3. Plaintiff is informed and believes that Defendant GREGORY McNICOL ("McNICOL") is, and at all times herein mentioned was, an individual and resident of Los Angeles County, California going business as "FULLSCOPE."

4. Plaintiff is informed and believes and thereon alleges that defendant KAMRAN PASADENA, INC. ("KAMRAN PASADENA"), is and at all times herein mentioned was, a corporation organized and existing under the laws of California.

5. Plaintiff is informed and believes and thereon alleges that defendant KAMRAN GROUP, LLC ("KAMRAN GROUP"), is and at all times herein mentioned was, a limited liability company organized and existing under the laws of California.

6. Plaintiff is informed and believes and thereon alleges that at all times herein mentioned, Defendants KAMRAN PASADENA and/or KAMRAN GROUP are and/or were the owners or reputed owners of all the certain real property situated in Los Angeles County, California located at 25 W. Walnut Street, Pasadena commonly known as the Pasadena Athletic Club (the "Property").

7. At all times herein mentioned, each of the Defendants, and each of them, were the agent, servant and/or employee of each of the remaining defendants and, in doing the things herein mentioned, was acting within the scope of such agency and employment and was responsible for the acts, errors, and/or omissions of each of the remaining defendants, and each

PEREZ GONZALEZ

EXHIBIT "2"-31

defendant proximately caused the damages sustained by Plaintiff herein.

8. The true names and capacities of Does 1 through 100, Inclusive, and each of them, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs will amend this complaint to allege their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that each of the fictitiously named Defendants is responsible in some manner for the occurrences herein alleged and that Plaintiffs' damages as herein alleged were proximately caused by those Defendants.

9. All of the obligations alleged herein were to be performed in the City of Pasadena, County of Los Angeles, State of California.

### GENERAL ALLEGATIONS

10. Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1-9 above, as though fully set forth.

11. On or about July 27, 2007, Defendant McNICOL retained Plaintiff to furnish all necessary labor, services, materials, and equipment for a commercial project on the Property (the "Project").

12. On or about July 27, 2007, Plaintiff and Defendant McNICOL entered in to a written agreement wherein Plaintiff agreed to perform the services on the Project and Defendant McNICOL agreed to pay Plaintiff for such services. A true and correct copy the agreement among the parties is attached hereto

PEREZ GONZALEZ

EXHIBIT "2"-32

as Exhibit A and incorporated herein by this reference (the "Contract").

13.    Plaintiff completed all work required of it on the Project.

14.    After completion on the Project, Defendant KAMRAN GROUP agreed to pay for Plaintiff's services on the Project. Defendant KAMRAN GROUP confirmed this agreement when it paid Plaintiff for their services.  KAMAN GROUP made several payments and then stopped.

## FIRST CAUSE OF ACTION

### (FOR BREACH OF WRITTEN CONTRACT

### AGAINST DEFENDANTS GREGORY MCNICOL AND DOES 1-100)

15.    Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1-14 above, as though fully set forth.

16.    Plaintiff and Defendants entered into the Contract. See Exhibit A.

17.    Under the Contract, Plaintiff agreed to furnish all necessary labor, services, materials, and equipment for the Project, for all of which Defendant agreed to pay.

18.    Plaintiff has performed all other conditions, covenants, and promises under the contract and change orders, on its part to be performed.

19.    Although demand has been made since the Project was completed and all necessary services, materials, and equipment were furnished, only a portion of the contract price has been paid.

PEREZ GONZALEZ

- 4 -

COMPLAINT FOR DAMAGES

EXHIBIT "2"-33

20.    As a proximate result of the breach by Defendant, Plaintiff has suffered damages in that sum, plus interest according to the terms and conditions of the written agreement, as well as, other damages to be proven at trial. Plaintiff will seek leave of court to amend this complaint to insert the exact amount of damages when the same is known by Plaintiff.

<u>SECOND CAUSE OF ACTION</u>

(FOR BREACH OF ORAL CONTRACT

AGAINST DEFENDANTS KARMAN GROUP, LLC AND DOES 1-100)

21.    Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1-20 above, as though fully set forth.

22.    After completion of the Project, KAMAN GROUP orally agreed to pay Plaintiff for its services regarding the Project.

23.    Plaintiff has performed all other conditions, covenants, and promises under the contract and change orders, on its part to be performed.

24.    KAMAN GROUP made several payments to Plaintiff and then stopped.

25.    Although demand has been made, only a portion of the contract price has been paid.

26.    As a proximate result of the breach by Defendant, Plaintiff has suffered damages in that sum, plus interest according to the terms and conditions of the written agreement, as well as, other damages to be proven at trial. Plaintiff will seek leave of court to amend this complaint to insert the exact amount of damages when the same is known by Plaintiff.

- 5 -
COMPLAINT FOR DAMAGES

EXHIBIT "2"-34

THIRD CAUSE OF ACTION

(FOR QUANTUM MERUIT

AGAINST ALL DEFENDANTS AND DOES 1-100)

27.   Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1-26 above, as though fully set forth.

28.   Within the last two years, Defendants, and each of them, became indebted to Plaintiff for work, labor, services, equipment and material performed and supplied at the special instance and request of said Defendants, and each of them, for which said Defendants, and each of them, agreed to pay Plaintiff the reasonable value of its work, labor, services, equipment and material performed and supplied for the Project.   Defendants, and each of them, had knowledge of and enjoyed the use of Plaintiff's work, labor, services, equipment and material that had a reasonable value according to proof.

29.   At all times mentioned herein, Plaintiff reasonably expected to be compensated for the above-described work, labor, and services to Defendants because the work, labor, and services performed are the type ordinarily performed for compensation, and Defendants on several occasions promised to make such compensation.

30.   Defendants, and each of them, have only paid a portion of the foregoing amount to Plaintiff.   Although Plaintiff has made a demand for payment of the remaining balance, Defendants, and each of them, have failed and refused to pay the foregoing sum, and the whole thereof is now due, owing, and unpaid together with interest therein a provided by law.

PEREZ GONZALEZ

- 6 -

COMPLAINT FOR DAMAGES

31.    Defendants have not paid for Plaintiff's services and there is now due and unpaid from Defendants to Plaintiff.  As a further proximate result of Defendants, and each of them, failure to pay for the reasonable value of Plaintiff's work, labor, services, equipment and material, Plaintiff has had to retain attorneys and incur court costs, in an amount as yet unknown, in pursuit of payment for the work of improvement.  The terms and conditions of the written agreement provide for reasonable attorney's fees and court costs incurred in enforcing payment thereof.  Plaintiff will seek leave of court to amend this complaint to insert the exact amount of damages when the same 's known by Plaintiff.

### FOURTH CAUSE OF ACTION

### (BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AGAINST ALL DEFENDANTS AND DOES 1-10)

32.    Plaintiff realleges and incorporates herein by this reference each and every allegation contained in paragraphs 1-31 above, as though fully set forth.

33.    The agreements between Plaintiff and Defendants contained an implied covenant of good faith and faith dealing which obligated Defendants to perform the terms and conditions of the agreements in good faith and honestly and reasonably and to refrain from doing any act that would prevent, impede or deprive Plaintiff of the benefits of their contract or impede Plaintiff from performing any and all conditions it agreed to perform.

34.    Throughout their contractual relationship, Plaintiff performed its duties and conditions of the contracts save and

COMPLAINT FOR DAMAGES

PEREZ GONZALEZ

except those terms and conditions which have been excused by Defendant's breaches thereof.

35.   By Defendants' conduct as alleged herein Defendants breached the covenant of good faith and fair dealing.

36.   These acts constituted a breach of the implied covenant of good faith and fair dealing in that the motivation for such conduct was extraneous to the contract and done solely to allow Defendants to gain the benefits of Plaintiff and money and to exclude Plaintiff from all benefit and bargain of the contacts with Defendants.

37.   As a legal and substantial result of these breaches of the implied covenant of good faith and fair dealing, Plaintiff have suffered harm, including lost profits, all to its harm in a sum capable of proof at trial.

38.   These acts in breach of the implied covenant of good faith and fair dealing also entitle each Plaintiff to exemplary damages because the motivation for such conduct was extraneous to the contract as set forth and which indicates a deliberate intention to harm Plaintiff in a despicable fashion within the definition of malice and oppression.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

ON THE FIRST, SECOND AND THIRD CAUSES OF ACTION:

1.   For general damages in a sum to be determined according to proof;

2.   For prejudgment interest; and

3.   For reasonable attorney's fees and costs in a sum to be determined by this Court.

- 8 -

COMPLAINT FOR DAMAGES

ON THE FOURTH CAUSES OF ACTION:

1.   For damages in an amount to be determined at trial.

2.   For punitive damages in an amount appropriate to punish Defendants and deter others from engaging in similar misconduct;

3.   For costs of suit incurred herein; and

4.   For such other and further relief as the court may deem proper.

ON ALL CAUSES OF ACTION:

1.   For costs of suit incurred herein;

2.   For prejudgment interest; and

3.   For such other and further relief as this Court deems just and proper.

Dated: September 15, 2008     PEREZ GONZALEZ, A PROF. LAW CORP.

By: _____
CHRISTOPHER GONZALEZ
Attorney for Plaintiff

COMPLAINT FOR DAMAGES

PEREZ GONZALEZ

EXHIBIT "2"-38

# EXHIBIT A

EXHIBIT "2"-39

FROM :KCSsa                    FAX NO. :9474734                    Mar. 13 2008 07:24AM  P2

FROM :KCSsa

FAX NO. :9474734                          Jul. 21 2007 06:38PM  P1

*Key Environmental*

1114 E. Holt Ave., Ste. 1
Los Angeles, CA 90011
(310) 656-5234

DOSH'S NO.
CA Contractor License # 783159
FAX ((631))947-4734

**PROPOSAL AND WORK AUTHORIZATION**

JOB SITE: Athletic Club
ADDRESS: 25 E. Walnut
Pasadena          ZIP: 91101
CONTACT:
HOME PHONE: (   )
WORK PHONE: (   )

INVOICE TO: FullScope
ADDRESS: 15581 Yukiell St 2nd
Encino Chocolate 91202
CONTACT: Constantin McNicol
HOME PHONE: 818 832 1300
WORK PHONE: 818 832 1346

Key Environmental proposes to furnish all labor, materials and equipment necessary to complete the following work:

1) Isolate work area with 6ml Visqueen including critical barriers.
2) Establish decontamination chamber
3) Provide negative air filtration machine
4) Provide air monitoring
5) Provide manifesting, hauling & disposal of last
6) Removal of the following materials.

Work to be started on _____ and substantially completed by _____ for $ _____
A down payment of $ _____ must be made prior to workers arrival on the jobsite and the balance is due on completion (unless otherwise noted in this agreement).

**TERMS, CONDITIONS AND EXCLUSIONS:**

Respectfully Submitted

Key Environmental Representative _____      Date _____

**ACCEPTANCE:** The above prices, specifications and conditions are satisfactory and are hereby accepted. Key Environmental is authorized to do the work as specified. Payment will be made as outlined above.

Customer's Signature _____      Date _____

**NOTICE**

EPA GENERATOR ID # CAC002619731

Page 1

FROM :KC5sa                          FAX NO. :9474734              Mar. 13 2008 07:24AM P3

## Key Environmental

1450 S. Harlington Ave, Ste. A                                    DOSH #768
Los Angeles, CA 90006                        CA Contractor License # 712159
(310) 655-6434                                            FAX (562)947-4734

### PROPOSAL AND WORK AUTHORIZATION

JOB SITE:_____   INVOICE TO_____

ADDRESS:_____   ADDRESS_____

_____ ZIP_____   _____ ZIP_____

CONTACT:_____   CONTACT_____

HOME PHONE: (    )_____   HOME PHONE: (    )_____

WORK PHONE: (    )_____   WORK PHONE: (    )_____

Key Environmental proposes to furnish all labor, materials and equipment necessary to complete the following
work

I. ASBESTOS

a) Removal of 56,000 sf of joistcompound
at Basement, 1st floor, & 3rd as per Survey

b) 150 sf of brown/Black sheeted linoleum
2nd layer at office #1

c) 80 sf of pipe fittings in basement

d) 700 sf white Acoutile amastic hallway
ducts, at Salon, Mens & Womens Restrooms

Work to be started on_____ and substantially completed by_____ for $_____

A down payment of $_____ must be made prior to workers arrival at the jobsite and the balance is due on
completion (unless otherwise noted in this agreement).

### TERMS, CONDITIONS AND EXCLUSIONS:

1) [illegible]
2) [illegible]
3) [illegible]
4) [illegible]
5) [illegible]
6) [illegible]
7) [illegible]
8) [illegible]
9) [illegible]

Respectfully Submitted,

_____          Date_____
Key Environmental Representative

ACCEPTANCE: The above prices, specifications and conditions are satisfactory and are hereby accepted.
Key Environmental is authorized to do the work as specified. Payment will be made as outlined above.

_____          Date_____
Customer's Signature

NOTICE
[illegible notice text]

 Page 2                                              AUG 03,2007 06:34A

EXHIBIT "2"-41

FROM :KCSsa                          FAX NO. :9474734              Mar. 13 2008 07:27AM  P8

FROM :KCSsa                          FAX NO. :9474734              Jul. 27 2007 8H:31PM  P3

## Key Environmental

14518, Berlinghi Ave. Ste. A                                    DOSH #767
Los Angeles, CA 90016                          CA Contractor License # 763759
(310) 416-5434                                              FAX (661)947-6734

### PROPOSAL AND WORK AUTHORIZATION

JOB SITE_____    INVOICE TO:_____
ADDRESS:_____    ADDRESS:_____
_____ ZIP_____      _____ ZIP_____
CONTACT:_____    CONTACT:_____
HOME PHONE:( )_____      HOME PHONE: ( )_____
WORK PHONE:( )_____      WORK PHONE: ( )_____

*Key Environmental proposes to furnish all labor, materials and equipment necessary to complete the following work*

  ①  1,500 of brown mastic behind black cove
base at basement north wall stairwell
landing, and office

  ②  200 linear color linoleum paper backing
at t/s, kitchen in Room 306

  ③  2,000 yellow mastic underneath wood
tiles and kitchen floor tile at kitchen, dining
and foyer at 3rd floor at room 300

Work is to be started on ____ and substantially completed by ____ for $ ____

A down payment of $____ must be made prior to workers arrival at the jobsite and the balance is due on completion (unless otherwise noted in this agreement).

TERMS, CONDITIONS AND DISCLOSURES

1) [illegible]
2) [illegible]
3) [illegible]
4) [illegible]
5) [illegible]
6) [illegible]
7) [illegible]
8) [illegible]
9) [illegible]

Respectfully Submitted,

_____               Date_____
Key Environmental Representative

ACCEPTANCE: The above prices, specifications and conditions are satisfactory and are hereby accepted. Key Environmental is authorized to do the work as specified. Payment will be made as outlined above.

_____               Date_____
Customer's Signature

NOTICE
[illegible notice text]

Page 3                                           AUG 03, 2007 06:30A

FROM :KCS58 FAX NO. :9474734 Mar. 13 2008 07:25AM P4

FROM :KCS58 FAX NO. :9474734 Jul. 41 2007 06:33AM P5

## Key Environmental

1453 S. Burlington Ave., Ste. A
Los Angeles, CA 90016
(310) 456-3434

DOSH A 745
CA Contractor License # 763187
FAX (661) 947-4734

### PROPOSAL AND WORK AUTHORIZATION

JOB SITE: _____  INVOICE TO: _____

ADDRESS: _____  ADDRESS: _____

_____ ZIP _____   _____ ZIP _____

CONTACT: _____  CONTACT: _____

HOME PHONE: ( ) _____  HOME PHONE: ( ) _____

WORK PHONE: ( ) _____  WORK PHONE: ( ) _____

Key Environmental proposes to furnish all labor, materials and equipment necessary to complete the following work:

1) 200 sf of multi color square pattern linoleum at kitchen 404
2) 200 sf of red linoleum 2nd layer kitchen 404
3) 250 sf yellow linoleum 2nd layer kitchen 404
4) Levaline Compound elevator, small area off lobby

II LEAD Intact loose & flaky LBP from:

Work to be started on _____ and substantially completed by _____ for $ _____

A down payment of $ _____ must be made prior to workers arrival at the jobsite and the balance is due on completion (unless otherwise stated in this agreement).

### TERMS, CONDITIONS AND EXCLUSIONS:

1) [illegible]
2) [illegible]
3) [illegible]
4) [illegible]
5) [illegible]
6) [illegible]
7) [illegible]
8) [illegible]
9) [illegible]

Respectfully Submitted,

_____  Date _____

Key Environmental Representative

ACCEPTANCE: The above prices, specifications and conditions are satisfactory and are hereby accepted. Key Environmental is authorized to do the work as specified. Payment will be made as outlined above.

_____  Date _____

Customer's Signature

NOTICE

[illegible fine print]

AUG 03, 2007 06:39A

EXHIBIT "2"-43

FROM :KCSsa                          FAX NO. :9474734                    Mar. 13 2008 07:25AM  P5

FROM :KCSsa                   FAX NO. :9474734              Jul. 21 2007 06:32PM  P1

## Key Environmental

1450 E. Burlington Ave. #Ste. A.                                    DOSH # 765
Los Angeles, CA 90006                              CA Contractor License # 763159
(319) 466-6134                                              FAX ((661)947-4714

### PROPOSAL AND WORK AUTHORIZATION

JOB SITE: _____       INVOICE TO: _____
ADDRESS: _____       ADDRESS: _____
_____ ZIP: _____       _____ ZIP: _____
CONTACT: _____       CONTACT: _____
HOME PHONE: ( )_____       HOME PHONE: ( )_____
WORK PHONE: ( )_____       WORK PHONE: ( )_____

Key Environmental proposes to furnish all labor, materials and equipment necessary to complete the following work:

a) Interior Stair System, basement

b) Metal fence poles, tennis court, South end

c) Exterior stair system, north end of building

d) Wood surfaces, window frame Salon

e) Elevator (4th.) _____ west door a frame

Work to be started on _____ and substantially completed by _____ for $ _____
A down payment of $ _____ must be made prior to workers arrival at the jobsite and the balance is due on completion (unless otherwise stated in this agreement).

**TERMS, CONDITIONS AND EXCLUSIONS**

[fine print terms illegible]

Respectfully Submitted,

_____          Date _____
Key Environmental Representative

ACCEPTANCE: The above prices, specifications and conditions are satisfactory and are hereby accepted.
Key Environmental is authorized to do the work as specified. Payment will be made as outlined above.

_____          Date _____
Customer's Signature

NOTICE
[fine print notice illegible]

EXHIBIT "2"-44

FROM :KCSea                          FAX NO. :9474734                    Mar. 13 2008 07:26AM  P7

FROM :KCSea                          FAX NO. :9474734                    Jul. 21 2007 05:33PM  P6

## Key Environmental

1400 S. Burlington Ave. Ste. A                                          BOSH #165
Los Angeles, CA 90006                              CA Contractor License # 703169
(310) 464-5634                                                    FAX ((561)947-4734

### PROPOSAL AND WORK AUTHORIZATION

JOB SITE:_____    INVOICE TO:_____

ADDRESS:_____    ADDRESS:_____

_____ ZIP:_____    _____ ZIP:_____

CONTACT:_____    CONTACT:_____

HOME PHONE: (    )_____    HOME PHONE: (    )_____

WORK PHONE: (    )_____    WORK PHONE: (    )_____

Key Environmental proposes to furnish all labor, materials and equipment necessary to complete the following work:

D. Encapsulate work areas

Contractor assistance 75⁰⁰ per hour per man (2) man crew

Work to be started on_____ and substantially completed by_____ for $ 8000 Ⓐ

A down payment of $_____ must be made prior to workers arrival at the jobsite and the balance is due on completion (unless otherwise stated in this agreement).

### TERMS, CONDITIONS AND EXCLUSIONS:
1) [illegible]
2) [illegible]
3) [illegible]
4) [illegible]
5) [illegible]
6) [illegible]
7) [illegible]
8) [illegible]
9) [illegible]

Respectfully submitted,

_____    Date_____
Key Environmental Representative

ACCEPTANCE: The above prices, specifications and conditions are satisfactory and are hereby accepted. Key Environmental is authorized to do the work as specified. Payment will be made as outlined above.

_____    Date  7/27/07
Customer's Signature

NOTICE
Under the mechanics' lien law, any contractor, subcontractor, laborer, supplier or other person who helps to improve your property but is not paid for labor work or supplies, has the right to enforce a claim against your property. This means that after a court hearing,

AUG 03,2007 06:40A

# Exhibit 3

(Plaintiffs' Exhibit 15 in Joint Pretrial Order)

Neil Papiano, Esq. (CSB #031811)
Joanna L. Orr, Esq. (CSB #229779)
IVERSON, YOAKUM, PAPIANO & HATCH
515 South Flower Street, 29th Floor
Los Angeles, California 90071
Phone: (213) 624-7444 * Facsimile: (213) 629-4563

Attorneys for Plaintiffs Christopher J. Holden
and Fannie Louise Holden

**FILED**
Los Angeles Superior Court

MAR 18 2009

John A. ~~~~~ Executive Officer/Clerk
By ~~~~~~~~~~~, Deputy
DOROTHY ~~~~

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES, CENTRAL DISTRICT

| | |
|---|---|
| CHRISTOPHER J. HOLDEN, an individual, FANNIE LOUISE HOLDEN, an individual, | CASE NO.: **BC409988** |
| Plaintiffs, | COMPLAINT FOR BREACH OF CONTRACT |
| vs. | |
| KAMRAN GROUP, LLC, a California Limited Liability Company, and DOE 1 through DOE 10, inclusive | |
| Defendants. | |

Plaintiffs Christopher J. Holden and Fannie Louise Holden (hereinafter "Plaintiffs") allege:

1. Plaintiff, Christopher J. Holden, is and at all times herein mentioned was a resident of Pasadena, California.

2. Plaintiff, Fannie Louise Holden, is and at all times herein mentioned was a resident of Pasadena, California.

3. Defendant, Kamran Group, LLC ("KG"), is a California Limited Liability Company with its principal place of business in the State of California, County of Orange.

1

**COMPLAINT**

EXHIBIT "2"-47

4.    The true names and capacities, whether individual, corporate, associate, or otherwise, of defendants, Doe 1 through Doe 10, inclusive, are unknown to Plaintiffs who, therefore, sue said Doe Defendants by such fictitious names. Plaintiffs will amend this complaint to show their true names and capacities when ascertained. Plaintiffs are informed and believe and thereon allege that each of said Doe Defendants is responsible in some manner for the events and happenings, and proximately caused the injuries and damages hereinafter alleged.

## FIRST CAUSE OF ACTION

## FOR BREACH OF CONTRACT

(By Plaintiffs against Defendants KG, Doe 1 through Doe 10, inclusive, and each of them)

5.    Plaintiffs refer to and incorporate herein paragraphs 1 through 4.

6.    Plaintiffs own the condominium unit located at 25 West Walnut Street, Unit 402, Pasadena, California 91103 (the "Property").

7.    In October 2006, Plaintiffs and KG, and Doe 1 through Doe 10, inclusive, and each of them, entered into a Purchase Agreement for the purchase of the Property by KG, Doe 1 through Doe 10, inclusive, and each of them.

8.    On November 20, 2008, Plaintiffs and KG, and Doe 1 through Doe 10, inclusive, and each of them, entered into an Escrow Extension Agreement (the "Extension Agreement"). Under the terms of the Extension Agreement, if Escrow on the Property had not closed by noon on Friday, February 27, 2009, KG, and Doe 1 through Doe 10, inclusive, and each of them, were compelled to pay and accordingly owed Plaintiffs Twenty-five Thousand Dollars ($25,000) on February 29, 2009, to extend the Closing Date under the Purchase Agreement from February 27, 2009 until July 31, 2009.

9.    Plaintiffs, and each of them, have performed all the conditions, covenants, and promises required on Plaintiffs' part to be performed in accordance with the terms and conditions of the Extension Agreement.

2

**COMPLAINT**

EXHIBIT "2"-48

10. On or about February 27, 2009, Plaintiffs requested that KG, and Doe 1 through Doe 10, inclusive, and each of them, perform the Extension Agreement.

11. On or about February 27, 2009, KG, and Doe 1 through Doe 10, inclusive, and each of them, breached the Extension Agreement by failing to pay Twenty-five Thousand Dollars ($25,000), or any part thereof, to the Plaintiffs.

12. As a result of the breach by KG, and Doe 1 through Doe 10, inclusive, and each of them, Plaintiffs have been damaged in the amount of Twenty-five Thousand Dollars ($25,000), plus interest as provided by law.

WHEREFORE, Plaintiffs pray for a judgment against KG, and Doe 1 through Doe 10, inclusive, and each of them, as follows:

1. Damages in the sum of $25,000;

2. Interest on that sum as provided by law;

3. For all costs of suit incurred herein; and

4. For such other and further relief as the Court deems proper.

DATED: March 18, 2009

IVERSON, YOAKUM, PAPIANO & HATCH

By: _____
Neil Papiano, Esq.
Attorneys for Plaintiffs Christopher J.
Holden and Fannie Louise Holden

3
COMPLAINT

EXHIBIT "2" -49

# Exhibit 4

(Plaintiffs' Exhibit 16 in Joint Pretrial Order)

EXHIBIT "2"-50

CONFORMED COPY

**SUMMONS**
**(CITACION JUDICIAL)**

SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

ORIGINAL FILED

NOV 2 0 2009

LOS ANGELES
SUPERIOR COURT
NORTHEAST DISTRICT

NOTICE TO DEFENDANT: THE KAMRAN GROUP; DAVID GOLKAR
(AVISO AL DEMANDADO):and DOES 1 through 20,

YOU ARE BEING SUED BY PLAINTIFF: KKE ARCHITECTS, INC.
(LO ESTÁ DEMANDANDO EL DEMANDANTE):

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association. NOTE: The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación

Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.

Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.

| The name and address of the court is: (El nombre y dirección de la corte es): | CASE NUMBER: (Número del Caso): GC044150 |
|---|---|

LOS ANGELES SUPERIOR COURT
300 East Walnut Street
Pasadena, CA 91101
Northeast District

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):
BRIAN K. STEWART, SBN 126412        626-243-1100    626-243-1111
COLLINS COLLINS MUIR + STEWART LLP
1100 El Centro Street
South Pasadena, CA 91030

DATE:                                   JOHN A. CLARKE              MARIA AGUIRRE        , Deputy
(Fecha)    NOV 2 0 2009        Clerk, by CLARKE    (Secretario)                          (Adjunto)

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).

NOTICE TO THE PERSON SERVED: You are served

[SEAL]

1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of (specify):
3. ☐ on behalf of (specify):

   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
          ☐ other (specify):
4. ☐ by personal delivery on (date):

Page 1 of 1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 (Rev. July 1, 2009)

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

EXHIBIT "2" -51

CONFORMED
COPY

Brian K. Stewart, State Bar No. 126412
Ryan M. Deam, State Bar No. 252505
COLLINS COLLINS MUIR + STEWART LLP
1100 El Centro Street
South Pasadena, CA 91030
(626) 243-1100 – FAX (626) 243-1111

Attorneys for Plaintiff
KKE ARCHITECTS, INC.

ORIGINAL FILED

NOV 20 2009
LOS ANGELES
SUPERIOR COURT
NORTHEAST DISTRICT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF LOS ANGELES— NORTHEAST DISTRICT

| KKE ARCHITECTS, INC., | ) | CASE NO.   GC044150 |
|---|---|---|
| Plaintiffs, | ) | |
| vs. | ) | COMPLAINT FOR: |
| | ) | 1. FORECLOSURE ON DESIGN |
| | ) | PROFESSIONALS' LIEN |
| THE KAMRAN GROUP; DAVID GOLKAR | ) | 2. BREACH OF CONTRACT |
| and DOES 1 Through 20, | ) | 3. QUANTUM MERUIT |
| | ) | 4. COMMON COUNT |
| Defendants. | ) | |
| | ) | Complaint Filed: |
| | ) | |
| | ) | Trial Date:      None |

COMES NOW, PLAINTIFF KKE ARCHITECTS, INC., and alleges as follows:

I.

## PARTIES

1.     Plaintiff, KKE ARCHITECTS,INC. ("KKE") is, and at all times mentioned herein, was a California corporation organized and existing under the laws of the state of California with its principal place of business in Pasadena, California.

2.     KKE is informed and believes and thereon alleges that Defendant THE KAMRAN GROUP ("KAMRAN") is, and at all times mentioned was, a California corporation organized and existed under the laws of the State of California, with its principal place of business in Costa Mesa, California.

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone (626) 243-1100
Fax (626) 243-1111

L:\15867.6\COMPLAINT.DOC.DOC

1

EXHIBIT "2"  52

3.   KKE is informed and believes and thereon alleges that Defendant DAVID GOLKAR ("GOLKAR") is, and at all times mentioned was, an individual existing and doing business under the laws of the State of California, in Costa Mesa, California.

4.   KKE is unaware of the true names and capacities of Defendants sued herein as DOES 1 through 20, inclusive. KKE therefore sues those Defendants by such fictitious names. KKE will amend this Complaint to allege their true names and capacities when ascertained.

5.   KKE is informed and believes and on that basis alleges that at all times relevant to this Complaint, KAMRAN, GOLKAR (collectively "DEFENDANTS"), and DOES 1 through 20 were, and now are, an agent, servant, employee, subsidiary, parent, affiliate, partner, assignee, successor in interest, predecessor in interest, alter ego, and/or other representative of each of the other Defendants and acted in such capacity, within the course and scope of such agency or employment, and with the permission and consent of each other Defendant.

## II.

## GENERAL ALLEGATIONS

6.   On or about April 10, 2008, GOLKAR, on behalf of DEFENDANTS, entered into an agreement with KKE whereby KKE would provide professional design services for the proposed addition of a 200-room, 6-story hotel with hotel amenities associated with a 5-star hotel, and twin condominium towers (100 units) to the development commonly referred to as the Fair Oaks + Walnut Development, located at 25 West Walnut Street, Pasadena, California ("PROJECT"). *See* Exhibit A, "AIA Standard Form Agreement B151 – 1997".

7.   Thereafter, KKE performed all services which were required of it under the agreement for the PROJECT and the related supplements and amendments. DEFENDANTS, and each of them, further enjoyed the benefit of the design and project management product that was created as a result of KKE'S services. KKE has invoiced DEFENDANTS for all of the services and costs incurred in performance of its obligations under the contract. DEFENDANTS, however, despite repeated promises to pay, have failed to reimburse KKE for these services and costs in the principle amount of at least $212,425.99.

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone (626) 243-1100
Fax   (626) 243-1111

L:\15867.6\COMPLAINT.DOC.DOC

2

**COMPLAINT**

EXHIBIT  "2"  53

### III.

### FIRST CAUSE OF ACTION

### FOR FORECLSOURE ON DESIGN PROFESSIONALS' LIEN

### (AS AGAINST DEFENDANTS KAMRAN AND GOLKAR)

8.      KKE alleges and incorporates by reference paragraphs 1 through 7, inclusive as though set forth in full.

9.      KKE recorded a verified Design Professionals' Lien on or about November 5, 2009 in the office of the County Recorder of Los Angeles prior to initiating this lawsuit and after providing DEFENDANTS at least ten (10) days notice of the intent to record the lien.  A copy of the recorded Design Professionals' Lien is attached hereto as Exhibit B.

10.      At the time KKE recorded the Design Professionals' Lien, the amount stated in the lien claim ($212,425.99) remained owing, and unpaid and to date, remains owing and unpaid.

### IV.

### SECOND CAUSE OF ACTION

### FOR BREACH OF CONTRACT

### (AS AGAINST DEFENDANTS AND DOES 1 – 20)

11.      KKE alleges and incorporates by reference paragraphs 1 through 10, inclusive as though set forth in full.

12.      DEFENDANTS and each of them have breached the contract for the PROJECT and its related supplements and amendments in numerous respects, including, but not limited to, failing to pay for services, costs, and expenses, by entering into these contracts without the intention of honoring them, and by failing to adhere to the contract requirements.  Moreover, DEFENDANTS repeatedly promised to pay and made assurances that KKE would be paid.

13.      As a proximate, legal, and direct cause of the foregoing, KKE has suffered damages in an amount that will be quantified at the time of trial, but is not less than $212,425.99.

///

///

///

Collins Collins
Muir + Stewart LLP
1100 B Centro Street
So. Pasadena, CA 91030
Phone (626) 243-1100
Fax   (626) 243-1111

*L:\15867.6\COMPLAINT.DOC.DOC*

3

## V.

### THIRD CAUSE OF ACTION

### FOR QUANTUM MERUIT

#### (AS AGAINST DEFENDANTS AND DOES 1 – 20)

14.    KKE alleges and incorporates herein by reference paragraphs 1 through 13, inclusive, as though set forth in full.

15.    Pursuant to an agreement entered into by DEFENDANTS, and at its special request and insistence, KKE has provided services in relation to the development of the PROJECT as alleged above.  The services were provided for the exclusive benefit of, and at the special request and insistence of DEFENDANTS at the PROJECT.  The services were provided in reliance on DEFENDANTS' promise to pay KKE the reasonable value of the services.  The reasonable value of the services that have been unpaid is no less than Two Hundred Twelve Thousand Four Hundred Twenty Five Dollars and Ninety Nine Cents ($212,425.99), not including interest collection costs or attorney's fees incurred by KKE.

16.    Despite demand thereof, no part of the above said sum has been paid by DEFENDANTS to KKE and the full amount is due and owing.

17.    KKE has been damaged in the sum exceeding Two Hundred Twelve Thousand Four Hundred Twenty Five Dollars and Ninety Nine Cents ($212,425.99), which is due and owing, for the services provided that have conferred a benefit to the subject PROJECT, its owners, interest holders, lessees, property managers, and contracting parties.

## VI.

### FOURTH CAUSE OF ACTION

### FOR COMMON COUNT

#### (AS AGAINST DEFENDANTS AND DOES 1 – 20)

18.    KKE alleges and incorporates herein by reference paragraphs 1 through 17, inclusive as though set forth in full.

19.    KKE has rendered work, labor, and services pursuant to the contracts alleged above, for the exclusive benefit of, and at the special request and insistence of DEFENDANTS, and each

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone (626) 243-1100
Fax    (626) 243-1111

L:\15867.6\COMPLAINT.DOC.DOC

4

EXHIBIT "2" 55

of them. The services were rendered in reliance on DEFENDANTS' promise to pay KKE the reasonable value of said services. Amounts have been paid and properly credited. The reasonable value of the services that have been unpaid is in excess of $212,425.99.

20.     Despite demand therefore, no part of the above-said sum has been paid and the full amount is due and owing.

WHEREFORE Plaintiff KKE prays for judgment as follows:

1.     Special damages on all causes of action in an amount not less than $212,425.99;

2.     For attorney's fees, litigation expenses, administration costs, services charges, expert fees, penalties, and other expenses and costs as allowed by law and/or the contracts referenced herein;

3.     For interest at the highest legally allowable rate;

4.     For costs and costs of suit incurred herein; and

5.     For such other and further relief as the Court may deem just and proper.

DATED: November 16, 2009                COLLINS COLLINS MUIR + STEWART LLP

By: _____
    Brian K. Stewart, Esq.
    Ryan M. Deam, Esq.
    Attorneys for Plaintiff
    KKE ARCHITECTS

Collins Collins
Muir + Stewart LLP
1100 El Centro Street
So. Pasadena, CA 91030
Phone (626) 243-1100
Fax   (626) 243-1111

L:\U5867.6\COMPLAINT.DOC.DOC

5

COMPLAINT

EXHIBIT "2"  56

# AIA Document B151™ – 1997

## Abbreviated Standard Form of Agreement Between Owner and Architect

AGREEMENT made as of the   Tenth   day of   April   in the year Two Thousand Eight
(In words, indicate day, month and year)

BETWEEN the Architect's client identified as the Owner:
(Name, address and other information)

KAMRAN Group, LLC.
575 Anton Boulevard, Suite 820
Costa Mesa, CA 92626

and the Architect:
(Name, address and other information)

KKE Architects, Inc.
525 East Colorado Boulevard, 4th Floor
Pasadena, CA 91101
Tel:      626/796-8230
Fax:      626/796-8735

For the following Project: KKE 0813.1256.01
(Include detailed description of Project)

W Hotel
Pasadena, CA
The Project is a new 200-room, 6-story hotel with hotel amenities associated with a 5-star hotel, and twin condominium towers (100 units) over a multi-level subterranean parking garage. All of the subterranean design work and construction documents have been completed by others. The Project has passed Pasadena's Design Review Commission and is substantially as presented in the Schematic Design package prepared by Onyx Architects, but with significant design changes to the elevations, currently represented in the work of design consultant Red Monkey. The hotel has been planned by Wimberley Allison Tong & Goo. The interior design is not yet complete; as of contract date, an interior designer has not been selected.

The Owner and Architect agree as follows.
(Paragraph deleted)
It is our understanding that KKE Architects, Inc. will pick up the Project with its current design as developed by your Design Architects, and will be the Architect of Record for the work above grade. The three levels of parking below grade have been designed, engineered, and are ready for plan check. The work of these three lower levels is not a part of this proposal.

ADDITIONS AND DELETIONS:
The author of this document has added information needed for its completion. The author may also have revised the text of the original AIA standard form. An Additions and Deletions Report that notes added information as well as revisions to the standard form text is available from the author and should be reviewed. A vertical line in the left margin of this document indicates where the author has added necessary information and where the author has added to or deleted from the original AIA text.

This document has important legal consequences. Consultation with an attorney is encouraged with respect to its completion or modification.

AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties; and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:16:09 on 04/30/2008 under Order No.1000315850_5 which expires on 8/23/2008, and is not for resale.
User Notes:                                                                            (142658987)

Init.
1

## ARTICLE 1   ARCHITECT'S RESPONSIBILITIES

§ 1.1 The services performed by the Architect, Architect's employees and Architect's consultants shall be as enumerated in Articles 2, 3 and 12.

§ 1.2 The Architect's services shall be performed as expeditiously as is consistent with professional skill and care and the orderly progress of the Project. The Architect shall submit for the Owner's approval a schedule for the performance of the Architect's services which may be adjusted as the Project proceeds. This schedule shall include allowances for periods of time required for the Owner's review and for approval of submissions by authorities having jurisdiction over the Project. Time limits established by this schedule approved by the Owner shall not, except for reasonable cause, be exceeded by the Architect or Owner.

§ 1.3 The Architect shall designate a representative authorized to act on behalf of the Architect with respect to the Project.

§ 1.4 The services covered by this Agreement are subject to the time limitations contained in Section 11.5.1.

## ARTICLE 2   SCOPE OF ARCHITECT'S BASIC SERVICES

### § 2.1 DEFINITION

The Architect's Basic Services consist of those described in Sections 2.2 through 2.6 and any other services identified in Article 12 as part of Basic Services.

### § 2.2 SCHEMATIC DESIGN PHASE

§ 2.2.1 The Architect shall review the program furnished by the Owner to ascertain the requirements of the Project and shall arrive at a mutual understanding of such requirements with the Owner.

§ 2.2.2 The Architect shall provide a preliminary evaluation of the Owner's program, schedule and construction budget requirements, each in terms of the other, subject to the limitations set forth in Section 5.2.1.

§ 2.2.3 The Architect shall review with the Owner alternative approaches to design and construction of the Project.

§ 2.2.4 Based on the mutually agreed-upon program, schedule and construction budget requirements, the Architect shall prepare, for approval by the Owner, Schematic Design Documents consisting of drawings and other documents illustrating the scale and relationship of Project components.

### § 2.2.5

This phase involves the following work efforts:

a. Review of W Hotel standard criteria documents.
b. Review of Design Architects' concept plan and program into a schematic floor plan.
c. Review exterior building concept design for massing, roof forms, exterior expression, initial exterior materials, and overall image.
d. Develop living-unit floor plans consistent with the Owner's wishes and expanding the areas to take best advantage of the approved increases in the FAR.
e. Coordination with engineering disciplines for initial programmatic and schematic direction.
f. Minor modifications to existing hotel plan.

### § 2.3 DESIGN DEVELOPMENT PHASE

§ 2.3.1 Based on the approved Schematic Design Documents and any adjustments authorized by the Owner in the program, schedule or construction budget, the Architect shall prepare, for approval by the Owner, Design Development Documents consisting of drawings and other documents to fix and describe the size and character of the Project as to architectural, structural, mechanical and electrical systems, materials and such other elements as may be appropriate.

*(Paragraphs deleted)*

Init.

/

AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:16:09 on 04/30/2008 under Order No.1000315850_5 which expires on 8/23/2008, and is not for resale    (142858987)
User Notes:

2

EXHIBIT "2"-58

## § 2.4 CONSTRUCTION DOCUMENTS PHASE

§ 2.4.1 Based on the approved Design Development Documents and any further adjustments in the scope or quality of the Project or in the construction budget authorized by the Owner, the Architect shall prepare, for approval by the Owner, Construction Documents consisting of Drawings and Specifications setting forth in detail the requirements for the construction of the Project.

§ 2.4.2 The Architect shall assist the Project Manager in the preparation of the necessary bidding information.

*(Paragraphs deleted)*
§ 2.4.4 The Architect shall assist the Owner in connection with the Owner's responsibility for filing documents required for the approval of governmental authorities having jurisdiction over the Project.

(Intentionally Omitted)
*(Paragraphs deleted)*

## § 2.6 CONSTRUCTION PHASE—ADMINISTRATION OF THE CONSTRUCTION CONTRACT

§ 2.6.1 The Architect's responsibility to provide Basic Services for the Construction Phase under this Agreement commences with the award of the initial Contract for Construction and terminates at the earlier of the issuance to the Owner of the final Certificate for Payment or 120 days after the date of Substantial Completion of the Work.

§ 2.6.2 The Architect shall assist in the administration of the Contract for Construction as set forth below and in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement, unless otherwise provided in this Agreement. Modifications made to the General Conditions, when adopted as part of the Contract Documents, shall be enforceable under this Agreement only to the extent that they are consistent with this Agreement or approved in writing by the Architect.

§ 2.6.3 Duties, responsibilities and limitations of authority of the Architect under this Section 2.6 shall not be restricted, modified or extended without written agreement of the Owner and Architect with consent of the Contractor, which consent will not be unreasonably withheld.

§ 2.6.4 The Architect shall be a representative of and shall advise and consult with the Owner during the administration of the Contract for Construction. The Architect shall have authority to act on behalf of the Owner only to the extent provided in this Agreement unless otherwise modified by written amendment.

§ 2.6.5 The Architect, as a representative of the Owner, shall visit the site at intervals appropriate to the stage of the Contractor's operations, or as otherwise agreed by the Owner and the Architect in Article 12, (1) to become generally familiar with and to keep the Owner informed about the progress and quality of the portion of the Work completed, (2) to endeavor to guard the Owner against defects and deficiencies in the Work, and (3) to determine in general if the Work is being performed in a manner indicating that the Work, when fully completed, will be in accordance with the Contract Documents. However, the Architect shall not be required to make exhaustive or continuous on-site inspections to check the quality or quantity of the Work. The Architect shall neither have control over or charge of, nor be responsible for, the construction means, methods, techniques, sequences or procedures, or for safety precautions and programs in connection with the Work, since these are solely the Contractor's rights and responsibilities under the Contract Documents.

§ 2.6.6 The Architect shall report to the Owner known deviations from the Contract Documents and from the most recent construction schedule submitted by the Contractor. However, the Architect shall not be responsible for the Contractor's failure to perform the Work in accordance with the requirements of the Contract Documents. The Architect shall be responsible for the Architect's negligent acts or omissions, but shall not have control over or charge of and shall not be responsible for acts or omissions of the Contractor, Subcontractors, or their agents or employees, or of any other persons or entities performing portions of the Work.

§ 2.6.7 The Architect shall at all times have access to the Work wherever it is in preparation or progress.

§ 2.6.8 Except as otherwise provided in this Agreement or when direct communications have been specially authorized, the Owner shall endeavor to communicate with the Contractor through the Architect and Owner's Project Manager about matters arising out of or relating to the Contract Documents. Communications by and with the Architect's consultants shall be through the Architect.

AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:16:09 on 04/30/2008 under Order No.1000315650_5 which expires on 8/23/2008, and is not for resale.
User Notes:                                                                                              (142658987)

Init.

/

3

EXHIBIT " 2" -59

*(Paragraphs deleted)*
§ 2.6.10 The Architect in conjunction with the Owner's Project Manager shall have authority to reject Work that does not conform to the Contract Documents. Whenever the Architect considers it necessary or advisable, the Architect shall have authority to require inspection or testing of the Work in accordance with the provisions of the Contract Documents, whether or not such Work is fabricated, installed or completed. However, neither this authority of the Architect nor a decision made in good faith either to exercise or not to exercise such authority shall give rise to a duty or responsibility of the Architect to the Contractor, Subcontractors, material and equipment suppliers, their agents or employees or other persons or entities performing portions of the Work.

§ 2.6.11 The Architect in conjunction with the Owner's Project Manager shall review and approve or take other appropriate action upon the Contractor's submittals such as Shop Drawings, Product Data and Samples, but only for the limited purpose of checking for conformance with information given and the design concept expressed in the Contract Documents. The Architect's action shall be taken with such reasonable promptness as to cause no delay in the Work or in the activities of the Owner, Contractor or separate contractors, while allowing sufficient time in the Architect's professional judgment to permit adequate review. Review of such submittals is not conducted for the purpose of determining the accuracy and completeness of other details such as dimensions and quantities, or for substantiating instructions for installation or performance of equipment or systems, all of which remain the responsibility of the Contractor as required by the Contract Documents. The Architect's review shall not constitute approval of safety precautions or, unless otherwise specifically stated by the Architect, of any construction means, methods, techniques, sequences or procedures. The Architect's approval of a specific item shall not indicate approval of an assembly of which the item is a component.

§ 2.6.12 If professional design services or certifications by a design professional related to systems, materials or equipment are specifically required of the Contractor by the Contract Documents, the Architect shall specify appropriate performance and design criteria that such services must satisfy. Shop Drawings and other submittals related to the Work designed or certified by the design professional retained by the Contractor shall bear such professional's written approval when submitted to the Architect. The Architect shall be entitled to rely upon the adequacy, accuracy and completeness of the services, certifications or approvals performed by such design professionals.

§ 2.6.13 The Architect in conjunction with the Owner's Project Manager shall prepare Change Orders and Construction Change Directives, with supporting documentation and data if deemed necessary by the Architect as provided in Sections 3.1.1 and 3.3.3, for the Owner's approval and execution in accordance with the Contract Documents, and may authorize minor changes in the Work not involving an adjustment in the Contract Sum or an extension of the Contract Time which are consistent with the intent of the Contract Documents.

§ 2.6.14 The Architect shall conduct inspections to determine the date or dates of Substantial Completion and the date of final completion, shall receive from the Contractor and forward to the Owner, for the Owner's review and records, written warranties and related documents required by the Contract Documents and assembled by the Contractor, and shall issue a final Certificate for Payment based upon a final inspection indicating the Work complies with the requirements of the Contract Documents.

*(Paragraphs deleted)*
§ 2.6.16 Interpretations and decisions of the Architect shall be consistent with the intent of and reasonably inferable from the Contract Documents and shall be in writing or in the form of drawings. When making such interpretations and initial decisions, the Architect shall endeavor to secure faithful performance by both Owner and Contractor, shall not show partiality to either, and shall not be liable for results of interpretations or decisions so rendered in good faith.

*(Paragraphs deleted)*

**Init.** AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:16:09 on 04/30/2008 under Order No.1000315850_5 which expires on 8/23/2008, and is not for resale.
User Notes:                                                                                           (142658987)

4

EXHIBIT "2"-60

ARTICLE 3  ADDITIONAL SERVICES
§ 3.1 GENERAL
§ 3.1.1 The services described in this Article 3 are not included in Basic Services unless so identified in Article 12, and they shall be paid for by the Owner as provided in this Agreement, in addition to the compensation for Basic Services. The services described under Sections 3.2 and 3.4 shall only be provided if authorized or confirmed in writing by the Owner. If services described under Contingent Additional Services in Section 3.3 are required due to circumstances beyond the Architect's control, the Architect shall notify the Owner prior to commencing such services. If the Owner deems that such services described under Section 3.3 are not required, the Owner shall give prompt written notice to the Architect. If the Owner indicates in writing that all or part of such Contingent Additional Services are not required, the Architect shall have no obligation to provide those services.

§ 3.2 PROJECT REPRESENTATION BEYOND BASIC SERVICES
§ 3.2.1 If more extensive representation at the site than is described in Section 2.6.5 is required, the Architect shall, at the Owner's request, provide one or more Project Representatives to assist in carrying out such additional on-site responsibilities.

(Paragraphs deleted)
§ 3.3 CONTINGENT ADDITIONAL SERVICES  (All require Owner's prior approval.)
§ 3.3.1 Making revisions in drawings, specifications or other documents when such revisions are:
    .1    inconsistent with approvals or instructions previously given by the Owner, including revisions made necessary by adjustments in the Owner's program or Project budget;
    .2    required by the enactment or revision of codes, laws or regulations subsequent to the preparation of such documents; or
    .3    due to changes required as a result of the Owner's failure to render decisions in a timely manner.

§ 3.3.2 Providing services required because of significant changes in the Project including, but not limited to, size, quality, complexity, the Owner's schedule, or the method of bidding or negotiating and contracting for construction, except for services required under Section 5.2.5.

§ 3.3.3 Preparing Drawings, Specifications and other documentation and supporting data, evaluating Contractor's proposals, and providing other services in connection with Change Orders and Construction Change Directives.

§ 3.3.4 Providing services in connection with evaluating substitutions proposed by the Contractor and making subsequent revisions to Drawings, Specifications and other documentation resulting therefrom.

§ 3.3.5 Providing consultation concerning replacement of Work damaged by fire or other cause during construction, and furnishing services required in connection with the replacement of such Work.

§ 3.3.6 Providing services made necessary by the default of the Contractor, by major defects or deficiencies in the Work of the Contractor, or by failure of performance of either the Owner or Contractor under the Contract for Construction.

(Paragraphs deleted)
§ 3.3.8 Providing services in connection with a public hearing, a dispute resolution proceeding or a legal proceeding except where the Architect is party thereto.

§ 3.3.9 Preparing documents for alternate, separate or sequential bids or providing services in connection with bidding, negotiation or construction prior to the completion of the Construction Documents Phase.

§ 3.4 OPTIONAL ADDITIONAL SERVICES
§ 3.4.1 Providing analyses of the Owner's needs and programming the requirements of the Project.

§ 3.4.2 Providing financial feasibility or other special studies.

Init.

AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:18:09 on 04/30/2006 under Order No.1000315850_5 which expires on 8/23/2008, and is not for resale.
User Notes:    (142658987)

5

EXHIBIT "2"-61

§ 3.4.3 Providing planning surveys, site evaluations or comparative studies of prospective sites.

§ 3.4.4 Providing special surveys, environmental studies and submissions required for approvals of governmental authorities or others having jurisdiction over the Project.

§ 3.4.5 Providing services relative to future facilities, systems and equipment.

§ 3.4.6 Providing services to investigate existing conditions or facilities or to make measured drawings thereof.

*(Paragraphs deleted)*
§ 3.4.8 Providing coordination of construction performed by separate contractors or by the Owner's own forces and coordination of services required in connection with construction performed and equipment supplied by the Owner.

§ 3.4.9 Providing services in connection with the work of a construction manager or separate consultants retained by the Owner.

§ 3.4.10 Providing detailed estimates of Construction Cost.

§ 3.4.11 Providing detailed quantity surveys or inventories of material, equipment and labor.

§ 3.4.12 Providing analyses of owning and operating costs.

§ 3.4.13 Providing interior design and other similar services required for or in connection with the selection, procurement or installation of furniture, furnishings and related equipment.

§ 3.4.14 Providing services for planning tenant or rental spaces.

§ 3.4.15 Making investigations, inventories of materials or equipment, or valuations and detailed appraisals of existing facilities.

§ 3.4.16 Preparing a set of reproducible record drawings showing significant changes in the Work made during construction based on marked-up prints, drawings and other data furnished by the Contractor to the Architect.

§ 3.4.17 Providing assistance in the utilization of equipment or systems such as testing, adjusting and balancing, preparation of operation and maintenance manuals, training personnel for operation and maintenance, and consultation during operation.

§ 3.4.18 Providing services after issuance to the Owner of the final Certificate for Payment, or in the absence of a final Certificate for Payment, more than 120 days after the date of Substantial Completion of the Work.

§ 3.4.19 Providing services of consultants for other than architectural, structural, mechanical and electrical engineering portions of the Project.

§ 3.4.20 Providing any other services not otherwise included in this Agreement or not customarily furnished in accordance with generally accepted architectural practice.

### ARTICLE 4  OWNER'S RESPONSIBILITIES
§ 4.1 The Owner shall provide full information in a timely manner regarding requirements for and limitations on the Project, including a written program which shall set forth the Owner's objectives, schedule, constraints and criteria, including space requirements and relationships, flexibility, expandability, special equipment, systems and site requirements. The Owner shall furnish to the Architect, within 15 days after receipt of a written request, information necessary and relevant for the Architect to evaluate, give notice of or enforce lien rights.

Init.

AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:16:09 on 04/30/2008 under Order No.1000315850_5 which expires on 8/23/2008, and is not for resale.
User Notes:                                                                                           (142653987)

6

EXHIBIT " 2" -62

*(Paragraphs deleted)*

§ 4.3 The Owner shall designate a representative authorized to act on the Owner's behalf with respect to the Project. The Owner or such designated representative shall render decisions in a timely manner pertaining to documents submitted by the Architect in order to avoid unreasonable delay in the orderly and sequential progress of the Architect's services.

§ 4.4 The Owner shall furnish surveys to describe physical characteristics, legal limitations and utility locations for the site of the Project, and a written legal description of the site. The surveys and legal information shall include, as applicable, grades and lines of streets, alleys, pavements and adjoining property and structures; adjacent drainage; rights-of-way, restrictions, easements, encroachments, zoning, deed restrictions, boundaries and contours of the site; locations, dimensions and necessary data with respect to existing buildings, other improvements and trees; and information concerning available utility services and lines, both public and private, above and below grade, including inverts and depths. All the information on the survey shall be referenced to a Project benchmark.

§ 4.5 The Owner shall furnish the services of geotechnical engineers when such services are requested by the Architect. Such services may include but are not limited to test borings, test pits, determinations of soil bearing values, percolation tests, evaluations of hazardous materials, ground corrosion tests and resistivity tests, including necessary operations for anticipating subsoil conditions, with reports and appropriate recommendations.

§ 4.6 The Owner shall furnish the services of consultants other than those designated in Section 4.5 when such services are requested by the Architect and are reasonably required by the scope of the Project.

§ 4.7 The Owner shall furnish structural, mechanical, and chemical tests; tests for air and water pollution; tests for hazardous materials; and other laboratory and environmental tests; inspections and reports required by law or the Contract Documents.

§ 4.8 The Owner shall furnish all legal, accounting and insurance services that may be necessary at any time for the Project to meet the Owner's needs and interests. Such services shall include auditing services the Owner may require to verify the Contractor's Applications for Payment or to ascertain how or for what purposes the Contractor has used the money paid by or on behalf of the Owner.

§ 4.9 The services, information, surveys and reports required by Sections 4.4 through 4.8 shall be furnished at the Owner's expense, and the Architect shall be entitled to rely upon the accuracy and completeness thereof.

§ 4.10 The Owner shall provide prompt written notice to the Architect if the Owner becomes aware of any fault or defect in the Project, including any errors, omissions or inconsistencies in the Architect's Instruments of Service.

§ 4.11 Any direct communication between the Owner or the Owner's Designated Representative and the Contractor that affect the performance or administration of the Work shall be made or confirmed in writing, with copies to the Architect and Project Manager.

*(Intentionally Omitted)*
*(Paragraphs deleted)*
ARTICLE 6  USE OF ARCHITECT'S INSTRUMENTS OF SERVICE
§ 6.1 Drawings, specifications and other documents, including those in electronic form, prepared by the Architect and the Architect's consultants are Instruments of Service for use solely with respect to this Project. The Architect and the Architect's consultants shall be deemed the authors and owners of their respective Instruments of Service and shall retain all common law, statutory and other reserved rights, including copyrights, until duly transferred to Owner.

AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA™ Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA™ Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:16:09 on 04/30/2008 under Order No.1000315850_3 which expires on 8/23/2008, and is not for resale.
User Notes:                                                                                                   (142658987)

Init.

I

7

EXHIBIT "2"-63

§ 6.2 Upon execution of this Agreement, the Architect grants to the Owner a nonexclusive license to reproduce the Architect's Instruments of Service solely for the purposes of constructing the Project, provided that the Owner shall comply with all obligations, including prompt payment of all sums when due, under this Agreement. Any termination of this Agreement due to the failure of the Owner to perform substantially in accordance with the terms of this Agreement prior to completion of the Project shall terminate this license. Upon such termination, the Owner shall refrain from making further reproductions of Instruments of Service and shall return to the Architect within seven days of termination all originals and reproductions in the Owner's possession or control. If the Agreement is terminated due to the Owner's convenience or Owner's claim that the Architect has failed substantially to perform in accordance with the terms of this Agreement, the Owner may elect to accept a second, nonexclusive license permitting the Owner to authorize other similarly credentialed design professionals to reproduce and, where permitted by law, to make changes, corrections or additions to the Instruments of Service solely for purposes of completing the Project, provided that the Owner releases Architect from any liability for the post-termination use of the Instruments of Service, waives any claims against the Architect for errors and omissions arising out of the post-termination use of the Instruments of Service and indemnifies Architect for the post-non-exclusive license.
§ 6.3  In the event of any non-payment or delayed payment, Architect shall be entitled to immediate return of its entire work product.

§ 6.3.1 Upon completion of the Project, provided that the Owner shall comply with all obligations, including prompt payment of all sums when due, the Architect grants to the Owner a non-exclusive license to reproduce the Architect's Instruments of Service solely for purposes of using and maintaining the Project. This non-exclusive license permits the Owner to authorize other similarly credentialed design professionals to reproduce and, where permitted by law, to make changes, corrections or additions to the Instruments of Service solely for purposes of future additions or alterations to this Project, provided that the Owner releases Architect from any liability for the post-completion use of the Instruments of Service, waives any claims against Architect for errors or omissions arising out of the post-completion use of the Instruments of Service and indemnifies Architect for the post-completion use of the Instruments of Service. In the event of any non-payment or delayed payment, Architect shall be entitled to immediate return of all of its work product.

§ 6.4 Any of the non-exclusive licenses described in this Agreement permit the Owner to authorize the Contractor, Subcontractors, Sub-subcontractors and material or equipment suppliers to reproduce applicable portions of the Instruments of Service appropriate to and for use in their execution of the Work.

§ 6.5 The reproduction of Instruments of Service pursuant to non-exclusive licenses described in this Agreement and submission or distribution of Instruments of Service to meet official regulatory requirements or for similar purposes in connection with the Project is not to be construed as publication in derogation of the reserved rights of the Architect and Architect's consultants.

§ 6.6 None of the non-exclusive licenses described in this Agreement authorize use of the Instruments of Service for other projects. None of the non-exclusive licenses described in this Agreement may be assigned, delegated, sublicensed, pledged or otherwise transferred by the Owner to any party other than an institutional lender providing financing for the Project without the prior written agreement of the Architect. Any unauthorized use of the Instruments of Service shall be at the Owner's sole risk and without liability to the Architect and the Architect's consultants.

§ 6.7 Prior to the Architect providing to the Owner any Instruments of Service in electronic form or the Owner providing to the Architect any electronic data for incorporation into the Instruments of Service, the Owner and the Architect shall by separate written agreement set forth the specific conditions governing the format of such Instruments of Service or electronic data, including any special limitations or licenses not otherwise provided in this Agreement.

**Init.**

**/**

AIA Document B151™ –1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:18:09 on 04/30/2008 under Order No.1000315850_5 which expires on 8/23/2008, and is not for resale.
User Notes:                                                                                      (142658987)

**B**

EXHIBIT " 2" -64

§ 6.8 Ownership of the Architectural Works  Upon receipt of Final Payment, Architect Provider hereby assigns to Owner all right, title, and interest in and to any design services included in the Services, including any drawings, specifications, and other documents, including those in electronic form, for such Services (collectively the "Architectural Works") that have been prepared or created as of the date of this Agreement. All materials developed in connection with the creation, preparation or use of the Architectural Works, including all books, papers, notes, outlines, computer disks or diskettes, letters, negatives, plates, photographs, sketches and illustrations, as well as all copies of any of the Architectural Works, will be provided to an owned by Owner exclusively. Any use by Owner of the Architectural Works subsequent to final completion of the Services, including any work, covered by the Services and acceptance of such Services, including any work, by Owner will be at Owner's sole risk and without liability to Provider and Provider's consultants unless the subsequent use is made pursuant to the written consent of Provider to that specific reuse.
*(Paragraphs deleted)*
ARTICLE 7  DISPUTE RESOLUTION
§ 7.1 MEDIATION

§ 7.1.1 The parties agree to submit all claims, disputes or controversies (whether based upon the law or contract, negligence, other common law or statute) arising out of, or in relation to, the interpretation, application or enforcement of this Agreement, including dispute resolution procedures, to sequential mandatory discussion, mediation and arbitration before, and as a condition precedent to judicial action or other remedies. The parties agree to give prompt written notice of any dispute. Within seven days after the notice, principals of each party with authority to settle the dispute shall participate in direct, informal discussions.
*(Paragraphs deleted)*
§ 7.1.2 Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to mediation as a condition precedent to arbitration or the institution of legal or equitable proceedings by either party. If such matter relates to or is the subject of a lien arising out of the Architect's services, the Architect may proceed in accordance with applicable law to comply with the lien notice or filing deadlines prior to resolution of the matter by mediation or by arbitration.

§ 7.1.3 The Owner and Architect shall endeavor to resolve claims, disputes and other matters in question between them by mediation which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect. Request for mediation shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. The request may be made concurrently with the filing of a demand for arbitration but, in such event, mediation shall proceed in advance of arbitration or legal or equitable proceedings, which shall be stayed pending mediation for a period of 60 days from the date of filing, unless stayed for a longer period by agreement of the parties or court order.

§ 7.1.4 The parties shall share the mediator's fee and any filing fees equally. The mediation shall be held in the place where the Project is located, unless another location is mutually agreed upon. Agreements reached in mediation shall be enforceable as settlement agreements in any court having jurisdiction thereof.

*(Paragraphs deleted)*
§ 7.2 ARBITRATION (Non-Binding)
§ 7.2.1 Any claim, dispute or other matter in question arising out of or related to this Agreement shall be subject to non-binding arbitration. Prior to arbitration, the parties shall endeavor to resolve disputes by mediation in accordance with Section 7.1.

§ 7.2.2 Claims, disputes and other matters in question between the parties that are not resolved by mediation shall be submitted to non-binding arbitration which, unless the parties mutually agree otherwise, shall be in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association currently in effect. The demand for arbitration shall be filed in writing with the other party to this Agreement and with the American Arbitration Association. No litigation may be visited prior to completion of the non-binding arbitration, provided however that the statute of limitations shall toll from arbitration demand to arbitration ruling.

§ 7.2.3 A demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen. In no event shall the demand for arbitration be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter in question would be barred by the applicable statute of limitations.

AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA° Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA° Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:18:09 on 04/30/2008 under Order No.1000315850_5 which expires on 8/23/2008, and is not for resale.
User Notes:                                                                                                          (1426558987)

Init.

*I*

9

EXHIBIT "2"-65

§ 7.2.4 No arbitration arising out of or relating to this Agreement shall include, by consolidation or joinder or in any other manner, an additional person or entity not a party to this Agreement, except by written consent containing a specific reference to this Agreement and signed by the Owner, Architect, and any other person or entity sought to be joined. Consent to arbitration involving an additional person or entity shall not constitute consent to arbitration of any claim, dispute or other matter in question not described in the written consent or with a person or entity not named or described therein. The foregoing agreement to arbitrate and other agreements to arbitrate with an additional person or entity duly consented to by parties to this Agreement shall be specifically enforceable in accordance with applicable law in any court having jurisdiction thereof.

§ 7.2.5 Arbitration shall occur in the State of California.

*(Paragraphs deleted)*
### § 7.3 CLAIMS FOR CONSEQUENTIAL DAMAGES
The Architect and Owner waive consequential damages for claims, disputes or other matters in question arising out of or relating to this Agreement. This mutual waiver is applicable, without limitation, to all consequential damages due to either party's termination in accordance with Article 8.

§ 7.3.1 Upon the condition that the Contractor waives claims against the Architect for consequential damages arising out of or relating to the contract between Owner and Contractor, the Architect waives claims against the Contractor and its consultants for consequential damages. Consequential damages, for the purposes of this Agreement, include without limitation any indirect, special, reliance, incidental, loss of use, loss of income, loss of profit, overhead, loss of rent, warranty or consequential damages as well as damages under theories of contribution or indemnity, but does not include damages for personal and bodily injuries or death. The parties further agree that any liability for any damages not waived under this Agreement are limited to an amount not-to-exceed $100,000 or the total compensation for basic and additional services under this Agreement, whichever sum is greater, but this limitation of liability does not apply to damages for personal and bodily injuries or death.

§ 7.3.2 The parties further agree that if, due to the Architect's error, any required item or component of the Project is omitted from the Construction Documents, any claims against the Architect shall not include the cost or expense of any addition to the Project that provides betterment, upgrades or enhancement of the Project.

### ARTICLE 8 TERMINATION OR SUSPENSION
§ 8.1 If the Owner fails to make payments to the Architect in accordance with this Agreement, such failure shall be considered substantial nonperformance and cause for termination or, at the Architect's option, cause for suspension of performance of services under this Agreement. If the Architect elects to suspend services, prior to suspension of services, the Architect shall give fourteen days' written notice to the Owner. In the event of a suspension of services, the Architect shall have no liability to and shall be indemnified by the Owner for delay or damage caused the Owner or others because of such suspension of services. Before resuming services, the Architect shall be paid all sums due prior to suspension and any expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted. Such suspension of services by Architect may include holding documents for governing agency approvals, holding construction documents for bidding or permitting, or not appearing at requested meetings on behalf of the Owner.

§ 8.2 If the Project is suspended by the Owner for more than 30 consecutive days, the Architect shall be compensated for services performed prior to notice of such suspension. When the Project is resumed, the Architect shall be compensated for expenses incurred in the interruption and resumption of the Architect's services. The Architect's fees for the remaining services and the time schedules shall be equitably adjusted.

§ 8.3 If the Project is suspended or the Architect's services are suspended for more than 90 consecutive days, the Architect may terminate this Agreement by giving not less than seven days' written notice.

§ 8.4 This Agreement may be terminated by either party upon not less than seven days' written notice should the other party fail substantially to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination.

Init.

/

AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:16:09 on 04/30/2008 under Order No.1000315650_5 which expires on 8/23/2008, and is not for resale.
User Notes:                                                                                                    (142656987)

10

EXHIBIT "2"-66

§ 8.5 This Agreement may be terminated by the Owner upon not less than seven days' written notice to the Architect for the Owner's convenience and without cause.

§ 8.6 In the event of termination not the fault of the Architect, the Architect shall be compensated for services performed prior to termination, together with Reimbursable Expenses then due and all Termination Expenses as defined in Section 8.7.

§ 8.7 Termination Expenses are in addition to compensation for the services of the Agreement and include expenses directly attributable to termination for which the Architect is not otherwise compensated.

ARTICLE 9  MISCELLANEOUS PROVISIONS

§ 9.1 This Agreement shall be governed by the laws of the State of California.

§ 9.2 Terms in this Agreement shall have the same meaning as those in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement.

§ 9.3 Causes of action between the parties to this Agreement pertaining to acts or failures to act shall be deemed to have accrued and the applicable statutes of limitations shall commence to run not later than either the date of Substantial Completion for acts or failures to act occurring prior to Substantial Completion or the date of issuance of the final Certificate for Payment for acts or failures to act occurring after Substantial Completion, whichever occurs last. In no event shall such statutes of limitations commence to run any later than the date when the Architect's services are substantially completed.

§ 9.4 To the extent damages are covered by property insurance during construction, the Owner and Architect waive all rights against each other and against the contractors, consultants, agents and employees of the other for damages, except such rights as they may have to the proceeds of such insurance as set forth in the edition of AIA Document A201, General Conditions of the Contract for Construction, current as of the date of this Agreement. The Owner or the Architect, as appropriate, shall require of the contractors, consultants, agents and employees of any of them similar waivers in favor of the other parties enumerated herein.

§ 9.5 The Owner and Architect, respectively, bind themselves, their partners, successors, assigns and legal representatives to the other party to this Agreement and to the partners, successors, assigns and legal representatives of such other party with respect to all covenants of this Agreement. Neither the Owner nor the Architect shall assign this Agreement without the written consent of the other, except that the Owner may assign this Agreement to an institutional lender providing financing for the Project. In such event, the lender shall assume the Owner's rights and obligations under this Agreement. The Architect shall execute all consents reasonably required to facilitate such assignment.

§ 9.6 This Agreement represents the entire and integrated agreement between the Owner and the Architect and supersedes all prior negotiations, representations or agreements, either written or oral. This Agreement may be amended only by written instrument signed by both Owner and Architect.

§ 9.7 Nothing contained in this Agreement shall create a contractual relationship with or a cause of action in favor of a third party against either the Owner or Architect.

§ 9.8 Unless otherwise provided in this Agreement, the Architect and Architect's consultants shall have no responsibility for the discovery, presence, handling, removal or disposal of or exposure of persons to hazardous materials or toxic substances in any form at the Project site.

§ 9.9 The Architect shall have the right to include photographic or artistic representations of the design of the Project among the Architect's promotional and professional materials. The Architect shall be given reasonable access to the completed Project to make such representations. However, the Architect's materials shall not include the Owner's confidential or proprietary information if the Owner has previously advised the Architect in writing of the specific information considered by the Owner to be confidential or proprietary. The Owner shall provide professional credit for the Architect in the Owner's promotional materials for the Project.

AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:16:09 on 04/30/2008 under Order No.1000315850_5 which expires on 8/23/2008, and is not for resale.
User Notes:                                                          (142658967)

Init.

/

11

EXHIBIT "2"-67

§ 9.10 If the Owner requests the Architect to execute certificates, the proposed language of such certificates shall be submitted to the Architect for review at least 14 days prior to the requested dates of execution. The Architect shall not be required to execute certificates that would require knowledge, services or responsibilities beyond the scope of this Agreement.

§ 9.11 The Architect shall not be responsible for the identification, discovery, removal, remediation of or any harm caused by hazardous substances present at the Site. The Owner shall be responsible for the identification, discovery, removal, remediation of any hazardous substances present at the Site. If any such hazardous substances are discovered while the Project is in progress, schedules and budgets shall be adjusted as necessary for the removal or remediation of any such hazardous substances.

ARTICLE 10  PAYMENTS TO THE ARCHITECT
(Intentionally Omitted)
(Paragraphs deleted)
§ 10.2 REIMBURSABLE EXPENSES
§ 10.2.1 Reimbursable Expenses are in addition to compensation for Basic and Additional Services and include expenses incurred by the Architect and Architect's employees and consultants directly related to the Project, as identified in the following Clauses:
    .1    transportation in connection with the Project, authorized out-of-town travel and subsistence, and electronic communications;
    .2    fees paid for securing approval of authorities having jurisdiction over the Project;
    .3    reproductions, plots, standard form documents, postage, handling and delivery of Instruments of Service;
    .4    expense of overtime work requiring higher than regular rates if authorized in advance by the Owner;
    .5    renderings, models and mock-ups requested by the Owner;
    .6
(Paragraphs deleted)
        other similar direct Project-related expenditures, if authorized by Owner in advance.

§ 10.3 PAYMENTS ON ACCOUNT OF BASIC SERVICES

(Paragraphs deleted)
§ 10.3.2 Subsequent payments for Basic Services shall be made monthly and, where applicable, shall be in proportion to services performed within each phase of service, on the basis set forth in Section 11.2.2.

§ 10.3.3 If and to the extent that the time initially established in Section 11.5.1 of this Agreement is exceeded or extended through no fault of the Architect, compensation for any services rendered during the additional period of time shall be computed in the manner set forth in Section 11.3.2.

(Paragraphs deleted)
§ 10.4 PAYMENTS ON ACCOUNT OF ADDITIONAL SERVICES
Payments on account of the Architect's Additional Services and for Reimbursable Expenses shall be made monthly upon presentation of the Architect's statement of services rendered or expenses incurred.

§ 10.5 PAYMENTS WITHHELD
No deductions shall be made from the Architect's compensation on account of penalty, liquidated damages or other sums withheld from payments to contractors, or on account of the cost of changes in the Work other than those for which the Architect has been adjudged to be liable.

§ 10.6 ARCHITECT'S ACCOUNTING RECORDS
Records of Reimbursable Expenses and expenses pertaining to Additional Services and services performed on the basis of hourly rates or a multiple of Direct Personnel Expense shall be available to the Owner or the Owner's authorized representative at mutually convenient times.

AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:16:09 on 04/30/2008 under Order No.1000315560_5 which expires on 8/23/2009; and is not for resale.
User Notes:                                                                                                     (142656987)

Init.

12

EXHIBIT "2"-68

ARTICLE 11  BASIS OF COMPENSATION
The Owner shall compensate the Architect as follows:

§ 11.1 An Initial Payment of   Zero    ($   -0-   ) shall be made upon execution of this Agreement and credited to the Owner's account at final payment.

§ 11.2 BASIC COMPENSATION
§ 11.2.1 For Basic Services, as described in Article 2, and any other services included in Article 12 as part of Basic Services, Basic Compensation shall be computed as follows:

*R 1,250,000 BD*

*A fixed fee of One Million Three Hundred Thousand Dollars ($1,300,000.00).*

§ 11.2.2 Where compensation is based on a stipulated sum or percentage of Construction Cost, progress payments for Basic Services in each phase shall total the following percentages of the total Basic Compensation payable:

| PHASE | PHASE FEE | PERCENT | |
|---|---|---|---|
| Schematic Design Phase: | $150,000.00 | percent (Twelve | 12 %) |
| Design Development Phase: | $340,000.00 | percent (Twenty-Six | 26 %) |
| Construction Documents Phase: | $610,000.00 | percent (Forty-Seven | 47 %) |
| *(Row deleted)* | | | |
| Construction Phase: | $200,000.00 | percent (Fifteen | 15 %) |
| Total Basic Compensation | $1,300,000.00  $1,250,000 BD | percent (One Hundred | 100.00 %) |

§ 11.2.3 See Appendix A -- Prevailing Hourly Rates.

§ 11.3 COMPENSATION FOR ADDITIONAL SERVICES
§ 11.3.1 For Project Representation Beyond Basic Services, as described in Section 3.2, compensation shall be computed as follows:

§ 11.3.2 For Additional Services of the Architect, as described in Articles 3 and 12, other than (1) Additional Project Representation, as described in Section 3.2, and (2) services included in Article 12 as part of Basic Services, but excluding services of consultants, compensation shall be computed as follows:

See Exhibit A for Prevailing Hourly Rates.

AIA Document B151™ – 1997. Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:16:09 on 04/30/2008 under Order No. 1000315850_5 which expires on 8/23/2008, and is not for resale.
User Notes:    (142658987)

Init.

13

EXHIBIT "2"-69

§ 11.3.3 For Additional Services of Consultants, including additional structural, mechanical and electrical engineering services and those provided under Section 3.4.19 or identified in Article 12 as part of Additional Services, a multiple of one and one-quarter ( 1.25 ) times the amounts billed to the Architect for such services.

§ 11.4 REIMBURSABLE EXPENSES
For Reimbursable Expenses, as described in Section 10.2, and any other items included in Article 12 as Reimbursable Expenses, a multiple of one and one-tenth ( 1.10 ) times the expenses incurred by the Architect, the Architect's employees and consultants directly related to the Project.

§ 11.4.1 See Appendix B – Prevailing Reimbursable Expenses.

§ 11.4.2 The Owner will pay any taxes currently in force or imposed in the future in addition to the fees and expenses.

§ 11.5 ADDITIONAL PROVISIONS
§ 11.5.1 If the Basic Services covered by this Agreement have not been completed within thirty-six ( 36 ) months of the date hereof, through no fault of the Architect, extension of the Architect's services beyond that time shall be compensated as provided in Sections 10.3.3 and 11.3.2.

§ 11.5.2 Payments are due and payable thirty ( 30 ) days from the date of the Architect's invoice. Amounts unpaid sixty ( 60 ) days after the invoice date shall bear interest at the rate entered below, or in the absence thereof at the legal rate prevailing from time to time at the principal place of business of the Architect.
(Insert rate of interest agreed upon.)
Interest on unpaid invoices after sixty (60) days will accrue at the maximum legal rate.

§ 11.5.3 The rates and multiples set forth for Additional Services shall be adjusted in accordance with the normal salary review practices of the Architect.

ARTICLE 12 OTHER CONDITIONS OR SERVICES
(Insert descriptions of other services, identify Additional Services included within Basic Compensation and modifications to the payment and compensation terms included in this Agreement.)

This Agreement entered into as of the day and year first written above.

| OWNER | ARCHITECT |
|---|---|
| (Signature) | (Signature) |
| David Golkar | John Deenihan, AIA |
| Kamran Group, LLC | KEE Architects, Inc. |
| (Printed name and title) | (Printed name and title) |

AIA Document B151™ – 1997: Copyright © 1974, 1978, 1987 and 1997 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This document was produced by AIA software at 14:16:09 on 04/30/2008 under Order No.1000315850_5 which expires on 8/23/2008, and is not for resale.
User Notes:     (142658987)

Init.

14

EXHIBIT "2"-70

APN: 5713-009-040
APN: 5713-009-041
APN: 5713-009-042
RECORDING REQUESTED BY:
KKE ARCHITECTS, INC.

WHEN RECORDED MAIL TO:
KKE ARCHITECTS, INC.
c/o Brian K. Stewart, Esq.
Collins, Collins, Muir & Stewart
1100 El Centro Street
South Pasadena, CA 91030

COPY of Doc... ... ... ... tec
...... Has no ...... la
Origina ......
processing has been completed.
LOS ANGELES COUNTY REGISTRAR - RECORDER

---

### NOTICE OF LIEN

---

NOTICE:  A design lien, pursuant to Civil Code §3081.1 – 3081.10, is hereby created in favor of KKE ARCHITECTS, INC. on the real property described as follows:

A parcel of land located in the State of California, County of Los Angeles, with a situs address of 25 West Walnut Street, Unit 501, Pasadena California 91103-3677 and being the same property more fully described as:
APN: 5713-009-042; Map Book 896, Page 84; *TR=33536, Condominium Unit 4, Lot Number 1;
A parcel of land located in the State of California, County of Los Angeles, with a situs address of 25 West Walnut Street, Unit 505, Pasadena California 91103-3677 and being the same property more fully described as:
APN: 5713-009-040; Map Book 896, Page 84; *TR=33536, Condominium Unit 2, Lot Number 1;
A parcel of land located in the State of California, County of Los Angeles, with a situs address of 25 West Walnut Street, Unit 504, Pasadena California 91103-3677 and being the same property more fully described as:
APN: 5713-009-041; Map Book 896, Page 84; *TR=33536, Condominium Unit 3, Lot Number 1.

The real property is owned by the Kamran Group, LLC at the time of recordation.

The amount of the lien is of Two Hundred Twelve Thousand Four Hundred Twenty Five Dollars and Ninety Nine Cents ($212,425.99).

The real property has been the subject of the following government approval: The design professional services which form the basis of this Design Professional Lien were furnished purusant to a written contract dated April 10, 2008, including all related supplements and addendums, and were subject to an increase in the floor area ratio allowance.

Dated: October ___, 2009

KKE ARCHITECTS, INC.

By: _____
Brian Arial, AIA

### ACKNOWLEDGEMENT

State of California        )
                          )
County of LOS Angeles     )

On OCt. 26, 09 before me, Joany Reymann a notary public, personally appeared Brian Arial who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.
I certify under Penalty of Perjury under the laws of the State of California that the foregoing paragraph is true and correct.
WITNESS my hand and official seal.

Notary Public

JOANY REYMANN
Commission #1821522
Notary Public - California
Los Angeles County
My Comm. Expires Nov. 3, 2012

β

EXHIBIT "2"-71

## VERIFICATION

I, Brian Arial, declare that I am an authorized representative of KKE ARCHITECTS, INC. named as Claimant in the foregoing Claim of Design Professionals' Lien and make this verification for and on behalf of the Corporation.

I have read the Claim of Design Professionals' Lien and know the contents thereof.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26 day of October, 2009 at PASADENA , California

_____

Brian Arial, AIA, NCARB

L:\15867.6\VERIFICATION (LIEN).DOC

ollins Collins
ulr + Stewart LLP
10 El Centro Street
. Pasadena, CA 91030
one (620) 243-1100
( (626) 243-1111

1

VERIFICATION

EXHIBIT "2" -72

# Exhibit 5

(Plaintiffs' Exhibit 17 in Joint Pretrial Order)

PLD-C-001

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Howard Goodman, State Bar #76570<br>LAW OFFICES OF HOWARD GOODMAN<br>18321 Ventura Blvd.<br>Suite 915<br>Tarzana, California 91356<br>TELEPHONE NO: 818-996-8903  FAX NO. (Optional): 818-996-2942 F<br>E-MAIL ADDRESS (Optional): HOWARD@HOWARDGOODMAN.NET<br>ATTORNEY FOR (Name): PLAINTIFF | |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES
STREET ADDRESS: 300 E. Walnut Street
MAILING ADDRESS: 300 E. Walnut Street
CITY AND ZIP CODE: Pasadena, CA 91101
BRANCH NAME: NORTHEAST DISTRICT-PASADENA COURT

6028 A
91103

FILED
LOS ANGELES SUPERIOR COURT
APR 20 2009
JOHN A. CLARKE CLERK
BY MARIA AGUIRRE DEPUTY

PLAINTIFF: B.L. PRICE CO., INC.;

DEFENDANT: FULLSCOPE PROJECT MANAGEMENT, INC.; TRANMAR PROPERTIES, LLC., KAMRAN GROUP, LLC.; PASADENA ATHLETIC CLUB INC.; NAMCO CAPITAL GROUP INC.;
[X] DOES 1 TO 20

**CONTRACT**
[X] COMPLAINT    [ ] AMENDED COMPLAINT (Number):
[ ] CROSS-COMPLAINT [ ] AMENDED CROSS-COMPLAINT (Number):

Jurisdiction (check all that apply):
[ ] ACTION IS A LIMITED CIVIL CASE
Amount demanded [ ] does not exceed $10,000
[ ] exceeds $10,000, but does not exceed $25,000
[X] ACTION IS AN UNLIMITED CIVIL CASE (exceeds $25,000)
[ ] ACTION IS RECLASSIFIED by this amended complaint or cross-complaint
[ ] from limited to unlimited
[ ] from unlimited to limited

CASE NUMBER:

GC042809

1. Plaintiff* (name or names): B.L. PRICE CO., INC.

   alleges causes of action against defendant* (name or names): FULLSCOPE PROJECT MANAGEMENT, INC.; TRANMAR PROPERTIES, LLC., KAMRAN GROUP, LLC.; PASADENA ATHLETIC CLUB INC.; NAMCO CAPITAL GROUP INC.; DOES 1-20

2. This pleading, including attachments and exhibits, consists of the following number of pages:

3. a. Each plaintiff named above is a competent adult
      [X] except plaintiff (name): B.L. PRICE CO., INC.

      (1) [X] a corporation qualified to do business in California
      (2) [ ] an unincorporated entity (describe):
      (3) [ ] other (specify):

   b. [X] Plaintiff (name): B.L. PRICE CO., INC.
      a. [ ] has complied with the fictitious business name laws and is doing business under the fictitious name (specify):

      b. [X] has complied with all licensing requirements as a licensed (specify): CONTRACTOR

   c. [ ] Information about additional plaintiffs who are not competent adults is shown in Attachment 3c.

4. a. Each defendant named above is a natural person
      [X] except defendant (name): FULLSCOPE PROJECT MANAGEMENT, INC.
      (1) [ ] a business organization, form unknown
      (2) [X] a corporation
      (3) [ ] an unincorporated entity (describe):
      (4) [ ] a public entity (describe):
      (5) [ ] other (specify):

      [X] except defendant (name): TRANMAR PROPERTIES LLC.
      (1) [ ] a business organization, form unknown
      (2) [ ] a corporation
      (3) [X] an unincorporated entity (describe): A LIMITED LIABILITY COMPANY
      (4) [ ] a public entity (describe):
      (5) [ ] other (specify):

* If this form is used as a cross-complaint, plaintiff means cross-complainant and defendant means cross-defendant.
Page 1 of 2

Form Approved for Optional Use
Judicial Council of California
PLD-C-001 (Rev. January 1, 2007)

COMPLAINT—Contract

Legal Solutions Plus

Code of Civil Procedure, § 425.12

EXHIBIT "2"-74

PLD-C-001

| SHORT TITLE: PRICE VS. FULLSCOPE | CASE NUMBER: |
|---|---|

4.  *(Continued)*
    b.  The true names of defendants sued as Does are unknown to plaintiff.
        (1) ☐ Doe defendants *(specify Doe numbers):* _____ were the agents or employees of the named defendants and acted within the scope of that agency or employment.
        (2) ☐ Doe defendants *(specify Doe numbers):* _____ are persons whose capacities are unknown to plaintiff.
    c.  ☒ Information about additional defendants who are not natural persons is contained in ~~Attachment 4~~ para. 9
    d.  ☐ Defendants who are joined under Code of Civil Procedure section 382 are *(names):*

5.  ☐ Plaintiff is required to comply with a claims statute, and
    a.  ☐ has complied with applicable claims statutes, *or*
    b.  ☐ is excused from complying because *(specify):*

6.  ☐ This action is subject to   ☐ Civil Code section 1812.10   ☐ Civil Code section 2984.4.
7.  This court is the proper court because
    a.  ☐ a defendant entered into the contract here.
    b.  ☐ a defendant lived here when the contract was entered into.
    c.  ☐ a defendant lives here now.
    d.  ☐ the contract was to be performed here.
    e.  ☐ a defendant is a corporation or unincorporated association and its principal place of business is here.
    f.  ☒ real property that is the subject of this action is located here.
    g.  ☐ other *(specify):*

8.  The following causes of action are attached and the statements above apply to each *(each complaint must have one or more causes of action attached):*
    ☒ Breach of Contract
    ☒ Common Counts
    ☒ Other *(specify):* FORECLOSURE OF MECHANIC'S LIEN

9.  ☒ Other allegations:
    KAMRAN GROUP, LLC. is a limited liability company organized on California.
    PASADENA ATHLETIC CLUB INC. is a California domestic stock corporation.
    NAMCO CAPITAL GROUP INC. is a California domestic stock corporation.

10. Plaintiff prays for judgment for costs of suit; for such relief as is fair, just, and equitable; and for
    a.  ☒ damages of: $ 245,500.00
    b.  ☒ interest on the damages
        (1) ☒ according to proof
        (2) ☐ at the rate of *(specify):*        percent per year from *(date):*
    c.  ☒ attorney's fees
        (1) ☐ of: $
        (2) ☒ according to proof.
    d.  ☒ other *(specify):*
        FORECLOSURE OF MECHANIC'S LIEN;
        DETERMINATION OF THE PRIORITY OF PLAINTIFF'S MECHANIC'S LIEN

11. ☐ The paragraphs of this pleading alleged on information and belief are as follows *(specify paragraph numbers):*

Date: APRIL 15, 2009

Howard Goodman, State Bar #76570
(TYPE OR PRINT NAME)                                              ► _____
                                                                      (SIGNATURE OF PLAINTIFF OR ATTORNEY)
*(If you wish to verify this pleading, affix a verification.)*

PLD-C-001 [Rev. January 1, 2007]          **COMPLAINT—Contract**

EXHIBIT "2" -75
Page 2 of 2

| In re: NAMCO CAPITAL GROUP, INC.<br><br>Debtor(s). | CHAPTER 11<br>CASE NUMBER: 2:08-bk-32333-BR<br>ADVERSARY PROC. NO.: 2:10-ap-01244-BR |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 831 State Street, Santa Barbara, California 93101. A true and correct copy of the foregoing document described **DECLARATION OF DAVID GOLKAR** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL(indicate method for each person or entity served):**
On **February 23, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 23, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge <u>will be</u> completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 2/23/11 | Kathy Koester | |
|---|---|---|
| Date | Type Name | Signature |

II.    **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**

EXHIBIT " 2"-76

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**F 9013-3.1**

January 2009
09019.003 - 163624.1

| | |
|---|---|
| In re: NAMCO CAPITAL GROUP, INC.<br><br>Debtor(s). | CHAPTER 11<br>CASE NUMBER: 2:08-bk-32333-BR<br>ADVERSARY PROC. NO.: 2:10-ap-01244-BR |

**United States Trustee (LA)**
725 S Figueroa St # 2600
Los Angeles, CA 90017-5413

**Sawtelle Properties LLC**
**Weissmann Wolff, et al**
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

**Soussan Hashemi**
**Weissmann Wolff, et al**
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

**John M. Rygh**
915 Wilshire Blvd, Suite 2100
Los Angeles, CA 90017

**Ashland Properties, LLC**
**Weissmann Wolff, et al**
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

**Mahmoud Fatorechi**
**Weissmann Wolff, et al**
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

**Morteza Homayounjam**
**Weissmann Wolff, et al**
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

**Saul Reiss**
Law Offices of Saul Reiss, P.C.
2800 28th St Ste 328
Santa Monica, CA 90405

## III.    SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL:

### SERVED BY E-MAIL:

- David M. Poitras          dpoitras@jmbm.com
- Robyn B. Sokol            rsokol@ebg-law.com; ecf@ebg-law.com
- Joseph A. Eisenberg       jeisenberg@jmbm.com
- Gregory M. Salvato        gsalvato@salvatolawoffices.com; gsalvato@pmcos.com
- Saul Reiss                saulreiss@verizon.net

### SERVED BY PERSONAL DELIVERY:

Honorable Barry Russell
United States Bankruptcy Court – Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012

EXHIBIT "2"-77

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*
09019.003 - 163624.1

F 9013-3.1

| In re: NAMCO CAPITAL GROUP, INC.<br><br>Debtor(s). | CHAPTER 11<br>CASE NUMBER: 2:08-bk-32333-BR<br>ADVERSARY PROC. NO.: 2:10-ap-01244-BR |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 831 State Street, Santa Barbara, California 93101. A true and correct copy of the foregoing document described **DECLARATION OF DAVID GOLKAR** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):

On **February 23, 2011**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL (indicate method for each person or entity served):** Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 23, 2011**, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 2/23/11 | Kathy Koester | _[signature]_ |
|---|---|---|
| Date | Type Name | Signature |

II.   **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009
09019.003 - 163624.1

**F 9013-3.1**

EXHIBIT "2"-78

| In re: NAMCO CAPITAL GROUP, INC.<br><br>Debtor(s). | CHAPTER 11<br>CASE NUMBER: 2:08-bk-32333-BR<br>ADVERSARY PROC. NO.: 2:10-ap-01244-BR |
|---|---|

United States Trustee (LA)
725 S Figueroa St # 2600
Los Angeles, CA 90017-5413

Sawtelle Properties LLC
Weissmann Wolff, et al
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

Soussan Hashemi
Weissmann Wolff, et al
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

John M. Rygh
915 Wilshire Blvd, Suite 2100
Los Angeles, CA 90017

Ashland Properties, LLC
Weissmann Wolff, et al
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

Mahmoud Fatorechi
Weissmann Wolff, et al
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

Morteza Homayounjam
Weissmann Wolff, et al
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

Saul Reiss
Law Offices of Saul Reiss, P.C.
2800 28th St Ste 328
Santa Monica, CA 90405

III.   **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL:**

**SERVED BY E-MAIL:**

- David M. Poitras    dpoitras@jmbm.com
- Robyn B. Sokol    rsokol@ebg-law.com; ecf@ebg-law.com
- Joseph A. Eisenberg    jeisenberg@jmbm.com
- Gregory M. Salvato    gsalvato@salvatolawoffices.com; gsalvato@pmcos.com
- Saul Reiss    saulreiss@verizon.net

**SERVED BY PERSONAL DELIVERY:**

Honorable Barry Russell
United States Bankruptcy Court – Central District of California
Edward R. Roybal Federal Building and Courthouse
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009
09019.003 - 163624.1

**F 9013-3.1**

EXHIBIT "2" -79

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:  1900 Avenue of the Stars, Seventh Floor, Los Angeles, California  90067-4308

A true and correct copy of the foregoing document described as ***EVIDENTIARY OBJECTIONS OF DEFENDANT BRADLEY D. SHARP, CHAPTER 11 TRUSTEE OF NAMCO CAPITAL GROUP, INC., TO DECLARATIONS OF ALI AKBAR HELMI AND DAVID GOLKAR*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

**I.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On ***March 9, 2011***, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☒ Service information continued on attached page

**II.  SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served)**:**
On ***March 9, 2011***, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

Served By Overnight Mail:
Honorable Barry Russell
United States Bankruptcy Court
255 E. Temple Street, Suite 1660
Los Angeles, CA 90012

☐ Service information continued on attached page

**III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on ***March 9, 2011***, I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Dugan P. Kelley       dugan@christmankelley.com
Matthew M. Clarke      matt@christmankelley.com

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| March 9, 2011 | Claudean Brandon | |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

August 2010                                                                                      **F 9013-3.1.PROOF.SERVICE**

**I. TO BE SERVED BY THE COURT VIA NEF:**

- Matthew M Clarke     mclarke@cappellonoel.com
- Marc S Cohen     mcohen@kayescholer.com
- Ashleigh A Danker     adanker@kayescholer.com
- Joseph A Eisenberg     jae@jmbm.com
- David M Poitras     dpoitras@jmbm.com
- Gregory M Salvato     gsalvato@pmcos.com, calendar@salvatolawoffices.com
- Gregory M Salvato     gsalvato@salvatolawoffices.com, calendar@salvatolawoffices.com
- Robyn B Sokol     ecf@ebg-law.com, rsokol@ebg-law.com
- United States Trustee (LA)     ustpregion16.la.ecf@usdoj.gov

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                                                   **F 9013-3.1.PROOF.SERVICE**