

ORIGINAL

Matthew Clarke (SBN 184532)
Matt@christmankelley.com
Dugan P. Kelley (SBN 207347)
Dugan@christmankelley.com
CHRISTMAN, KELLEY & CLARKE
831 State Street
Santa Barbara, California 93101
Telephone:    (805) 884-9922
Facsimile:    (866) 611-9852

Attorneys for Plaintiffs
Kamran Pasadena Group, Inc. and Kamran Group, LLC

FILED
FEB 0 1 2012
BY:

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA – LOS ANGELES DIVISION

In Re:  NAMCO CAPITAL GROUP INC, a
California corporation

Debtor.

KAMRAN PASADENA GROUP, INC., a
California corporation; and KAMRAN GROUP,
LLC, a California limited liability company

Plaintiffs,

v.

BRADLEY D. SHARP, CHAPTER 11
TRUSTEE OF NAMCO CAPITAL GROUP
INC, a California corporation; WOODMAN
PARTNERS, LLC, a California limited liability
company; FIDELITY NATIONAL TITLE
COMPANY, a California corporation DANIEL
JACOB ISSAC, an individual; FAY FRANAK
SARAFIAN, an individual; DARIOUSH
SOLEIMANI, an individual; MORTEZA
HOMAYOUNJAM, an individual; MEHRNAZ
HEKMATRAVAN, an individual; JAMSHID
BAHARVAR; an individual; ASHLAND
PROPERTIES, LLC, A California limited
liability company; FARMCO TRUST,
SAWTELLE PROPERTIES, LLC; a California
limited liability company; MAHMOUD
FATORECHI AND SOUSSAN HASHEMI AS
TRUSTEES FOR THE FATORECHI-
HASHEMI TRUST; and
DOES 1 THROUGH 100

Defendants.

Case No.: 2:08-bk-32333-BR
Chapter 11
Adv. No.: 2:10-ap-01244-BR

**DECLARATION OF DUGAN P. KELLEY
IN SUPPORT OF PLAINTIFFS'
OPPOSITION TO BRADLEY D. SHARP,
CHAPTER 11 TRUSTEE OF NAMCO
CAPITAL GROUP, INC.'S MOTION FOR
SUMMARY JUDGMENT, OR IN THE
ALTERNATIVE, PARTIAL SUMMARY
ADJUDICATION, ON COMPLAINT**

Hearing
Date:      February 22, 2012
Time:      2:00 p.m.
Place:     Courtroom 1668
           255 E. Temple Street
           Los Angeles, CA 90012

1
DECLARATION OF DUGAN P. KELLEY

**DECLARATION OF DUGAN P. KELLEY**

I, Dugan P. Kelley, do declare and say:

1.      I am an attorney licensed to practice law in the State of California, and a shareholder in the law firm of Christman, Kelley & Clarke, PC, attorneys of record for Plaintiffs.  I make this declaration based upon my own personal knowledge.  I could and would competently testify to these facts in a court of law.

2.      Ezri Namvar's deposition was taken on October 22, 2009.  Attached hereto as **Exhibit8** is a true and correct copy of the transcript of Ezri Namvar's Deposition, with important sections of the declarations highlighted therein.

3.      In an effort to further explore the areas of testimony offered by Mr. Namvar on October 22, 2009, my office attempted multiple times to depose Ezri Namvar personally and as the Person Most Knowledgeable of Namco Capital Group, Inc., however, either because of his criminal indictment and subsequent incarceration or the Trustee's unwillingness to produce Mr. Namvar, my office has been unable to depose Mr. Namvar.

I declare under penalty of perjury under the laws of the Unites State of America that the foregoing is true and correct.  Executed this 1st day of February, 2012, at Highland Village, Texas.

Dugan P. Kelley

DECLARATION OF DUGAN P. KELLEY

# EXHIBIT 8

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA (LOS ANGELES DIVISION)

In re:                          )
                                )
NAMCO CAPITAL GROUP, INC., a )
California corporation,
                                )
        Debtor.        )  Case No. 2:08-bk-32333-BR
_____ )

DEPOSITION OF EZRI NAMVAR

OCTOBER 22, 2009

REPORTED BY GRISELDA R. CABANGON-OLSON, CSR NO. 8585

1

CENTURY COURT REPORTERS 1-800-555-0014

Deposition of EZRI NAMVAR,

taken on behalf of Movants, at

12424 Wilshire Boulevard, Suite 720,

Los Angeles, California 90025

commencing at 10:10 a.m.,

Thursday, October 22, 2009, before

Griselda R. Cabangon-Olson, C.S.R. No. 8585.

* * *

APPEARANCES OF COUNSEL:

For Movants Ashland Properties, LLC; Jamshid Baharvar and/or Shohreh E. Baharvar; Farmo Trust Dated January 1, 2007; Mahmoud Fatorechi and Soussan Hashemi, Trustees of Fatorechi-Hashemi Family Trust Dated March 29, 2005; Morteza Homayounjam; Faranak Faye Sarafian; Sawtelle Properties, LLC; and Darioush Soleimani:

LAW OFFICES OF RAYMOND H. AVER
BY: RAYMOND H. AVER
12424 Wilshire Boulevard
Suite 720
Los Angeles, California 90025
(310) 571-3511

For Chapter 11 Trustee Bradley D. Sharp:

EZRA BRUTZKUS GUBNER LLP
BY: DANIEL H. GILL
21350 Oxnard Street
Suite 500
Woodland Hills, California 91367
(818) 827-9000

Also Present:

MORTEZA HOMAYOUNJAM
ABRAHAM YERMIAN

2

CENTURY COURT REPORTERS 1-800-555-0014

I N D E X

WITNESS            EXAMINATION            PAGE

EZRI NAMVAR          BY MR. AVER              6

                    BY MR. GILL          69


E X H I B I T S

Movants':

A (1-9)      Subpoena in a Case Under the
             Bankruptcy Code            6

B-1 (a-d)    Promissory Note Secured by Deed
             of Trust 28

B-2 (a-l)    Long Form Deed of Trust and
             Assignment of Rents          28

C-1 (a-d)    Promissory Note Secured by Deed
             of Trust                  28

C-2 (a-e)    Long Form Deed of Trust and
             Assignment of Rents 28

D-1 (a-d)    Promissory Note Secured by Deed
             of Trust                  28

D-2 (a-e)    Long Form Deed of Trust and
             Assignment of Rents          28

E-1 (a-d)    Promissory Note Secured by Deed
             of Trust                  28

E-2 (a-e)    Long Form Deed of Trust and
Assignment of Rents        28

F-1 (a-b)    Promissory Note        36

F-2 (a-h)    Collateral Assignment of Deed
of Trust        36

G-1 (a-b)    Promissory Note        36

3

CENTURY COURT REPORTERS 1-800-555-0014

I N D E X

E X H I B I T S

Movants':                    Page

G-2 (a-i)    Collateral Assignment of Deed
of Trust        36

H-1 (a-b)    Promissory Note        36

H-2 (a-i)    Collateral Assignment of Deed
of Trust        36

I-1 (a-b)    Promissory Note 36

I-2 (a-i)    Collateral Assignment of Deed
of Trust        36

I-3 (a-b)    Promissory Note        44

J-1 (a-b)    Promissory Note 36

J-2 (a-d)    Collateral Assignment of Deed
of Trust        36

K-1 (a-b)    Promissory Note        36

K-2 (a-b)    Collateral Assignment of Deed
of Trust        36

L-1 (a-b)    Promissory Note        36

L-2 (a-d)    Collateral Assignment of Deed
              of Trust 36

M-1 (a-b)    Promissory Note                36

M-2 (a-k)    Collateral Assignment of Deed
              of Trust              36

N-1          Namco Capital Group, Inc., Account
              QuickReport              56

N-2          Namco Capital Group, Inc., Account
              QuickReport              56

4

I N D E X

E X H I B I T S

Movants':                      Page

N-3          Namco Capital Group, Inc., Account
              QuickReport              56

N-4          Namco Capital Group, Inc., Account
              QuickReport              56

N-5          Namco Capital Group, Inc., Account
              QuickReport              56

O (1-21)     Purchase and Sale Agreement with
              Escrow Instructions          61

P (1-4)      Collateral Assignment of Deed of Trust  61

5

CENTURY COURT REPORTERS 1-800-555-0014

Los Angeles, California

Thursday, October 22, 2009

10:10 a.m.


EZRI NAMVAR,

the Witness herein, having been first duly

affirmed, was deposed and testified as follows:


EXAMINATION

BY MR. AVER:

Q    Good morning, Mr. Namvar.

A    Good morning.

Q    We're here today pursuant to a subpoena in a case under the bankruptcy code. My name is Raymond Aver, and I represent Ashland Properties, LLC; Jamshid Baharvar and/or Shohreh Baharvar; Farmo Trust; Mahmoud Fatorechi and Soussan Hashemi, Trustees of the Fatorechi-Hashemi Family Trust dated March 29, 2005; Morteza Homayounjam; Faranak Faye Sarafian; Sawtelle Properties, LLC; and Darioush Soleimani.

I'd like to mark as Exhibit A to the transcript a copy of the subpoena in the case under the bankruptcy code.

(Movants' Exhibit A (1-9) was marked for identification and is included herewith.)


6


CENTURY COURT REPORTERS 1-800-555-0014


Q    BY MR. AVER: But before we get there, let me go through a couple of preliminaries. Mr. Namvar, have you ever had your deposition taken before?

A    Yes.

Q    Approximately how many times?

A    Too many times to count.

Q    All right.

A    More than 30.

Q    More than 30.

So you're familiar with the proceedings, and I'll just go through things very, very quickly.

You understand that you've been sworn under oath?

A   I do.

Q   And you understand that your testimony today is as if you were in a court of law in front of a judge or jury?

A   I do.

Q   And is there any reason why you can't give honest and truthful answers to the questions I'm going to ask you today?

A   No.

Q   Have you ingested any alcohol in the last 12 hours?

A   Very little last night.

7

CENTURY COURT REPORTERS 1-800-555-0014

Q   Would that impair your ability to give honest and truthful answers?

A   No.

Q   Are you on any prescription medication that it would impair your ability to give honest and truthful answers?

A   No.

Q   The deposition today is being transcribed by the court reporter. And so there's --

A   I want to go back to the previous question because it was compound. I take some medication, but it's not going to impair my giving the truth answer. So -- because the no doesn't apply -- it was two-parted question. So I just want to make sure --

Q   Fair enough.

A   -- it's clear.

Q   Fair enough. I understand. Thank you for the clarification.

There are some discovery procedural rules that we adhere to so that we can have a clear -- or try and get a clear transcript.

First of all, please wait for me to finish my question before giving me an answer, and I will endeavor to wait for you to finish giving your answer before I ask my next question. Okay?

8

CENTURY COURT REPORTERS 1-800-555-0014

A   Is that a question?

Q   That's a question, yeah. Please.

A   Yeah.

Q    Everything is being taken down verbally.  So if you shake your head or you shrug your shoulders, the court reporter can't take that down.  So yes, no, we have to give verbal answers.  Okay?

A    Okay.

Q    All right.  Don't guess at a question.  If I ask a question and you're not clear what kind -- what the question is, then please ask me to rephrase it, and I will attempt to do so.

If you answer a question, it is assumed that you understand the question.  You understand that?

A    Yes.

Q    The testimony that you're giving today will be transcribed into a typed booklet.  And you will have an opportunity to review that booklet and make any changes you deem necessary.

Off the record for a quick second.

(Break taken at 10:15 a.m.)

(Deposition resumed at 10:15 a.m.)

Q    BY MR. AVER:  But while you may make changes to the booklet, I can comment or Mr. Gill, for example, can comment about anything that -- any changes that you make.

9

So it's important that you give full, honest and truthful answers today.

Q   You understand that?

A   Yes.

Q   Would you please state and spell your name for the record?

A   Ezri Namvar, E-z-r-i N-a-m-v-a-r.

Q   Have you ever used any other names?

A   Yes.

Q   What other names have you used?

A   My last name used to be a two-parted last name. Namvar, dash, Moghadam, M-o-g-h-a-d-a-m.

Q   And --

MR. GILL:  I'm sorry.  Would you spell that again.  I was too slow.

THE WITNESS:  M-o-g-h-a-d-a-m.

MR. GILL:  Thank you.

THE WITNESS:  Namvar, dash, Moghadam.

Q   BY MR. AVER:  And have you legally changed your name?

A   Yes.

Q   And other than Ezri Namvar and Ezri Namvar-Moghadam, have you used any other names?

A   No.

Q   When were you born?

10

CENTURY COURT REPORTERS 1-800-555-0014

A   In August of 1951.

Q   And where were you born?

A   Tehran, Iran.

Q   When did you come to the United States?

A   September of 1969.

Q   And I'd like to just get a little bit of educational background.  Where did you go to high school?

A   In Tehran.

Q   And did you graduate from high school?

A   Yes.

Q   Do you recall what year?

A   1969.

Q   Did you subsequently have any further formal education?

A   Yes.

Q   Can you please just go through it just by way of background?

A   1969 through 1974, Kansas University.  Learning English at the beginning.  Maybe for one semester.  And then graduating in 1974 from the school of electrical engineering.  Immediately after the summer of '74, I enrolled at UCLA's Anderson School of Management.  Got my MBA from UCLA.  Was taking some courses toward my PhD program.  And I interrupted my education to go back to

Iran in 1978.

11

CENTURY COURT REPORTERS 1-800-555-0014

Do you want more?  There's no other education I think.  But do you want more or --

Q   No.  No.  That's okay.

You were going to get your PhD in business?

A   Yes.

Q   And you never went back to school basically after that?

A   I did not.

Q   Okay.

A   I went to real estate school but that --

Q   Yeah.  I mean --

A   I went to Iran.  I served in the army.  Came back.  The revolution happened while I was in the army. So my army service was interrupted also.  Came back to the U.S.  I think toward the end of 1979 or 1980, I went to Anderson school of real estate, got my broker's license, and did various type of businesses.

Q   The Anderson school of real estate, did you get a degree from that --

A   I got my broker -- no.  Not from them, but they prepared me to get my real estate broker's license from

the state.

Q   Okay.

A   That's one of those intensive training schools.

Q   Did you form a company known as Namco Capital

12

Group, Inc.?

A   Yes.

Q   Do you recall approximately when you formed that corporation?

A   No.  I can guess.  It's probably about 1984.

Q   And you were the president of Namco Capital Group, Inc.?

A   Yes.

Q   And you were the chief executive officer of Namco Capital Group, Inc.?

A   We did not have that title.

Q   You were a director?

A   I believe so, yes.

Q   And you were an employee?

A   I believe I started drawing salary from Namco Capital at some point, yes.  I don't know when.

Q   All right.  And you were the president, a director, and an employee until about February 10 of

2009?

A Whatever the court record shows regarding the bankruptcy.

Q Okay.

A But that sounds perhaps right.

Q All right. I'm holding in my hand a multipage document which I'll identify for the record as Debtors

13

Statement of Financial Affairs, and I'm looking at attachment 22 B.

MR. GILL: Are we marking this, Ray?

MR. AVER: I'm not there yet.

I'm looking at attachment B, former officers, directors, and shareholders. I'd like to show that to you, Mr. Namvar.

The actual 22 B is set forth toward the middle of the document, and that provides that you were the president, CEO, and director and you were terminated on February 10, 2009.

A Where does it say I was terminated?

Q It says -- if you take a look at the very last page --

A I don't know the context of -- by looking at

this page alone.

Q   All right. If you take a look at the statemer' of financial affairs -- it's a form document. If you go to the page -- the 15th page of this document --

A   Give me yours and take this one.

Q   Sure.

MR. GILL: Are you referring to this page?

MR. AVER: I'm referring to the page where it has former -- it says No. 22, former partners, officers, and directors and shareholders.

14

CENTURY COURT REPORTERS 1-800-555-0014

MR. GILL: Thank you.

THE WITNESS: Did I sign something like this?

MR. AVER: I don't think you did, Mr. Namvar.

THE WITNESS: So I cannot testify to anything in here.

MR. AVER: Okay.

THE WITNESS: But I would testify, if it's okay with Mr. Gill, that at some point we replace directors and I did either -- I don't think I was terminated. I believe I resigned. I remember those discussions.

That period of time is not very clear in my mind because I was under tremendous amount of stress. So I

remember either at the time of an appointment of a

trustee or right before that we changed directors. We --

I don't know whether I was terminated or I was replaced

or I resigned. I really don't remember any of that.

MR. AVER: All right. Just for the record --

THE WITNESS: Especially as to the dates for sure.

As to the dates, I don't remember.

Q  BY MR. AVER: Okay. But for the record I would

note that if you page -- two more pages afterward, you'll

see that this appears to have been signed on March 15,

2009, by Howard Grobstein whose title is chief

restructuring officer.

A  Did he sign it?


15


CENTURY COURT REPORTERS 1-800-555-0014


Q  Well, I don't know. It looks -- there's a

signature above his name. So --

A  Well, that's his -- so we're assuming that's his

signature.

Q  So -- that's right.

So just for the record you were the president, a

director, and an employee of Namco Capital for many years

until approximately the early part of 2009?

A  That would be a correct statement.

Q  All right.

A  Again, my question is the same as Mr. C'l. Are you marking this or not?

Q  I don't -- I don't think we're going to mark it.

A  Then you can have it.

Q  And during the period of time that you were an employee of Namco Capital Group, you received compensation for the services you performed?

A  During all the time?

Q  During the period that you were an employee of the company.

A  I can testify that at least for five years prior to the date we talked about, at least, I was drawing salary.  Maybe more.

Q  So we're looking at a rough timeframe of 2002, 2003, till about 2008, '9?

16

CENTURY COURT REPORTERS 1-800-555-0014

A  At least.  At least.

Q  All right.

A  Maybe even further beyond -- I mean before that.

Q  And during that four- or five-year period of time, you were a real estate broker licensed by the California Department of Real Estate?

A    I personally was.

Q    Yes.

A    So was Namco, separately, through my license.

Q    And you were the individual designated by the California Department of Real Estate as Namco's -- Namco Capital -- Namco Capital's designated officer?

A    Correct.

Q    My understanding is that an involuntary bankruptcy case was filed against Namco in or around late December of 2008. Is that your recollection?

A    Yes.

Q    And prior to the filing of the involuntary bankruptcy case, Namco Capital was in the -- was engaged in the business of making real estate investments?

A    Indirectly. There's some LLCs. I mean that's a very technical question. I don't know how that is going to come to play. Namco either made direct investments which is rare which it could have -- could have. I don't -- but mostly the investments were made through

17

CENTURY COURT REPORTERS 1-800-555-0014

some other LLCs that Namco loaned the money to.

Q    For example, Tranmar Properties?

A    Tranmar was one of them.

Q   All right.  And prior to the Chapter 11
involuntary bankruptcy filing, Namco Capit' was engaged
in the making and servicing of real estate secured loans?

A   Mostly.

Q   When you say "mostly," help me out a little bit.

A   We did make some unsecured loans also.

Q   Oh, okay.  But it did make real estate secured
loans?

A   Yes.  Most -- most of the loans were real
estate.  Secured or -- a lot of it was also the loans to
these LLCs.

Q   Okay.

A   The loans to various LLCs as well.

Q   All right.  And prior to the Chapter 11
involuntary filing, you in connection with your work for
Namco Capital were involved in the solicitation of loans?

A   Yes.

Q   And prior to the Chapter 11 involuntary filing,
you in connection with your work at Namco Capital were
involved in arranging real estate loans?

A   Yes.  Arranging and making.

Q   And negotiating those loans?

18

CENTURY COURT REPORTERS 1-800-555-0014

A   Negotiating and making the loans, yes.

Q   And you did this on behalf of Namco Capital prior to 2007, during 2007, and on into 2008 on behalf of Namco Capital?

A   Onto most of 2008 until the filing, correct.

Q   Would it be fair to say that in 2006 you on behalf of Namco Capital were involved in the solicitation, arrangement, and negotiation of eight or more real estate secured loans?

MR. GILL: Objection.  Leading question.

But you can answer it if you understand it.

THE WITNESS: I don't know.  I mean it sounds like correct.

Q   BY MR. AVER: Isn't it true that Namco Capital made dozens of loans in 2006?

A   Yes.  To these LLCs mostly.

Q   All right.  And would it be fair to say that you as an employee of Namco Capital Group was involved in the solicitation, arrangement, and negotiation of eight or more real estate secured loans in 2007?

A   It could be, yes.

Q   In fact, dozens probably?

A   Again, the same answer as before.

Q   All right.  And --

MR. GILL: Just for the record, the same objection.

19

CENTURY COURT REPORTERS 1-800-555-0014

Q   BY MR. AVER:  And isn't it true that you through Namco Capital Group were involved in the solicitation, arrangement, and negotiation of eight or more real estate loans on behalf of Namco Capital in 2008?

MR. GILL:  Same objection.

THE WITNESS:  I really don't know about 2008.

MR. AVER:  Okay.

THE WITNESS:  But I would guess yes.

MR. GILL:  Don't guess.

Q   BY MR. AVER:  I don't want to you guess.

A   Right.  So I don't know.

MR. AVER:  Off the record for a second.

(Break taken at 10:33 a.m.)

(Deposition resumed at 10:34 a.m.)

Q   BY MR. AVER:  Was the standard business model that Namco Capital Group used that it would borrow funds and would use those funds to then lend?

MR. GILL:  Objection to the form of the question.

THE WITNESS:  Especially the word "standard."

MR. GILL:  I would suggest just for the record and request that the questions be formed in a way that are asking the witness what he did rather than asking him to confirm or deny what you're saying he did.

MR. AVER:  Well, I'll try and -- I'll try and follow

your direction, but this is an adverse witness, and I

20

CENTURY COURT REPORTERS 1-800-555-0014

think I'm entitled to ask leading questions and do that,

you know, that type of thing.

Q   Okay. Mr. Namvar, you've testified that Namco

Capital Group lent money and many of the loans were to

related LLCs; correct?

A   Correct.

Q   Where did Namco Capital Group get the money that

it loaned to these related entities and others?

A   Mostly from individuals.

Q   All right. And in most cases would Namco

Capital Group give the individual from whom it was

borrowing the money a promissory note to evidence the

loan?

A   Yes.

Q   And in many cases would Namco Capital Group

collateralize that promissory note with some property?

a   Yes.

Q   And in many cases, would that property consist

of a promissory note made by another individual or entity

in favor of Namco Capital Group and secured by real

estate?

A    Basically, yes.

Q    Okay. When you say "basically, yes," what are you hedging?

A    That -- I'm not hedging. It's just the form of

21

CENTURY COURT REPORTERS 1-800-555-0014

collateralization. It wasn't always the same.

Q    All right. But many of the loans followed that basic formula; correct?

A    Yes.

Q    In rough numbers -- and I know I'm asking you to guess, but I can -- I can ask for a guesstimate here.

In rough numbers, during the period of let's say 2006 through 2008, how many of these loans did -- were you involved in on behalf of Namco Capital Group where Namco borrowed money, gave a promissory note to the lender, and secured that loan with a promissory note made by a third party and secured by a deed of trust?

A    I'm not going there because I would not know no matter how many times you ask this question in different ways. I wouldn't know. I don't have the records. And --

Q    Well, more than a dozen?

A    I don't -- I don't know. I'm not going to

guess. I don't know, but I can testify that I would take

responsibility for all of those notes in that category,

whether it was 2 or 2,000. I was the one doing it.

Q All right. In most --

A Can I get some water, please?

Q Oh, absolutely.

Off the record.

22

CENTURY COURT REPORTERS 1-800-555-0014

(Break taken at 10:38 a.m.)

(Deposition resumed at 10:39 a.m.)

Q BY MR. AVER: Now in these transactions where

Namco Capital Group borrowed money from individuals and

gave those individuals a promissory note and secured the

promissory note with a note and deed of trust -- can we

call that a collateral note and deed of trust? Will you

know what I'm referring to?

A For our purposes, call it collateral, yes.

Q All right.

This transaction, would there be both a

promissory note made by Namco Capital in favor of the

lender as well as a document called a collateral

assignment of the collateral note and deed of trust?

A Of the original note and deed of trust, yes.

Q    All right. And the documentation, the promissory note and the collateral assignment, that would be prepared by Namco Capital Group under your direction?

A    Yes.

Q    And the collateral assignments would be recorded in the office of the county recorder in the county in which the real estate was located?

A    Usually.

Q    And under these collateral assignments, the collateral notes and deeds of trust would be endorsed and

23

CENTURY COURT REPORTERS 1-800-555-0014

assigned to the lender, the individual lender?

A    Correct.

Q    Did Namco service these collateral notes, or did Namco leave it to the third party lenders to service the collateral notes?

MR. GILL: Objection. Compound.

THE WITNESS: I'll answer it. As far as I remember, we serviced all of them. If there is one or two that we did not service, I'm not aware of, but we serviced almost all of them.

Q    BY MR. AVER: And by "service," do you mean that Namco took all necessary action or steps to obtain

payment of or payment due under the terms of the collateral note?

A    Yes.

Q    And Namco was responsible for making the payments to the third party lenders who had received these collateral notes and deeds of trust?

A    Yes.

MR. GILL:  Could you restate the question?  I'm objecting on a vague and ambiguous grounds but --

MR. AVER:  He's answered it.

MR. GILL:  I understand.  But I want to make a record.

Would you repeat the question?

24

CENTURY COURT REPORTERS 1-800-555-0014

MR. AVER:  If you want to make a -- if you want to object after the fact on grounds of vague and ambiguous, you're welcome to.

MR. GILL:  I know.  But I'd like to hear the question.

MR. AVER:  Oh, sure.

MR. GILL:  Because maybe there's a clarification that you'll agree with me on.

MR. AVER:  That's fine.

(The question was read as follows:

"And Namco was responsible for making

the payments to the third party lenders who

had received these collateral notes and deeds

of trust?")

MR. GILL: I just misheard it. That's why I wanted

to hear it.

Thank you.

I withdraw my objection.

Q   BY MR. AVER: If payment was not forthcoming

from the collateral notemaker, would Namco Capital

nonetheless ensure that payment was made to the third

party lender who held the collateral note and deed of

trust?

A   In most cases. Just for clarification, it's not

necessarily forthcoming or not forthcoming. In a lot of

25

these notes we would add the interest to the note,

especially on the development type notes and properties

that had no cash flow. It would be an open-ended trust

deed in a lot of cases that it would just -- as long as

we had cushion, we would just keep adding the payments on

our book entry as some sort of compounding, whether it

was annually or semiannually or quarterly or monthly,

depending on the case.

Q   So if I understand your answer correctly, on some of these collateral notes secured by deeds of trust, with regard to the servicing by Namco Capital, some of them -- the makers were not making regular payments to Namco Capital?

A   Yeah.  Especially the related entries.

Q   And even though that was the case, Namco Capital would in most cases take care of the third party lenders --

A   That's right.

Q   -- and make sure they got paid what they were due under the promissory note made by Namco Capital Group in favor of that third party lender?

A   Correct.

MR. GILL:  Could we go off the record for a second.

MR. AVER:  Sure.

(Discussion held off the record at 10:44 a.m.)

26

CENTURY COURT REPORTERS 1-800-555-0014

(Deposition resumed at 10:45 a.m.)

MR. GILL:  Back on the record.

Mr. Namvar, what did you mean when you answered

yes to the question that you take care of the third party

lenders?

THE WITNESS: Usually paying the payment on the note

according -- on the Namco collateral note given to the

individual lender according to its term.

MR. GILL: Thank you.

Q    BY MR. AVER: And when you say -- in that

explanation when you said "you," you meant Namco Capital

Group?

A    Correct. Thank you for clarifying that.

Q    Does the name Kamran Group mean anything to you?

A    Is that David Golkar's entity?

Q    I believe that's correct.

A    Then that would, yes.

Q    And was Kamran Group a borrower from Namco

Capital Group?

A    The entity was.

Q    Kamran Group was?

A    Yeah.

Q    And between June of 2007 and September of 2007,

Namco made four real estate secured loans to Kamran

Group?

27

CENTURY COURT REPORTERS 1-800-555-0014

A    It could be correct.  I can't testify unless I look at some records.

Q    Fair enough.

We're going to do some marking.

I don't know which is easier to do but --

We're off the record.

(Break taken at 10:48 a.m.)

(Deposition resumed at 10:52 a.m.)

(Movants' Exhibits B-1 (a-d), B-2 (a-d), C-1 (a-d), C-2 (a-e), D-1 (a-d), D-2 (a-e), E-1 (a-d)  and E-2 (a-e) were marked for identification and are included herewith.)

Q    BY MR. AVER:  Mr. Namvar, if you could take a look at the documents that have been marked as Exhibit B-1, which for the record is a Promissory Note Secured by Deed of Trust dated June 29, 2007, in the amount of $5 million.  On page 4 appears the signature of David Golkar - President, Kamran Group Pasadena.

And Exhibit B-2 which is a Long Form Deed of Trust and Assignment of Rents bearing recording stamp 20071990505, which also bears the signature of David Golkar for Kamran Group on the third page of Exhibit B-2, the deed of trust.

A    Is there a question pending?

Q    No. No.

28

CENTURY COURT REPORTERS 1-800-555-0014

After you -- let me ask you. Do you recognize these documents?

A These look to be -- are form of note and deed of trust. One of the forms.

Q And do you recall Namco Capital Group making one or more loans to Kamran --

A Yes.

Q -- Group?

A Yes.

Q And would this promissory note be evidence of one of the loans which has been marked as Exhibit B-1 in the amount of $5 million?

A Only the promissory note or the note and deed of trust?

Q The note and deed of trust.

A Yes.

Q All right. Please take a look at Exhibit C-1 and C-1.

A (Deponent complies.)

MR. AVER: Exhibit C-1 for the record is a Promissory Note Secured by Deed of Trust dated September 10, 2007, in the amount of $450,000. At page 4 it is signed by David Golkar, manager of Kamran Group, LLC.

Exhibit C-2 is a short -- is a Long Form Deed of

Trust and Assignment of Rents bearing recording

29

No. 20072133932. On page 2 it is -- also appears to be signed by David Golkar as the manager of Kamran Group.

Q   Is this, Mr. Namvar, a second note and deed of trust that was made by Namco Capital Group in favor of -- excuse me -- that was made by Kamran Group in favor of Namco Capital Group evidencing a loan of approximately $450,000 to Kamran Group?

A   The word "second," if you will, could be confusing. I don't believe this is a second deed of trust, but it is another, a different deed of trust. I don't know its position. I believe it would be first in a different parcel.

Q   The only -- when I said "second," I only --

A   I know what you meant.

Q   -- I mean second -- second note. Yeah.

A   I think I knew what you meant, but I wanted to make the record clear.

MR. GILL: That's a good clarification.

MR. AVER: All right.

THE WITNESS: Do you think I would pass for a paralegal?

MR. GILL: Are you hiring?

MR. AVER: Okay.

THE WITNESS: No. I take too many of these.

Q    BY MR. AVER: I'd like you to take a look,

30

CENTURY COURT REPORTERS 1-800-555-0014

Mr. Namvar, at what has been marked as Exhibit D-1 which is a third Promissory Note Secured by Deed of Trust dated September 10th, 2007, in the face amount of 1.3 million. On page 4 it appears to have been signed by David Golkar on behalf of Kamran Group.

MR. GILL: Objection. Vague and ambiguous as to the term "third."

MR. AVER: Third promissory note.

THE WITNESS: Same objection here.

MR. AVER: Yes, very well.

I'm just taking it in sequence of --

THE WITNESS: Can you use rather than third the word "different"?

Q    BY MR. AVER: Sure.

Different promissory note.

A    Or another, yes.

Q    Or another.

A    Yes. That's better.

Q   Another promissory note.

And then Exhibit D-2, I'll describe as a conformed copy of a Long Form Deed of Trust and Assignment of Rents bearing recording No. 20072133936.

Also appears to have been signed by David Golkar, manager on behalf of Kamran Group, LLC.

Do you recognize these documents?

31

CENTURY COURT REPORTERS 1-800-555-0014

A   Same answers to those questions.  Yes, I do.

Q   All right.  And as with the prior two sets of documents, these evidence a loan made by Namco Capital Group to Kamran Group which was secured by the real estate reflected in the Long Form Deed of Trust and Assignment of Rents?

A   I would say, yes, if you change the word "a" because there's two of them.  So two different other loans.  Yes.

Q   All right.  And then lastly, I'd like you to take a look at what has been marked as Exhibit E-1 and E-2 which I'll describe for the record as a Promissory Note Secured by Deed of Trust dated September 10, 2007, in the face amount of $600,000 which appears to be signed by David Golkar on behalf of Kamran Group, together with

a corresponding Long Form Deed of Trust and Assignment of

Rents marked as Exhibit E-2 bearing recording No.

20072133956 which also appears to have been signed by

David Golkar on behalf of Kamran Group.

    Do you recognize this set of documents?

A   Same answers throughout.

Q   All right.  And this note and this deed of trust

evidences a loan made by Namco Capital Group to Kamran

Group --

A   You already said that.


32


CENTURY COURT REPORTERS 1-800-555-0014


Q   -- in the amount of 600,000?

A   Didn't he say that in the previous question?

You already asked that question.

Q   I did?

A   Yes.

Q   So the answer is "yes"?

A   I said the same answers.

Q   "Yes?"  Is that a "yes"?

A   Yes.

Q   Other than --

A   Off the record.

Q   Sure.

You need to take a break?

A   No. I'm just getting too old.  Go ahead.

Q   The relationship between Kamran Group and Namco Capital Group, was it other than lender and borrower, or was there more to it than simply lender and borrower?

A   Yes.

Q   Could you please describe the relationship between Namco Capital Group and Kamran Group?

A   The agreement was -- and I don't know whether it was reduced to writing.  Mr. Gill may have the records -- that after paying Namco all the advances, the profits, if any, would be split 50/50.  Advances plus interest according to the notes.  Then the profits thereafter

33

CENTURY COURT REPORTERS 1-800-555-0014

would be split 50/50.

Q   And that was in agreement that you made on behalf of Namco Capital Group with David Golkar on behalf of Kamran Group?

A   The business terms are basically true, but we talked about various -- different variations.  Whether at that point we would put it all in a different LLC and refinance through an institution to pay Namco off or Namco down partially, I'm not completely aware.

The reason I have to testify correctly because I don't know what's going to come from Kamran Group later on. So those things did not really get tied down hundred percent.

But the basic agreement was the profits would be split 50/50. Whether they would be split 50/50 with Namco or a party related to Namco like these other LLCs, that wasn't cleared out.

And whether he could deliver -- because it was my choice to become -- it was my choice that an entity of ours would become a partner or not. Because his duty was to deliver all the parcels.

And I remember until I was keeping track there was one hold-out, a small piece that was a hold-out, and I don't know what happened.

Q   Holding?

34

CENTURY COURT REPORTERS 1-800-555-0014

A   Because he was assembling a whole block.

Q   Okay. So --

A   But the loans, there was no question on the validity of the loans. The loans stood on their own.

Q   So even though each of these four promissory notes provide for interest payments, monthly interest

payments, Namco Capital Group wasn't collecting monthly interest payments from Kamran Group?

A    I don't believe we were, but we were adding it to their note. Because I believe our standard note which I don't review or I didn't review as a practice every day and somebody else was in charge of preparing it, at least the original loan that I use as a template would have provided or did provide -- and I believe maybe even these -- that we have the right to do that.

MR. GILL: The right to do what?

THE WITNESS: The compounding. The addition of interest to the principal. The adding. My English is not very good. The adding of interest to the principal.

Q    BY MR. AVER: Can you tell, Mr. Namvar, by looking at the legal descriptions attached to the deeds of trust whether each of these four promissory notes was secured by property on Walnut Street in Pasadena, California?

A    Not necessarily by looking at the legal

35

CENTURY COURT REPORTERS 1-800-555-0014

descriptions because they're just a bunch of numbers and plot maps. But the purposes of these notes and deeds of trust was to secure that assemblage which we called

Walnut and 134 Freeway and another street, another famous

street. It was a whole square block. So it would border

more than one.

Q   Okay. And you were involved in the

solicitation, arrangement, structuring and negotiation of

each of these four promissory notes marked B-1, C-1, D-1,

and E-1 --

A   Yes.

Q   -- on behalf of Namco Capital?

A   Yes. And the deed of trust that went with it.

The deeds of trust that went with it. Plural.

Can I take a break now?

Q   Oh, for sure. Any time.

(Break taken at 11:05 a.m.)

(Deposition resumed at 11:25 a.m.)

(Movants' Exhibits F-1 (a-b), F-2 (a-h),

G-1 (a-b), G-2 (a-i), H-1 (a-b), H-2 (a-i),

I-1 (a-b), I-2 (a-l), J-1 (a-b), J-2 (a-d),

K-1 (a-b), K-2 (a-b), L-1 (a-b), L-2 (a-d)

and M-1 (a-b) and M-2 (a-k) were marked for

identification and are included herewith.)

Q   BY MR. AVER:  During our little break, we had

36

marked for the record what I'll describe as collateral

notes and collateral assignments of deeds of trust, and

I'd like to go through these with you, Mr. Namvar, and

ask you if you recognize them.

Marked as Exhibit F-1 is a promissory note in

the face amount of 1.1 million dated July 1, 2007, in

favor of Morteza Homayounjam, and it appears to have been

made by Namco Capital Group and signed by you as

president of Namco Capital Group.

Is that your signature on the second page of

your Exhibit F-1?

A   Yes.

Q   And that's your initial on the first page, the

bottom of the first page?

A   It is.

Q   Do you recall signing this promissory note on or

about July 1, 2007?

A   I'm just assuming I did.

Q   And then with Exhibit F-2, it appears to be a

Collateral Assignment of Deed of Trust dated August 31,

2007, again made by Namco Capital Group in favor of

Morteza Homayounjam.

Is that your signature about two-thirds of the

way down on the right-hand side?

A   It is.

37

CENTURY COURT REPORTERS 1-800-555-0014

Q   All right. And you executed -- you executed a Collateral Assignment of Deed of Trust in favor of Mr. Homayounjam; correct?

A   Yes.

    This one you mean?

Q   Yes.

A   F-2?

Q   F-2.

A   Yes.

Q   And so Exhibit F-1 and F-2 evidences a loan of $1.1 million made by Mr. Homayounjam to Namco Capital and also evidences that Namco Capital Group assigned to Mr. Homayounjam a 25 percent beneficial interest under the deed of trust dated June 29, 2007, executed by Pasadena Athletic Club to Woodman Partners, LLC.

A   It does.

Q   And so --

A   And just for clarification, the 1.1 most probably represents the balance as of the date of the note.

Q   So it's possible --

A   As of that date, the balance was that.

Q   So it's possible that Mr. Homayounjam had made loan -- one or more loans to Namco Capital prior to the

date of this note?

38

CENTURY COURT REPORTERS 1-800-555-0014

A    Yeah.

Q    And it's also possible and it wasn't unusual that individuals who would lend money to Namco Capital Group would get a collateral assignment as to a certain piece of property, that piece of property would be sold, and it would be replaced with another collateral assignment of a different piece of property?

A    That was a -- that was a practice.

Q    A common -- a somewhat common occurrence?

A    Yes, somewhat.  It had happened, I'd say, more than 10, 15 times.

Q    Yeah.

Turning to Exhibit G-1 and G-2, I'll describe Exhibit G-1 as a Promissory Note dated November 6, 2007, in the face amount of $420,000 made in favor of Ashland Properties, LLC, and you -- the note appears to be signed on page 2 on behalf of Namco Capital Group by you, Ezri Namvar.

Is that your signature on page 2?

A    Yes.

Q    Exhibit G-2 is a Collateral Assignment of Deed

of Trust which appears to have been executed by you on

behalf of Namco Capital Group also in favor of Ashland

Properties.

Is that your signature on page 2 of Exhibit G-2?

39

CENTURY COURT REPORTERS 1-800-555-0014

A    Where do you see Ashland here?  My signature --

that's my signature, but I don't see --

Q    The collateral assignment.  It shows right

underneath the title of the document, Collateral

Assignment Deed of Trust.  It says, "For value received,

the undersigned" --

A    Yes.  I saw it.  Yes.

Q    All right.

And these documents evidence a loan made by

Ashland Properties, LLC, to Namco Capital Group, and

Namco Capital Group's collateralizing that note with a --

with an 8 percent beneficial interest under the deed of

trust dated June 29, 2007, executed by Pasadena Athletic

Club to Woodman Partners.

A    A lot of words, but correct.  I think I know

what you mean.

Q    Okay.  Turning to Exhibit H-1 and H-2,

Exhibit H-1 is a Promissory Note in the face amount of

$780,000 made by Namco Capital Group in favor of Sawtelle

Properties, LLC.

Is that your signature on page 2 of Exhibit H-1?

A  There's two signatures.  Both of them are mine.

Q  All right.  And Exhibit H-2 is a Collateral

Assignment of Deed of Trust executed on behalf of Namco

Capital Group by you in favor of Sawtelle Properties,

40

CENTURY COURT REPORTERS 1-800-555-0014

LLC; is that correct?

A  Correct.

Q  And by this set of documents, Exhibit H-1 and

Exhibit H-2, it evidences a loan made by Sawtelle

Properties, LLC, to Namco Capital Group which --

repayment of which was secured by a collateral

assignment, a 16 percent beneficial interest under the

deed of trust dated June 29, 2007, executed by Pasadena

Athletic Club to Woodman Partners, LLC?

A  Correct.

Q  Now do you recall what the relationship was

between Pasadena Athletic Club and Kamran Group?  Was

Pasadena Athletic Club -- was Kamran Group formerly known

as Pasadena Athletic Club?

A  I don't know.

Q   Okay.

A   But I know that the big part of the assemblage was some sort of an athletic club perhaps called Pasadena Athletic Club.

Q   Okay.

A   Perhaps -- perhaps he bought the company for whatever purposes he had rather than buying the real estate. I don't know.

Q   All right.

A   But I know it's the same property. Same -- same

41

CENTURY COURT REPORTERS 1-800-555-0014

related property.

Q   The Walnut/134 Freeway assemblage as you called it?

A   Correct.

MR. GILL: When you say "perhaps," is this based on some knowledge you have, or are you just guessing?

THE WITNESS: No. I remember him -- discussing with him Pasadena Athletic Club. I don't know when LLCs were formed or what form he took the ownership under. But we don't have another Pasadena Athletic Club. This was the Pasadena Athletic Club right in the middle of this assemblage that we bought -- or he bought a few things

around it.

MR. AVER: For the record and for whatever it's worth, I have seen -- I have seen documents where it says Pasadena Athletic Club fka -- or excuse me -- Kamran fka Pasadena Athletic Club.

Q  All right. Turning to Exhibit I-1 and I-2, I'll describe Exhibit I-1 as a Promissory Note dated May 7, 2008, in the face amount of 1,542,000, made by Namco Capital Group in favor of Jamshid Baharvar or Shohreh Baharvar.

Is that your signature on page 2 under the name "Namco Capital Group, Inc., " and above the signature block "Ezri Namvar, President"?

42

CENTURY COURT REPORTERS 1-800-555-0014

A  It is.

Q  Exhibit I-2 is a Collateral Assignment of Deed of Trust which appears to be signed on behalf of Namco Capital Group by you as president reflecting an assignment of a 40 percent beneficial interest under that certain deed of trust dated June 29, 2007, executed by Pasadena Athletic Club to Woodman Partners, LLC.

Is that your signature two-thirds of the way down on page 3 of Exhibit I-2?

A   In a lot of this you keep referring to Woodman.

Let the record reflect that Woodman was only the trustee

under the deed of trust and not in any other capacity.

The note was made to Namco, and Namco made the note to

Baharvar.

Q   Thank you for the clarification. I appreciate

that.

MR. GILL: Allow me to interrupt for a second. I

just want to make sure I have the correct documents. The

promissory note I have as I-1 is dated May 7, 2008, but

the collateral assignment of Deed of Trust I have is

January 16, 2008.

Do I have the correct documents, or is there a

mix-up?

MR. AVER: Off the record for one second.

(Break taken at 11:35 a.m.)


43


CENTURY COURT REPORTERS 1-800-555-0014


(Deposition resumed at 11:39 a.m.)

(Movants' Exhibit I-3 (a-b) was marked

for identification and is included herewith.)

MR. AVER: All right. While we were off record,

Mr. Gill noticed that the collateral assignment dated

January 16, 2008, Exhibit I-2, predates the promissory