note, Exhibit I-1, which is dated May 7, 2008.

And so while we were off the record, we ha·

marked as Exhibit I-3 a promissory note dated January 16, 2008, in the face amount of $1,512,972.75.

THE WITNESS:  That sounds like Baharvar.

MR. AVER:  And you've got to know him.

And on page 2 --

Strike that.

MR. GILL:  Quickly.

(Discussion held off the record.)

Q   BY MR. AVER:  So page 2 is signed Namco Capital Group, Ezri Namvar, President.  Is that your signature on -- at page 2 of Exhibit I-3?

A   Yes.

Q   All right.  Based on these documents, does it appear that Mr. Baharvar -- or Dr. Baharvar and his wife made a loan to Namco Capital Group prior to the making of the collateral assignment which is Exhibit I-2?

A   Prior?

44

CENTURY COURT REPORTERS 1-800-555-0014

Q   Yeah.  Well --

A   I-3 and I-2 match on dates.

Q   All right.  So --

A    There is no prior.

Q    So at the time that the collateral assignment, Exhibit I-2, was -- was signed by you, Namco Capital Group had received a loan from the Baharvars?

A    Yes.

Q    All right.  And subsequent to that -- the making of that promissory note and collateral assignment, Namco Capital Group signed a new promissory note, this time -- you know, that essentially replaced -- Exhibit I-1 replaced Exhibit I-3?

A    With a different amount.

Q    Right.

It wasn't -- it wasn't -- it wasn't two loans, a total of 3 million rather --

A    No.  That's what it says.

Q    Right.

A    If you look at I-1 page 2, three -- fourth paragraph from the bottom, it says this note replaces and represents (sic) all our prior instruments, documents and agreements which evidence the indebtedness represented by this note, all of which prior instruments, documents, and agreements, shall be null and void and of no force and --

45

or effect.

Q   And you recall Namco Capital Group receiving a loan from the Baharvars?

A   Yes.

Q   And Namco Capital Group collateralized the promissory note that has been marked as Exhibit I-3 with a 40 percent beneficial interest under the deed of trust dated June 27, 2007, executed by the Pasadena Athletic Club?

A   Correct.

Q   Turning to Exhibit J-1 and J-2.

For the record, Exhibit J-1, I'll describe it as a Promissory Note dated February 1, 2008, with the face amount of $450,000, signed by Namco Capital Group, Ezri Namvar, President.

Is that your signature two-thirds of the way down on page 2 of Exhibit J-1?

A   It is.

Q   And you signed this document on behalf of Namco Capital Group?

A   I did.

Q   Exhibit J-2 I'll describe as a Collateral Assignment of Deed of Trust bearing recording or instrument No. 20080214974, dated February 1, 2008, signed by Namco Capital Group by Ezri Namvar, President.

46

CENTURY COURT REPORTERS 1-800-555-0014

Do you recognize your signature on page 2 of Exhibit J-2, Mr. Namvar?

A   I do.

Q   Okay.  So is it true that Exhibits J-1 and J-2 evidence a loan from Farmo Trust to Namco Capital Group in the principal amount of $450,000 which was secured by a collateral assignment of all of the beneficial interest under the deed of trust dated September 9, 2007, executed by Kamran Group in favor of Namco Capital Group?

A   That's what the document says, but I believe that Kamran Group note previously was marked as something.  I don't know.  C-1.  I believe that's what you're referring to.  C-1?

Q   C-1

A   What's the instrument number?  932 at the end?

Q   Yes.

A   Okay.  Correct.

Q   Turning to Exhibit K-1, I'll describe -- K-1 and 2 -- Exhibit K-1 and K-2.  I'll describe K-1 as a Promissory Note dated January 8, 2008, in the face amount of $1 million made by Namco Capital Group in favor of Darioush Soleimani.

Is that your signature at the end of page 2 of Exhibit K-1?

A   It is.


47


CENTURY COURT REPORTERS 1-800-555-0014


Q   And Exhibit K-2 is a Collateral Assignment of Deed of Trust dated January 8, 2008, bearing recording No. 20080072494, evidencing a -- of an assignment of all of the beneficial interest under that certain deed of trust dated September 10, 2007, executed by Kamran Group, which has been marked as Exhibits D-1 and D-2.

A   Correct.

Q   And is that your signature, middle of the page, of Exhibit K-2?

A   It is.

Q   And you recall that Darioush Soleimani made a loan to Namco Capital Group of about a million dollars?

A   That I recall very well.

Q   Turning to Exhibit L-1 and L-2.  I'll describe Exhibit L-1 as a Promissory Note dated October 10, 2006, in the face amount of $500,000 made by Namco Capital Group in favor of Mahmoud Fatorechi and Soussan Hashemi, Trustees of the Fatorechi-Hashemi Family Trust.

Do you recognize your signature there on page 2 of Exhibit L-1?

A   I do.

Q   And you signed this document in or around

October of 2006?

A   I did.

Q   Okay. I'll describe Exhibit L-2 as a Collateral

48

Assignment of Deed of Trust bearing recording No.

20080117011, and I'll describe it as a Collateral

Assignment of Deed of Trust to Mahmoud Fatorechi and

Soussan Hashemi, Trustees of the Fatorechi-Hashemi Trust,

as to all beneficial interest under that certain deed of

trust dated September 10, 2007, which is --

A   Maybe E-1, E-2.

Q   Yeah.

A   What's the instrument number of the underlying

collateral?  Does it end with 956?

MR. GILL:  Yes.

THE WITNESS:  That's then E-1 and 2.

MR. AVER:  E-1 and E-2.  Thank you.

Q   Is that your signature on the second page about

middle of Exhibit L-2?

A   It is.

Q   And you recall that Fatorechi and Hashemi

through their trust made a loan to Namco Capital in the

sum of about $500,000?

A   I'm assuming it.  I don't recall the e⁻ ·ct date
or the amount.

Q   Okay.  And that Namco Capital Group secured the
payment of this note with a collateral assignment of a
portion of the Walnut/134 Freeway assemblage?

A   At a later time.

49

CENTURY COURT REPORTERS 1-800-555-0014

Q   Correct.

Turning to Exhibit M-1 and M-2.  For the record,
I'll describe Exhibit M-1 as a Promissory Note dated
March 1, 2006, in the principal amount of -- or face
amount of $260,000 made by Namco Capital group in favor
of Faranak Faye Sarafian.

Is that your signature at the end of page 2?

A   Yes.

Q   And you signed this Promissory Note on behalf of
Namco Capital Group?

A   Yes.

Q   In or around March of 2006?

A   Correct.

Q   Exhibit M-2 I'll describe for the record as a
Collateral Assignment of Deed of Trust, a conformed copy

bearing instrument No. 20081075595 dated October 29,

2007, made by Namco Capital Group in favor of Faye

Faranak (sic) Sarafian and assigning a 5.5 percent

beneficial interest under the deed of trust dated

June 29,2007, executed by Pasadena Athletic Club in favor

of Namco Capital Group.

A   Correct.

Q   And this is your signature on page 3 of

Exhibit M-2?

A   Since the pages -- yeah.  The pages are numbered

50

CENTURY COURT REPORTERS 1-800-555-0014

on top, I'm assuming 3 is -- yeah.  Yes.

Q   And as we previously discussed, some of these

eight loans that we just went over, Exhibits F through M

were old loans that had been collateralized with other

real estate that had subsequently been sold by Namco and

the individual lender wanted to continue lending money to

Namco and, therefore, Namco collateralized the loan with

this new real estate?

A   I cannot testify to that.

Q   Okay.

MR. GILL:  Why not?

THE WITNESS:  Without looking at the records.  It

could have been what he said, but it could have also been -- it could have also been -- it cou'' be what you said or it could also be that the note originally started to be an unsecured note and at some point they came in and say we want security and we gave them security.

Q    BY MR. AVER:  Or it could have been a brand-new loan from a brand-new individual?

A    Well, the ones that are dated the same, it's in that category which you just mentioned.  The ones that the promissory notes are dated previous to the collateral assignment could fall, the best I can think of, in two different categories.

Category No. 1, the security given by the

51

CENTURY COURT REPORTERS 1-800-555-0014

collateral assignment was a replacement for a different security like Mr. Aver mentioned that was either sold or repaid and it was a replacement security.

Or category No. 2, it could have started as an unsecured loan, and later on for whatever reason, the lender or the investor had decided that they wanted security and we gave him security.

MR. AVER:  Can we go off the record for a second?

(Discussion held off the record.)

Q   BY MR. AVER:  Again, referring to the promissory notes and collateral assignments which have been marked as Exhibits F through M, you were one of the individuals at Namco who solicited, arranged, structured, and negotiated each of the loans -- each of the eight loans?

A   Yes.

MR. GILL:  We're referring to the loans Exhibits F through M?

MR. AVER:  That's what I said.  Yeah.

Q   Namco prepared the respective loan documents that we've now talked about, Exhibits F through M; i.e., the documents were not prepared by the third party lenders.  They were prepared by Namco?

A   Correct.

Q   Was it your intent in assisting in the preparation and execution of the collateral assignments

52

CENTURY COURT REPORTERS 1-800-555-0014

that the Walnut Street property, the 134 freeway assemblage would go to secure repayment of these eight loans, Exhibits F through M?

MR. GILL:  Objection.  Vague and ambiguous.

THE WITNESS:  And compound.

MR. GILL:  If you understand the question, you can

answer, but if you don't, you should say you don't.

THE WITNESS: I'd like to answer in a way -- the question wasn't asked right, but I'll answer in a way that I think what you wanted.

According to the respective percentages reflected on each document, those percentages and those portions where the security backing up the notes that Namco signed for the repayment of the loans, my intent -- you asked my intent. Our intent was to secure those -- those lenders with different portions of various percentages of one or more instrument.

I think that answers your question. I don't know what you were getting at but --

MR. AVER: I think that answers --

THE WITNESS: I don't plan to be here all day. Please can we go a little faster?

MR. AVER: I will try.

MR. GILL: We'll have to be here as long as we have to be here.

53

CENTURY COURT REPORTERS 1-800-555-0014

THE WITNESS: All right.

Q   BY MR. AVER: Namco Capital controlled the physical possession of the collateral notes? "The

collateral notes" being Exhibits B-1, C-1, D-1, and E-1?

A   At some point, yes.

Q   Well, it controlled -- it controlled the physical possession of those notes from the time they were made and delivered to Namco Capital; correct?

A   From the time -- until when?  You didn't say the until.  It was originally maintained by Namco.

Q   Okay.  And we'll get there.  But eventually it was -- the possession was delivered to an escrow company in connection with a proposed sale?

A   Correct.

Q   All right.  We'll get there.  We're jumping ahead a little bit.

Was there a reason why -- well, strike that.

No.

Was there a reason why Namco Capital Group did not release physical possession of the Kamran notes --

MR. GILL:  Objection.  Vague and unintelligible.

MR. AVER:  I haven't even finished my question.

MR. GILL:  Well, then that would explain my objection.  I apologize for stepping on you.  I thought you were concluded.

54

MR. AVER: No problem.

Can you -- can you help me?

(The question was read as follows:

"Was there a reason why Namco Capital

Group did not release physical possession of

the Kamran notes --")

Q   BY MR. AVER: Kamran notes, Exhibit B-1, C-1, D-1, and E-1, to the collateral lenders, the eight individuals that we've discussed this morning?

A   It was our common practice to hold the physical position -- possession of these notes.

Q   Is it also true that some of these notes were secured by fractionalized interests in the various Kamran deeds of trust making it almost impossible to release physical possession to one collateral lender and not to another collateral lender?

A   That would be the biggest reason, but it just evolved.

MR. GILL: I'm sorry. That would be the biggest reason?

THE WITNESS: That would be the biggest reason from the beginning, but it evolved. Also as a common practice for Namco, even sometimes when a person at hundred percent of a note unless they would specifically ask for it, we wouldn't give it to them. We would hold it.

55

Q   BY MR. AVER:  And Namco Capital Group made
payments to each of the eight note holders reflected in
Exhibits F through M over time?

A   We made payments as they would be reflected on
the Namco records which I don't have.

Q   Okay.

A   Up to a certain period of time, of course.

MR. AVER:  I'd like to mark as N-1, N-2, N-3, N-4,
and N-5.

(Movants' Exhibits N-1, N-2 N-3, N-4, and
N-5 were marked for identification and are
included herewith.)

MR. GILL:  So did you just hand us all those, or is
this just N-1 that you're handing me?

MR. AVER:  This is N-1 through N-5?

MR. GILL:  So each page is another number?

MR. AVER:  Yes, sir.

MR. GILL:  Okay.

Q   BY MR. AVER:  Mr. Namvar, we've just marked and
you've been handed a five-page document which has been
marked Exhibit N-1, N-2, N-3, N-4, and N-5, and I will
identify these as Namco Capital Group transaction reports
for lack of a better identification.

A   We call it account statements.

Q   Account statements.


56


CENTURY COURT REPORTERS 1-800-555-0014


Are these examples of account statements that Namco Capital Group regularly provided to the third party lenders?

A   No.

Q   Okay.

A   These are examples of Namco account statements, but we did not regularly provide this to the investors as a practice unless somebody asked for it.

Q   I see.

A   We would not waste paper or do this unless somebody -- and in most cases, people didn't want to see these anyways.

Q   Do you recognize these account statements, Exhibits N-1 through N-5, as Namco Capital account statements?

A   I'd like with the exception of N-2 to make a general statement because N-2 has other handwritings in it that I need to examine.  If these were prepared by our office, it looks like Namco account statements, and I have no reason to believe that it wasn't prepared by Namco's offices.

But as to each item, each date, each deposit,
each withdrawal, I cannot testify because I wasn't the
one handling this function.

Q   Fair enough.

57

A   And then if you want to ask additional questions
on N-2, I printed the stuff.  My testimony would be the
same, and the handwritten stuff I haven't read it yet.
So if you want to ask me questions, I'll read it.
Otherwise, we'll just --

Q   No.  I'm not -- actually I'm not interested at
all in the handwritten.

A   Okay.

MR. GILL:  Ray, are you aware of whose handwriting
that is?

MR. AVER:  I wouldn't know for sure, but my educated
speculation would be it's Dr. Baharvar's handwriting.

MR. GILL:  Is that who gave you this document?

MR. AVER:  Correct.

MR. GILL:  Thank you.

Q   BY MR. AVER:  Beginning in or around August of
2008, were you involved in efforts to sell the Walnut
Street/134 Freeway assemblage?

A  That's a loaded question. The word "involved" is very broad. I will answer your question to the best of my ability. I told David Golkar to forget about his grandiose plan of building the condos and the hotel with the picture or the rendering hanging on my wall. It was an ambitious project.

I tried to get loans for him which I couldn't.


58


CENTURY COURT REPORTERS 1-800-555-0014


And at least at that time I for one believed that if I can't get a loan, nobody can. Maybe a little bit of arrogance involved there, but hotel market was going -- taking a nose-dive.

David was too optimistic and didn't want to believe it. So finally he agreed to sell it. I instructed him please sell it even to apartment developers because it could work for apartment. And I also suggested if he had to take a loss, he should do that.

The next I knew was that he was communicating with my office --

MR. GILL: I'm sorry. This may be in the question. But when was all this happening?

THE WITNESS: Just about the summer of '08. End

of -- he said August 08-ish.

MR. GILL: Thank you.

THE WITNESS: And I know through third parties -- and I don't think -- and my office that he was put in touch with the note-holders on the property, the individual investors. They had one or more meetings.

He was telling us and them that this is going to close in a week, in a month. My investor is coming from San Diego.

I have no reason to believe that he was lying.

59

CENTURY COURT REPORTERS 1-800-555-0014

I think he was sincere and he believed that whoever the buyer was was there. And escrow was opened. I had nothing to do with any of that, the logistics end of this.

He was put in touch with our staff, Mr. Hamid Taba, for the accounting and handling of the logistics of the documents. And I believe -- and I'm not sure -- our in-house counsel, Mr. Nick -- well, strike that. He's not an in-house counselor. Nick Klein, who rented office -- Nicholas Klein -- in our space and handled a lot of our related transactional legal work -- may have been involved with making comments on the escrows or

trying to shore it up.

But it was basically Namco wanted to get paid and pay the investors. The investors -- or the creditors that I will call them in this case would have got paid through the closing of this escrow.

In a couple of occasions based on conversations that I had with Golkar and subsequently with Mr. Soleimani, and Mr. Homayounjam, I believed -- and this is during the fall of '08 -- that we were very close to a sale.

We also had a buyer. Verbally. Somebody we knew, and somebody we knew of all his capabilities and was involved with my brother in other projects who made

60

CENTURY COURT REPORTERS 1-800-555-0014

an offer to buy it. A very clean verbal offer.

I don't think it was even reduced in writing, but it could have been some sort of proposal from him, Mr. Ed Miller, who's an experienced developer. And I believe the price also was $23 million.

And Golkar said no. I'll bring somebody to buy it for that. And I also believed that he was going to be part of the deal with the new buyer -- David Golkar was going to be, on a going forward basis, which I didn't

mind as long as we could get most of our money in a diving market. My mind-set was just to cash this out as quickly as possible.

The word "involved" is also -- I encouraged him. I said don't put all your eggs in one basket. Deal with others. And if you come in and the buyer needs financing, we would prefer -- and I can convince my individual creditors to carry some paper, even, if the deal was clean and some new money came in.

So I hope that narrative answers a lot of your questions about the word "involved." That is the extent of my involvement.

MR. AVER: Saves a lot of time, that's for sure, and I appreciate it.

(Movants' Exhibit O (1-21) was marked for identification and is included herewith.)

61

MR. AVER: Exhibit O. I've marked to the transcript a document Exhibit O which is a multipage document, and I'll identify it as a purchase and sale agreement with escrow instructions. It appears to be dated December 5, 2008, between Tranmar Properties, LLC, and Kamran Group, LLC.

THE WITNESS: You're telling me that he was the buyer?

MR. AVER: Wait a second.

Off the record for a second.

(Break taken at 12:14 p.m.)

(Deposition resumed at 12:15 p.m.)

Q   BY MR. AVER: Do you recognize this document, Mr. Namvar?

A   I recognize only my signature.

Q   Okay.

A   And it's not to take any responsibility off of this I'll go on another narrative. This was --

Q   And when you say your signature, I'm looking at page 311 --

A   Yes.

Q   -- of Exhibit O --

A   Right.

Q   -- under the name "Tranmar Properties, LLC"?

A   Correct.

62

CENTURY COURT REPORTERS 1-800-555-0014

Q   All right.

A   So -- but I would not have read any of this document as it was also a common practice with me if Nick

Klein or Hamid Taba through another attorney told me what it is. Just I was interested in the terms.

Years ago I used to read every document, but not later on unless there was some reason for me to read something. Term sheets I read, but the final contracts I usually did not read. They put it in front of me, and I signed it.

Q   Well, let me just ask you this about this purchase and sale agreement. Was this part of the efforts of Kamran properties, David Golkar, Namco Capital Group, Ezri Namvar to get this project sold and to pay off the individuals who had lent money to Namco Capital Group and whose loans were collateralized with collateral notes?

A   Yeah. Basically, you know, we did everything -- every cooporation humanly possible on our end to sell this property and it wouldn't sell as individual. And it was obvious that the best price would be paid as an assemblage and get the secured creditors paid, the individual creditors -- the secured individual creditors paid.

Q   So at a point in time pursuant to these efforts

63

to sell the assemblage, the Kamran notes, Exhibits B, C,

D, and E and perhaps other notes, were forwarded to

Commerce Escrow, the escrow company that was handling the

prospective sale?

A    Yes.  Not by me, but my staff.

Q    Correct.

A    And "my," I mean Namco.  Not -- but by Namco's

staff.

Q    And can you tell me what was Tranmar Properties

and what was its connection with this attempt to sell the

assemblage?

A    There isn't -- we bought one of these pieces.

It was because Tranmar had an exchange to complete, 1031

exchange.

Q    So there were tax reasons for Tranmar getting

involved in this?

A    This is the technical question that I cannot

answer.

Q    All right.  And you were the manager of

Tranmar --

A    I was.

Q    -- Properties?

Who were the members of Tranmar?

A    I don't know.

Q    Okay.

64

CENTURY COURT REPORTERS 1-800-555-0014

A But they are related to my family, and the records are at Namco. Mr. Gill can -- I mean if that becomes a necessity, it's between you and them.

Q Okay. Going back to Exhibits F-2 through M-2, was Namco Capital responsible for recording these collateral assignments with the Los Angeles County Recorder's office?

It didn't leave it to the individual lenders, I guess is my question.

A You're talking about a common practice, or you're talking about in this case?

Q In these -- in the cases of these eight collateral assignments that we have discussed.

A I don't know. I believe we were responsible for recording it as it was a common practice, but there have been expressions that an individual investor was at -- would ask for themselves to handle the recording and would ask for their lawyer or -- or their lawyers to handle the recording.

Unless they asked us specifically for that, we would have done all the recordings and handling of the documents.

Q Okay.

Can we take a short break? I need to confer

with Mr. Marshall, and then we can -- I'm pretty close to

65

CENTURY COURT REPORTERS 1-800-555-0014

concluding.

A    Who's Marshall?  The young guy?

Q    Mr. Marshall, yes.

(Break taken at 12:21 p.m.)

(Deposition resumed at 12:41 p.m.)

MR. AVER:  Exhibit P.

(Movants' Exhibit P (1-4) was marked

for identification and is included herewith.)

Q    BY MR. AVER:  Now, Mr. Namvar, I'm holding in my

hand a four-page document which has been marked as

Exhibit P.

I'll describe it for the record as a Collateral

Assignment of Deed of Trust which was recorded in the --

it appears to be recorded in the Maricopa County,

Arizona, official records.

And I'd like to turn your attention to page 2 of

this document where it says "Ezri Namvar - President,"

under the signature block for Namco Capital Group.

Is that your signature?

A    It is my signature.

Q    And you believe that you signed this document on

or about March 18, 2008, as reflected in the jurat?

A   I don't know when I signed it. That's again --
the document itself is dated November.

Q   Right.

66

A   So best I can tell is that I signed it in November. When it was notarized, it could have been a later date. So --

Q   But this reflects -- this reflects a collateral assignment by Namco Capital Group to one of these individual lenders, not one of the group that we're involved with here but a person by the name of Roya Boucharian who made a loan to Namco Capital Group?

A   Yes.

    Why does this have to do with our case?

    MR. AVER:  off the record.

    (Discussion held off the record.)

    MR. AVER:  Why don't we go back on the record.

Q   Mr. Namvar, while we were going -- while we were off the record, we were talking about whether Namco Capital Group was involved in the making of eight or more real estate secured loans in 2007 and was it involved in the making of eight or more real estate loans in 2008.

and I believe that what you were willing to do is you were willing to stipulate that Namco Capital Group was involved in the making of at least eight or more real estate secured loans in 2007 and a similar number in 2008.

A   Well, it's not -- it's not necessarily making or arranging loans. Giving this collateral assignments to

67

people who wanted to be secured, is that making or is it a half bake, something that was already made before?  I mean --

Q   Fair enough.

A   I don't know technically what I -- and the only thing I know about the No. 8 is that it's a lucky number in Chinese.  But if there is something with the Department of Real Estate, I'm not aware of it right now.

Q   But it's your -- it's your recollection that Namco Capital Group made at least eight collateral assignments in 2007 and made at least eight collateral -- eight or more collateral assignments in 2008?

A   If you change the word from made to signed collateral assignments, I will go with that.

Q    Okay.

A    I signed probably more than eight collateral assignment in '08.

Q    All right. Fair enough.

A    I don't know the technical, you know, answer; but I would testify that I signed more than eight. Eight or more, at least, of collateral assignment in both '07 and '08.

Q    And was it Namco Capital Group's policy to provide the collateral assignment lenders with UCC1

68

CENTURY COURT REPORTERS 1-800-555-0014

financing statements?

A    No. Unless they asked for it. In the very few occasion, either the borrower or their attorneys would ask for UCC.

MR. AVER: I'll turn it over to Mr. Gill to ask whatever questions he has.

MR. GILL: I'll need just a second.

EXAMINATION

BY MR. GILL:

Q    Okay. Thank you for your patience Mr. Namvar. As you know, I'm Daniel Gill. I'm with Ezra Brutzkus

Gubner LLP, and we're the special counsel for Brad Sharp who's the trustee of the Namco Capital Group bankruptcy case.

I'd like to ask you a few questions on the subject we've been talking about. Again, I'll note that if you don't understand what I'm asking, please make sure that you don't guess at what I'm trying to say and just simply tell me you don't understand, and we'll clarify it as best as possible.

Earlier you testified -- no. Let's strike that.

Did Namco act as the servicing agent for all of its notes that were -- portions of which were assigned as collateral?

69

A   I believe my testimony was that for most of them. Over 90 percent, let's say, would be accurate.

Q   Do you have any idea how many of these notes there were --

A   No.

Q   -- in 2007 and 2008?

A   No.

Q   Who would service the notes for those that you did not service?

MR. AVER: Objection. Calls for speculation.

Q    BY MR. GILL: If you know.

A    Unless the investors or the lawyers asked to collect the payments themselves which was very rare and unusual, we would service them.  Namco would service them.

Q    Did you have servicing agreements with the individual lenders?

A    It wasn't a common practice to -- for us to have a servicing agreement.

Q    Does that mean no, you didn't have a written agreement?

A    Ten years ago?  Did we ever have any written servicing agreements with anybody?

Q    Let's start with that, yes.  Did you ever have any written servicing agreements with anybody for

70

CENTURY COURT REPORTERS 1-800-555-0014

servicing loans?

A    Yes.  Years ago we did.

Q    With -- in 2007 and 2008, did you have -- no. Let's strike that and start over.

For the loans, the individuals that we've discussed here today that are memorialized by Exhibits

F-1 through M-1, did you service all of those loans?

A   Yes.

Q   When I say "you," I mean Namco.

A   Yes, Namco did.

Q   Did you have a servicing agreement for any of those loans, a written servicing agrement?

A   Not every --

MR. AVER:  Objection.  Objection.  Are you talking about -- of an oral or a written agreement?

Q   BY MR. GILL:  Did you have a written servicing agreement for any of those loans?

A   Not a written agreement.  Not that I'm aware of.

Q   Did you have oral servicing agreements?

A   Yes.

Q   Referring now to the notes which were the collateral, those four promissory notes marked A (sic) through D, payable by Kamran to Namco, did you -- did Namco ever get any payments on any of those notes?

A   Indirectly I believe we did.

71

CENTURY COURT REPORTERS 1-800-555-0014

Q   What does that mean, "indirectly"?

A   Because David Golkar through various companies of his -- and you need to look at the account statement

for Pasadena that would come from Hamid Taba's offices

paid some payables.

Q    I'm sorry.  Whose offices was that?  That man --

A    Namco offices.

Q    The Hamid?

A    Taba.

Q    T-a- --

A    B-a.

Q    -- b-a.  Okay.

A    He paid moneys through either himself or entities controlled by him either toward purchase, toward tax payments, toward engineering fees which was all initially supposed -- was all supposed to be financed by Namco or our related entities, and those were applied as payments.

And I don't know how Hamid categorized them, but I know that David Golkar paid a lot of money out of his pocket when he was not supposed to.

And we had discussions about that.

Q    All right.  I want to make sure I understand what you're saying here.  Are you saying -- and I very well might have misinterpreted you.

72

But are you saying that Namco was supposed to pay as part of its loan proceeds certain vendors or other third parties?

A   Namco, the verbal agreement we had with Golkar was that we would finance a hundred percent of the Pasadena project. I believe we put an upper limit of 26 or 27 million. I don't remember. Maybe 30. I don't remember.

But we were supposed to do hundred percent financing, get interest rate. I believe it was the rate of 10 percent. After we get all of our moneys paid plus the 10 percent, the profits would be 50/50 at our choice.

Q   You're referring to an ultimate sale at the conclusion of the project?

A   Or building it and making the profit. Our money would come first, plus the 10 percent interest compounded at a certain basis and then -- which was very usual in my formats but -- and then the profits would be 50/50.

Q   In other words, you would split the back end?

A   Yes.

Q   All right. Well, that's not entirely what I was asking. My question is -- it's pretty simple, but you said it was complicated. So --

A   No. I said indirectly he paid.

Q   Wait. Let me finish. I did hear you say that

73

CENTURY COURT REPORTERS 1-800-555-0014

it was indirectly.

Okay. So still trying to explore your answer. The payments that Golkar made to third parties was booked as payments -- was booked as interest payments owed to Namco? Is that what you were saying?

A   It was booked as credit to Golkar, and I don't know how else it was booked unless you go through the Namco records and see how it was booked.

But between me and Golkar, it was in lieu of, and between me and Golkar, although the notes might say monthly payments, these properties, none of them, had any cash flow or any proceeds from them. If it did, we would have applied it to interest first.

Q   Did Golkar ever make any direct interest payments monthly?

A   He was not supposed to.

Q   Well, when I say -- okay. Strike that. Strike that.

When I said "Golkar," I used that name improperly.

A   His entities, I understand.

Q   His entities.

To me if you look -- let's take a look at the promissory note. Let's look at Exhibit A which is not

one of the promissory notes. Sorry.

74

CENTURY COURT REPORTERS 1-800-555-0014

Look at Exhibit C. Do you have that there in front of you?

A   No. I don't need to look at it.

Q   Okay. You don't need to see it.

This note does provide that --

A   For monthly payment.

Q   Let me finish, please.

Okay. I understand that you see where I'm going.

A   Sorry. Go ahead.

Q   I just need to make the record.

A   Yeah. My fault.

Q   The note provides that monthly payments are due monthly; correct?

A   Correct.

Q   Were monthly payments ever made on any of these notes?

MR. AVER: Objection. That's been asked and answered. Mr. Namvar answered it.

Q   BY MR. GILL: Were any -- you could still answer the question. Were they ever made directly -- was a

check ever written to you, meaning Namco, on account of

the monthly interest?

A   I don't know.  You need to look at the Namco

records which is at your client's possession.


75


CENTURY COURT REPORTERS 1-800-555-0014


Q   So are you saying that it's possible that they did?

A   It's possible that they did.  And it's most probable that they didn't because this wasn't a practice with many, many loans in this category.

Q   Is that practice written in any of these notes?

A   I don't know.  The notes speak -- no.  These are our standard notes that we used for a long time.

Q   Okay.  Did you ever amend any of these promissory notes, Exhibits B through E?

A   No.  Not that I'm aware of.

Q   Did you ever give any of the individual lenders any kind of notice that Golkar hadn't made a monthly payment?

A   No.

Q   Not orally?

A   I didn't believe I had to.  No.

Q   Not in writing then either?

A   If they asked.  If they asked, we would answer the question.

Q   Okay.  Did you make annual accountings to the individual lenders on account of the loans that you were servicing?

A   Only in form of a 1099.

Q   When would you usually --

76

CENTURY COURT REPORTERS 1-800-555-0014

A   Or any time they asked for.

Q   Did you --

A   For various reasons, individual investors would come forward, and they needed a copy of the printout on their account statement.  Whether it was for their accountant or other reasons, we never withheld those.  They asked for it.  They got it.

Q   Where did the money come from that you used to pay your individual investors every month if -- if Golkar and his companies didn't make interest payments?

MR. AVER:  Assumes facts not in evidence.  An improper hypothetical.

Q   BY MR. GILL:  Well, earlier you testified that you paid your investors yourself; right?

A   Namco paid it every month.  They would write

them checks.

Q   Okay. Where did that money come from?

A   From Namco's general account.

Q   Do you recall how many bank accounts Namco had in 2007?

A   Namco Capital Group?

Q   Yeah.

A   No more than two or three. Two for sure. Maybe three. I don't know.

Q   Okay. Let's talk about the original promissory

77

CENTURY COURT REPORTERS 1-800-555-0014

notes, Exhibits B through E, some more. Earlier you testified that originally Namco kept those original notes.

A   Correct.

Q   Where?

A   At the Namco offices, 12121 Wilshire, Suite 1400.

Q   Was there a special place in the office?

a   Yes.

Q   And what was that?

A   File cabinets outside of Hamid Taba's room.

Q   Where those file cabinets locked?

A   For most -- most of the times, yes.

Q   When --

A   Let's put it this way. They were supposed to be locked.

Q   Okay.

A   My instructions. They lock everything before they leave.

Q   Okay. And when did -- at some point did Tranmar have possession of those notes?

A   What? Tranmar was the issuer of the note.

Q   No. I'm referring to the notes --

MR. AVER: Made by Kamran.

Q   BY MR. GILL: -- made by --

78

CENTURY COURT REPORTERS 1-800-555-0014

Thank you.

-- made by -- is it Kamran --

(Telephonic interruption.)

MR. GILL: Off the record.

(Break taken at 12:59 p.m.)

(Deposition resumed at 12:59 p.m.)

THE WITNESS: Repeat the question, please.

Q   BY MR. GILL: Yes.

I'm referring to the notes payable by Kamran to

Namco. You said if -- you said initially Namco had possession of these, and I believe you testified · or maybe I'm asking at some point did Tranmar get possession of those?

A   Why would Tranmar have possession?

Q   Well, do you remember who put these notes into the escrow?

A   Yes. Hamid Taba sent them to escrow.

Q   On behalf of Tranmar or on behalf of Namco?

A   Let's go off the record, please.

Q   Well --

A   Let's go off the record, please. I'll answer your question.

Q   Well, if I want to get --

Off the record for a second.

(Break taken at 1:00 p.m.)

79

(Deposition resumed at 1:01 p.m.)

MR. AVER: Would you repeat the question?

(The question was read as follows:

"QUESTION: Well, do you remember who put these notes into the escrow?

"ANSWER: Yes. Hamid Taba sent them to

escrow.

"QUESTION: On behalf of Tranmar or on behalf of Namco?")

THE WITNESS: On behalf of Namco.

Q   BY MR. GILL: Is it your belief and understanding then that Namco had possession of these notes until they went into the escrow?

A   Yes.

Q   Not a trick question.

Let's turn to Exhibit, if I can find it, L-1 and 2.

Do you have it?

A   I have it.

Q   This is one of those -- this is a promissory note dated October 10 followed by a collateral assignment dated December 19, 2007. So October 10, 2006, December --

A   About 14 months later.

Q   Right.

80

Do you happen to know -- earlier you testified that the later collateral assignment could be for one of two reasons. It could be because earlier collateral

expired, or it could be because the debtor came to you and demanded collateral.

In this case --

MR. AVER: Well, that misstates the testimony. It was the collateral lender, not the debtor.

MR. GILL: That's correct. Thank you. Thank you for the correction. I made an inaccurate record.

Q   That -- do you recall in the case of Mahmoud Fatorechi and Soussan Hashemi as the trustees of their family trust why it is that 14 months later they got the collateral assignment?

A   I don't remember, and I don't have any knowledge which one of those two categories that you explain this falls under. But Namco's offices through Hamid Taba kept great records. And let's change the word "great" to good records.

Q   If you'll look at Exhibit M-1 and M-2, that's a promissory note payable to Sarafian dated March 1, 2006, and M-2 is the collateral assignment of the deed of trust which is dated October 29, 2007.

Do you remember in this instance why the collateral came -- the collateral assignment came so much

81

later?

A    Same answer as before.

Q    You don't remember?

A    I don't remember.

Q    Okay.  Mr. Aver earlier asked you about why Tranmar was a party to the purchase and sale agreement which was marked as Exhibit --

Help me, somebody.

MR. AVER:  O.

MR. GILL:  O.

THE WITNESS:  I believe it was O; right?

MR. AVER:  (Mr. Aver nods head.)

Q    BY MR. GILL:  And I believe -- again, without intending to misstate your testimony that you said it had something to do with Tranmar needing to conclude a 1031 exchange; is that correct?

A    For a portion of this property, not for all of it.  The portion that Tranmar owns.  It's just not the whole block, but a separate portion, yes.

Q    I'm sorry that I'm so disorganized.

A    Are you looking for Exhibit O?

Q    I am.  Yeah.

A    Here.  I'll give it to you.  Here it is.

Q    Thank you.

A    Make sure you give it back to her.

82

MR. GILL: (To Mr. Aver)  Thank you.

Q  So were there other sellers in the -- for the sale of the property that was -- that resulted in the opening of the escrow with Commerce Escrow?  Other sellers besides Tranmar?

I'm sorry.  Let me take that from the top.

Was Tranmar the only seller in -- of property that went into the -- one more time.

MR. AVER: Can we go off the record for a second?

MR. GILL: Thank you.

MR. AVER: I think I can help explain.

MR. GILL: All right.

(Discussion held off the record at 1:08 p.m.)

(Deposition resumed at 1:10 p.m.)

Q  BY MR. GILL: We've heard of an escrow opened with a company called Commerce Escrow.  Do you know what that -- what sale that escrow was for?

A  I think the main escrow -- there may be more than one escrow opened.  I believe the main escrow was to sell the whole assemblage to a different entity that Kamran Group and Golkar on one hand collectively and a new buyer on the other hand would have been part of each other, could have been separate.  I was never aware of the arrangements.

But I heard more than once that there were

83

CENTURY COURT REPORTERS 1-800-555-0014

arrangements being made to sell the whole assemblage,
we're calling the entire block, to this other entity.

Q   Do we know the name of the other entity?

A   Since I instructed Mr. Aver to tell his clients
not to talk to me, I can't ask.  They know it.

Q   The question is do you know?

A   No.  All I know is a shadow person.  I never met
him.  I never -- a guy from San Diego.  Another investor
from New York.  I never met him, but I think the
creditors -- or these people may have met with him.  I
don't know.

Q   And --

A   I never met the guy.

Q   I see.

And Mr. Golkar may, so far as you know, have
been intending to be a part of the new company making
this acquisition?

A   Yeah.  And I don't think he denied that fact.

Q   Okay.

A   I don't know what the exact arrangement was.

Q   That's okay.  I don't need to get into it.

I'm almost done. I appreciate your bearing with me while I go through the notes.

A I appreciate it --

MR. AVER: Take your time.

84

CENTURY COURT REPORTERS 1-800-555-0014

THE WITNESS: -- being done. That's good news.

Q BY MR. GILL: Are you aware if Namco ever had any loan servicing agreements with any other parties other than Mr. Golkar or any of the parties associated with this transaction or the assemblage?

A Yes.

MR. AVER: Are you referring to oral or written servicing agreements?

MR. GILL: Good question.

Q Any.

A We had written a few times and we had oral. All --

Q Can you remember the --

MR. AVER: Let him finish. You've got to let him finish his answer.

THE WITNESS: We had oral almost with everything else.

We, I believe, to help you out with your

question, stopped the practice of doing written servicing agreements at least -- and I'm saying at least five years prior to the bankruptcy filing.

Q   BY MR. GILL:  Why is that?

A   Good question.  Really a good question.

Q   Thank you.

A   Because we were writing the checks to these

85

investors anyways, and on a collateral basis rain or shine, Namco was taking responsibility for these.

So we didn't feel it was necessary to have servicing agreement, and we even closed our trust account because the servicing agreement referred to a trust account.  We take the payment.  We put it in the trust account.

So when we closed the trust account, that's when we stopped that practice.  It may not be a perfect answer, but it's the best I can do.

Q   The best you can do is all I can ask for.

A   I appreciate it.

Q   Do you recall whether you had trust accounts for every servicing agreement, or was it one master trust account?

A   No, it was one master.

Q   And when you were -- and when you were servicing loans under those servicing agreements, did you issue annual statements on the collections and disbursements to the collateral assignees?

MR. AVER:  Has that not been asked and answered?

THE WITNESS:  No.

MR. GILL:  No.  I'm referring to this -- well, we asked about it in this context.  I'm talking about where he had the service agreements.

86

CENTURY COURT REPORTERS 1-800-555-0014

THE WITNESS:  He's right.  It's a different question.

Only when they asked for it.  But always in form of a 1099.

Q   BY MR. GILL:  Would you issue a 1099 if there was a -- strike that.

That's all I have.  Thank you very much.

MR. AVER:  Why don't we do a -- what I'd like to do --

Off the record for a second.

(Break taken at 1:17 p.m.)

(Deposition resumed at 1:17 p.m.)

MR. AVER:  We'll stipulate that the court reporter

will be relieved of her statutory duties upon the preparation and transmission of the transcript to Mr. Namvar.

Where would you like the transcript sent, Mr. Namvar?

THE WITNESS: To my house.

Better write it for you.

MR. AVER: Mr. Namvar -- and with a copy of the transcript and -- a copy of the cover letter to Mr. Namvar to my office.

Mr. Namvar will have 30 days, or can you do it sooner than that? How long do you need to review the transcript once you receive it?

87

CENTURY COURT REPORTERS 1-800-555-0014

THE WITNESS: 30 days would be nice.

MR. AVER: All right. Mr. Namvar will have 30 days to review the transcript and to make any changes he deems necessary.

If there are any changes that are required to the transcript, Mr. Namvar will make them and will provide those changes to my office, and I will notify Mr. Gill's office within 72 hours of that.

In the event that Mr. Namvar does not make any

changes and/or notify my office, then we may use an unsigned copy of the transcript in lieu of the original transcript.

MR. GILL: So stipulated.

THE WITNESS: So stipulated.

(The deposition concluded at 1:19 p.m.)

* * *

88

| In re: NAMCO CAPITAL GROUP, INC.<br><br>Debtor(s). | CHAPTER 11<br>CASE NUMBER: 2:08-bk-32333-BR<br>ADVERSARY PROC. NO.: 2:10-ap-01244-BR |
|---|---|

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 831 State Street, Santa Barbara, California 93101. A true and correct copy of the foregoing document described as **DECLARATION OF DUGAN P. KELLEY IN SUPPORT OF OPPOSITION TO BRADLEY D. SHARP, CHAPTER 11 TRUSTEE OF NAMCO CAPITAL GROUP, INC.'S MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE, PARTIAL SUMMARY ADJUDICATION, ON COMPLAINT** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On _____ I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

☐ Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):

On **February 1, 2012**, I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **February 1, 2012,** I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 2/1/12 | Matthew N. Mong | |
|---|---|---|
| Date | Type Name | Signature |

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

January 2009
09019.003 - 163624.1

*F 9013-3.1*

| | |
|---|---|
| In re: NAMCO CAPITAL GROUP, INC.<br><br>Debtor(s). | CHAPTER 11<br>CASE NUMBER: 2:08-bk-32333-BR<br>ADVERSARY PROC. NO.: 2:10-ap-01244-BR |

## II.  SERVED BY U.S. MAIL

**United States Trustee (LA)**
725 S Figueroa St # 2600
Los Angeles, CA 90017-5413

**David M. Poitras**
**Dan P. Sedor**
**Jeffer Mangels Butler & Mitchell LLP**
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067

**Sawtelle Properties LLC**
**Weissmann Wolff, et al**
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

**Soussan Hashemi**
**Weissmann Wolff, et al**
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

**John M. Rygh**
915 Wilshire Blvd, Suite 2100
Los Angeles, CA 90017

**Ashland Properties, LLC**
**Weissmann Wolff, et al**
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

**Mahmoud Fatorechi**
**Weissmann Wolff, et al**
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

**Morteza Homayounjam**
**Weissmann Wolff, et al**
9665 Wilshire Blvd, 9th Floor
Beverly Hills, CA 90212

**Saul Reiss**
**Law Offices of Saul Reiss, P.C.**
2800 28th St Ste 328
Santa Monica, CA 90405

**Susan I. Montgomery**
**Law Offices of Susan I. Montgomery**
1925 Century Park East, Suite 2000
Los Angeles, CA 90067

## III.  SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL:

### SERVED BY E-MAIL:

- **David M. Poitras**          dpoitras@jmbm.com
- **Robyn B. Sokol**           rsokol@ebg-law.com; ecf@ebg-law.com
- **Joseph A. Eisenberg**      jeisenberg@jmbm.com
- **Gregory M. Salvato**       gsalvato@salvatolawoffices.com
- **Saul Reiss**               saulreiss@verizon.net
- **Susan I. Montgomery**      susan@simontgomerylaw.com
- **Daniel Issak**             info@lightingzilla.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*
09019.003 - 163624.1

**_F 9013-3.1_**

| In re: NAMCO CAPITAL GROUP, INC. | CHAPTER 11 |
|---|---|
| | CASE NUMBER: 2:08-bk-32333-BR |
| Debtor(s). | ADVERSARY PROC. NO.: 2:10-ap-01244-BR |

**F 9013-3.1**

### SERVED BY PERSONAL DELIVERY:

**Honorable Barry Russell**
**United States Bankruptcy Court – Central District of California**
**Edward R. Roybal Federal Building and Courthouse**
**255 E. Temple Street, Suite 1660**
**Los Angeles, CA 90012**

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*January 2009*
09019.003 - 163624.1

**F 9013-3.1**